# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| Q'MAX AMERICA, INC., *et al*[1] | § | Case No. 20-60030-CML |
| | § | |
| Debtors. | § | (Jointly Administered) |

**AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

(Related to Dkt. No. _____)

Upon the motion ("**Motion**")[2] of Christopher R. Murray, the duly appointed chapter 7 trustee

("**Trustee**") of the chapter 7 estates of Anchor Drilling USA, LLC ("**Anchor Drilling**" or the "**NM**

**Borrower**") and Q'Max America Inc. ("**Q'Max America**" and together with Anchor Drilling, each a

"**Debtor**" and collectively, "**Debtors**") in the above-captioned cases ("**Chapter 7 Cases**"), pursuant

to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503,

506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* ("**Bankruptcy Code**"),

Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), and Rule

4001-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District

of Texas ("**Local Rules**"), for entry of interim and final orders, among other things:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Q'Max America Inc. (2319) and Anchor Drilling Fluids USA, LLC (5395).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the NM Note or the Motion, as applicable.

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF
PAGE | 1

a.      Authorizing the Trustee on behalf of Anchor Drilling ("**NM Borrower**") to obtain post-petition credit financing in an aggregate principal amount of up to $30,000,000 million] ("**NM Financing**") to be funded by the Prepetition ABL Secured Parties (in their capacity as lenders under the NM Facility, each a "**NM Lender**" and collectively, "**NM Lenders**")[3] under a credit facility ("**NM Facility**") subject to the terms, conditions, and limitations set forth herein and in the NM Documents (the loans thereunder, "**DIP Loans**"), which shall include (a) the refinancing of the outstanding Prepetition ABL Obligations into obligations under the NM Facility and (b)] funding of those certain expenditures set forth in the Budget;

b.      authorizing the Trustee, in connection with the NM Facility, to (a) execute and enter into the Senior Secured Super-Priority Post-Petition Line of Credit Promissory Note payable to the order of Encina Business Credit SPV, LLC in its capacity as a lender under the NM Facility ("**NM Lender**"), substantially in the form attached as **Exhibit A** to the proposed Interim Order (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**NM Note**" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and amendments executed and delivered in connection therewith, including the Budget and the Participation Agreement, "**NM Documents**") and (b) to perform all such other and further acts as may be required by the NM Lender or Encina Business Credit, LLC, in its capacity as agent for the NM Lender ("**NM Agent**" and together with the NM Lender, "**NM Secured Parties**"), in connection with the NM Documents;

c.      authorizing for the Trustee to execute and deliver the NM Note and the other NM Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

d.      granting to the NM Agent, for the benefit of the NM Secured Parties, valid, enforceable, non-avoidable and automatically and fully perfected liens and security interests, subject only to the (a) Prepetition Parent Facility Adequate Protection Liens, (b) Prepetition Parent Facility Liens and (c) other valid, enforceable and non-avoidable liens that are (i) in existence on the Petition Date, (ii) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (iii) senior in priority to the liens granted the Prepetition ABL Secured Parties under and in connection with the ABL Credit Agreement in accordance with applicable law (such liens, "**Permitted Prior Liens**"), to secure the NM Obligations, which liens and security interests shall have the rankings and priorities set forth herein;

---

[3]      Q Drilling Holdco LLC, an affiliate of certain stockholders of the Debtors and sponsor of the proposed purchaser of certain of Anchor Drilling's assets shall acquire a participation in the NM Facility in the amount of $3,500,000 pursuant to a Participation Agreement, to be dated on or about the date of the NM Note, by and between Encina Business Credit SPV, LLC and Q Drilling Holdco LLC ("**Participation Agreement**") upon entry of this Interim Order and the filing of the Sale Motion.

e.      granting superpriority administrative claims to the NM Secured Parties payable from, and having recourse to, all prepetition and post-petition property of the NM Borrower's estates and all proceeds thereof (other than Avoidance Actions, but, subject to entry of the Final Order), subject to Prepetition Parent Facility Credit Agreement Adequate Protection Claims;

f.      authorizing the NM Borrower (A) upon entry of this Interim Order, to incur on the date of execution of the NM Note ("**Closing Date**"), NM Loans in an aggregate principal amount of up to $10 million ("**Initial NM Loans**") (the incurrence of such loans upon entry of this Interim Order, "**Interim Financing**") and (B) upon entry of the final order ("**Final Order**"), to incur NM Loans in the maximum aggregate principal amount of $30 million, in each case subject to the terms and conditions set forth in the NM Documents, this Interim Order and the Final Order;

g.      authorizing the Debtors' use of the proceeds of the NM Facility pursuant to the NM Note and the other NM Documents, including the Budget (as defined in the NM Note);

h.      authorizing the Debtors to continue to use the Cash Collateral (subject to the Budget) and all other Prepetition Collateral, and the granting of Adequate Protection to (a) the Prepetition Parent Facility Secured Parties and (b) the Prepetition ABL Secured Parties, in each case, with respect to, inter alia, such use of their Cash Collateral to the extent of diminution in the value of the Prepetition Collateral (including Cash Collateral);

i.      modifying the automatic stay as set forth herein and the NM Documents, to the extent necessary, to implement and effectuate the foregoing and the other terms and provisions of the NM Documents, the Interim Order and Final Order;

j.      (i) subject to entry of the Final Order, waiving any right to surcharge against the NM Collateral, including pursuant to section 506(c) of the Bankruptcy Code or otherwise, (ii) providing that the Prepetition ABL Secured Parties are not subject to the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code and (iii) providing that the Prepetition ABL Secured Parties are not subject to the equitable doctrine of "marshaling," or any other similar doctrine with respect to the NM Collateral;

k.      scheduling the Final Hearing to be held within 30 days after the Petition Date, to consider entry of the Final Order approving the NM Facility and use of Cash Collateral, as set forth in the Motion and the NM Documents;

l.      granting related relief; and

the Court having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. § 1334;

and the Court having authority to hear the matters raised in the Motion pursuant to 28 U.S.C. § 157;

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and consideration

of the Motion and the requested relief being a core proceeding that the Court can determine pursuant

to 28 U.S.C. § 157(b)(2); and due and proper notice of the Motion and opportunity for a hearing on the Motion having been given to the parties listed therein, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion; and the Court having held an interim hearing on the Motion ("**Interim Hearing**"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing establish just cause for the relief granted herein; and the Court having found that good and sufficient cause exists for the relief requested in the Motion; and the Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their chapter 7 estates; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

THE COURT HEREBY FINDS AND CONCLUDES as follows:[4]

A.     On May 24, 2020 ("**Petition Date**"), both Debtors filed voluntary petitions for relief under chapter 7 of the Bankruptcy Code commencing the Chapter 7 Cases.

B.     On or about May 24, 2020, the United States Trustee appointed the Trustee as the duly qualified trustee over the Debtors' chapter 7 estates.

C.     This Court has jurisdiction over the Chapter 7 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. The Motion presents a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue of the Chapter 7 Cases and related proceedings is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in the Motion are §§ 105, 361, 364, 704 and 721 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-1.

---

[4]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND  (VII) GRANTING RELATED RELIEF     PAGE | 4

D.      The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and under the circumstances, no other or further notice of the Motion or the entry of this Interim Order shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

E.      The Debtors are party to that certain Credit Agreement, dated as of the September 6, 2019 (as amended, supplemented or modified, "**Prepetition ABL Credit Agreement**") by and among the Debtors, Encina Business Credit, LLC as the administrative agent and collateral agent (in such capacity, "**Prepetition ABL Agent**") and the various lenders party thereto from time to time ("**Prepetition ABL Credit Agreement Lenders**" and, together with the Prepetition ABL Agent, "**Prepetition ABL Secured Parties**"), pursuant to which the Prepetition ABL Credit Agreement Lenders provided revolving credit loans in an amount not to exceed $65,000,000.00 and other financial accommodations to Anchor Drilling ("**Prepetition ABL Credit Facility**").

F.      Anchor Drilling secured its obligations under the Prepetition ABL Credit Agreement by granting the Prepetition ABL Agent, for the benefit of the Prepetition ABL Credit Agreement Lenders, first priority liens ("**Prepetition ABL Liens**") on substantially all of its assets ("**Prepetition ABL Collateral**").

G.      As of the Petition Date, the amount of the obligations owing under the Prepetition ABL Credit Agreement includes (i) unpaid principal of $19,710,331.26, (ii) accrued and unpaid interest in the amount of $108,328.21 as of Petition Date, and (iii) attorneys' fees, consultants' fees and other fees, expenses, advances, and costs incurred in connection with the Prepetition Credit Agreement (collectively, "**Prepetition ABL Obligations**").

H.      The Debtors are also party to that certain Credit Agreement, dated as of January 30, 2015 (as amended, supplemented or modified, "**Prepetition Parent Facility Credit Agreement**")

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF
PAGE | 5

by and among borrowers party thereto ("**Prepetition Parent Facility Borrowers**"), HSBC Bank Canada, as collateral agent (in such capacity, "**Prepetition Parent Facility Agent**") and the various lenders party thereto from time to time ("**Prepetition Parent Facility Lenders**" and, together with the Prepetition Parent Facility Agent, "**Prepetition Parent Facility Secured Parties**"), pursuant to which the Prepetition Parent Facility Lenders provided revolving credit loan in an amount not to exceed $145,000,000 and other financial accommodations to the Prepetition Parent Facility Borrowers thereunder (collectively, "**Prepetition Parent Facility Obligations**").

I.      The Prepetition Parent Facility Obligations are secured by, among other things, liens ("**Prepetition Parent Facility Liens**") on all or substantially all of the Debtors' assets ("**Prepetition Parent Facility Collateral**"), which certain of the liens were subordinated to the liens of the Prepetition ABL Secured Parties pursuant to that certain Intercreditor Agreement, dated as of September 6, 2019 ("**Prepetition Intercreditor Agreement**") (the Prepetition ABL Collateral and the Prepetition Parent Facility Collateral are collectively referred to herein as the "**Prepetition Collateral**"). Pursuant to the Prepetition Intercreditor Agreement, the Prepetition ABL Agent's lien on certain of the Prepetition ABL Collateral is subject to first priority lien in favor of the Prepetition Parent Facility Agent on Anchor Drilling's real property, equipment, certain inventory and specific intellectual property.

J.      The Prepetition Intercreditor Agreement constitutes a "subordination agreement" under section 510 of the Bankruptcy Code. The NM Financing does not, in any way affect, abridge or impair the rights and claims preserved in favor of the Prepetition Parent Facility Agent and the Prepetition Parent Facility Secured Parties obtained prior to the Petition Date or under the Prepetition Intercreditor Agreement. Except with respect to inventory purchased with proceeds of the NM Facility or Cash Collateral pursuant to the Order to Operate, the NM Facility and the liens granted to

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF
PAGE | 6

the NM Agent for the benefit of the NM Lenders thereunder are in accordance with and consistent with the Prepetition Intercreditor Agreement in all respects.

K.  *Findings Regarding the NM Facility and Use of Cash Collateral.*

(i)      Good and sufficient cause has been shown for the entry of this Interim Order.

(ii)     The NM Borrower has an immediate and critical need to obtain the NM Financing and to continue to use the "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), in each case on an interim basis, in order to permit, among other things, the orderly continuation of the operation of its businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to administer these Chapter 7 Cases, and to satisfy other working capital and operational needs. The access of the NM Borrower to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness under the NM Note and other financial accommodations provided under the NM Facility are necessary and vital to the preservation and maintenance of the going concern value of the NM Borrower and to a successful sale process.

(iii)    The Trustee is unable to obtain financing on more favorable terms from sources other than the NM Lender and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Trustee is also unable to obtain secured credit allowable under section 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code without granting to the NM Secured Parties the NM Liens and the NM Superpriority Claims and granting Adequate Protection, in each case subject to (a) Prepetition Parent Facility Adequate Protection Claims and Prepetition Parent Facility Adequate Protection Liens, (c) Prepetition

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF                                                    PAGE | 7

Parent Facility Credit Agreement Claims and Prepetition Parent Facility Credit Agreement Liens, subject to the terms and conditions set forth in this Interim Order, the Prepetition Intercreditor Agreement and in the NM Documents.

(iv)    Based on the Motion, and the record presented to the Court at the Interim Hearing, the terms of the NM Financing and the terms on which the NM Loan Parties may continue to use the Cash Collateral pursuant to this Interim Order and the NM Documents are fair and reasonable, reflect the Trustee's exercise of prudent business judgment consistent with his fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)    Absent order of the Court and the provision of adequate protection, consent of the Prepetition ABL Secured Parties is required for the NM Borrower's use of Cash Collateral. The Prepetition ABL Secured Parties have consented to the NM Borrower's use of Cash Collateral, and the NM Borrower's entry into the NM Documents in accordance with and subject to the terms and conditions in this Interim Order, the Prepetition Intercreditor Agreement, and the NM Documents.

(vi)    The NM Financing and the use of the Cash Collateral have been negotiated in good faith and at arms' length among the Trustee and the NM Secured Parties, and all of the NM Borrower's obligations and indebtedness arising under, in respect of, or in connection with, the NM Financing and the NM Documents, including all Obligations (as defined in the NM Note), in each case owing to the NM Secured Parties (collectively, "**NM Obligations**"), shall be deemed to have been extended by the NM Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the NM Secured Parties (and

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF                                                                        PAGE | 8

the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(vii)    The Prepetition ABL Secured Parties have acted in good faith regarding the NM Financing and the NM Borrower's continued use of the Cash Collateral to fund the administration of the Debtors' estates and continued operation of their businesses (including the granting of Adequate Protection), in accordance with the terms hereof, and the NM Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) and 364(e), as may be applicable, of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)   The Prepetition Parent Facility Secured Parties and the Prepetition ABL Secured Parties (collectively, "**Prepetition Secured Parties**") are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code. Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Cash Collateral are fair and reasonable, reflect the Trustee's prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of the Cash Collateral; provided that nothing in this Interim Order or the other NM Documents shall (a) be construed as the affirmative consent by any of the Prepetition ABL Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Cash Collateral (whether senior or junior) other than on the terms set forth in this

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF
PAGE | 9

Interim Order, or (c) prejudice, limit, or otherwise impair the rights of any of the Prepetition ABL Secured Parties to seek new, different, or additional adequate protection for any diminution in value of their interests in the Cash Collateral (or other Prepetition ABL Collateral) from and after the Petition Date and the rights of the Prepetition ABL Secured Parties or any other party in interest to object to such relief are hereby preserved.

(ix)    The Trustee has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules. Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the NM Financing and the use of the Cash Collateral in accordance with this Interim Order and the NM Documents are, therefore, in the best interests of the Debtors' estates and consistent with the Trustee's exercise of his fiduciary duties.

(x)    The assumption of the NM Obligations or the payment of the NM Obligations in full in cash at the closing of any sale of the Prepetition ABL Collateral is a material condition to the NM Financing being provided by the NM Agent and the NM Lender.

L.    *Permitted Prior Liens; Continuation of Prepetition Liens.*    Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including the Debtors, the NM Agent, the NM Lender, the Prepetition Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the NM Liens. The Prepetition Liens, and the NM Liens that prime the Prepetition ABL's liens,

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF                                                      PAGE | 10

are continuing liens and the NM Collateral is and will continue to be encumbered by such liens in light of the integrated nature of the NM Facility, the NM Documents, and the Prepetition ABL Credit Facility.

M.     *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). Accordingly,

**IT IS HEREBY ORDERED THAT:**

1.     *Interim Relief Approved*. The interim relief requested in the Motion is granted to the extent provided herein, and the use of Cash Collateral on an interim basis and the Interim Financing is authorized and approved, in each case both strictly in accordance with the NM Facility, and the NM Documents, including, without limitation, the NM Note annexed hereto as **Exhibit A** and the Budget annexed hereto as **Exhibit B**. The Budget contemplates the following administrative expenses to be incurred by the estate: (1) $250,000 in legal expenses; (2) $400,000 in financial advisor expenses; (3) $660,000 in Trustee fees; and (4) $200,000 in unencumbered cash.  On or before the Closing Date, the NM Lenders shall deposit the sum of $1,510,000 in the Trustee's bank account. These funds shall be free and clear of any lien, claim or encumbrance to be used by the Trustee in his discretion as authorized by the Bankruptcy Code.  Any objections to the Motion with respect to the entry of the Interim Order that have not been previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.     *Approval of Documents*. The NM Facility is hereby approved subject to the terms of the NM Documents and this Interim Order and the Final Order. The failure to reference or discuss any particular provision of the NM Facility and NM Documents shall not affect the validity or enforceability of any such provision.

3.     *Authorization to Execute and Deliver Documents*. The Trustee is hereby authorized and directed to (i) execute and deliver all documents that the NM Agent and the Trustee deem necessary

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND  (VII) GRANTING RELATED RELIEF                                                 PAGE | 11

to implement the transactions contemplated by the NM Facility, and (ii) perform the obligations under, limit his expenditures, and comply with all of the terms and provisions of the NM Facility, the NM Documents, the Budget, and this Interim Order. No obligation, payment, transfer or grant of security under the NM Facility, the NM Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. The Trustee is authorized and directed to pay all principal and interest that may be required or necessary for the Trustee to perform all of their obligations under this Interim Order, the NM Facility, and the NM Documents without any further order or approval of the Court.

4.      *Authorization to Borrow; the Budget*. Good and sufficient cause has been shown for the entry of this Interim Order. The Trustee on behalf of the NM Borrower is hereby authorized to incur the NM Facility and close the NM Facility solely in accordance with and pursuant to the terms and provisions of the NM Documents, the Budget, and this Interim Order.

5.      *Authorization for Use of Cash Collateral*.  Pursuant to the terms and conditions of this Interim Order, the NM Facility, and in accordance with and as may be limited by the Budget (subject to any variances thereto permitted under the terms and conditions of the NM Facility), the Trustee on behalf of the NM Borrower is authorized to use the advances under the NM Facility to pay administrative expenses due and accruing for the period commencing on the Petition Date and use Cash Collateral in accordance herewith through June 23, 2020 (the "Interim Period").

6.      *Interim Roll-Up*.  During the Interim Period, all cash, collections, and proceeds of the NM Collateral, shall be immediately paid and applied in the following order: first, to the Prepetition ABL Agent for application in partial reduction of the Prepetition ABL Obligations until paid in full;

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND  (VII) GRANTING RELATED RELIEF                                                    PAGE | 12

and <u>second</u>, to the NM Agent for application in reduction of the obligations under the NM Facility until paid in full.

7.      *Final Roll-Up*.  Solely upon entry of the Final Order, the Trustee shall use the proceeds of the next advance under the NM Facility to satisfy all remaining outstanding Prepetition ABL Obligations in full in accordance with the terms of the Prepetition ABL Credit Facility ("**Final Roll-Up**").  In the event of a successful Challenge Proceeding (defined below), the effectuation of the Final Roll-Up will be without prejudice to the rights of the Court and/or any third party, including, without limitation, the Trustee, to seek an appropriate remedy from the Court (including, without limitation, to unwind or partially unwind, after notice and hearing, the post-petition protection provided to the Prepetition ABL Secured Parties or the pay down of the Prepetition ABL Obligations, whichever is applicable) upon appropriate notice to the Prepetition ABL Agent, the NM Agent, the NM Lenders and the other Prepetition ABL Secured Parties.

8.      *NM Obligations*.   Upon execution and delivery of the NM Documents, the NM Documents shall constitute valid, binding and non-avoidable obligations of the NM Borrower, enforceable against the NM Borrower party thereto in accordance with the terms of the NM Documents and this Interim Order as of the date of the entry of this Interim Order. No obligation, payment, transfer or grant of security to the NM Secured Parties under the NM Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d), 544, 548, 549 or 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, claim, or counterclaim.

9.      *Amendments.* The NM Agent and the Trustee may amend, modify, supplement, or waive any provision of the NM Facility if such amendment, modification, supplement, or waiver is not

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND  (VII) GRANTING RELATED RELIEF                                                          PAGE | 13

material (in the good faith judgment of the NM Agent and the Trustee), without any need to apply to, or receive further approval from, the Court subject. Any material amendment, modification, supplement, or waiver shall be in writing, signed by the parties and approved by the Court on appropriate notice.   Notwithstanding the foregoing, the NM Agent may not amend, modify, supplement, or waive any provisions of the NM Facility that is inconsistent with the terms of the Participation Agreement.

10.     *NM Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the NM Obligations shall constitute allowed superpriority administrative expense claims against the NM Borrower (without the need to file any proof of claim) with priority over all other administrative claims against the NM Borrower, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses or other claims arising under section 105, 326, 328, 330, 331, 365, 503(b), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Prepetition ABL Adequate Protection Claims, but not the Prepetition Parent Facility Adequate Protection Claims on account of Parent Facility Priority Collateral (as defined in the Prepetition Intercreditor Agreement)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims ("**NM Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which NM Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the NM Borrower and all proceeds thereof (excluding the NM Borrower's claims and causes of action under sections 502(d), 506(c), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code and under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and similar

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND  (VII) GRANTING RELATED RELIEF                                                     PAGE | 14

statutes or common law, and any commercial tort claims (collectively, "**Avoidance Actions**"),[5] which, for the avoidance of doubt, excludes NM Borrower's claims and causes of action under section 549 of the Bankruptcy Code or similar state or other applicable law and the proceeds of each of the foregoing), but, subject to entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement, or otherwise; *provided* that notwithstanding anything to the contrary in this paragraph 10, the NM Obligations shall be junior and subordinated in all respects to Prepetition Parent Facility Adequate Claims solely related to the Parent Facility Priority Collateral (as defined in the Prepetition Intercreditor Agreement) and subject in all respect to the Prepetition Intercreditor Agreement.  The NM Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.  The NM Superpriority Claims shall be *pari passu* in right of payment with one another and senior to the Prepetition ABL Adequate Protection Claims.

11.     *Adequate Protection of Prepetition Parent Facility Secured Parties.*  The Prepetition Parent Facility Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Parent Facility Collateral, for the reasons provided for under the Bankruptcy Code, the Debtors' use, sale or lease of Cash Collateral and/or the imposition of the automatic stay. In consideration of the foregoing,

---

[5]     "**Avoidance Actions**" as defined herein and for all purposes relating to this transaction, is limited to all avoidance claims, causes of action, or rights of recovery under Chapter 5 of the Bankruptcy Code or similar state laws available to the Trustee, that may exist against any current  trade vendors of the Regional Business, but does not include any such causes of action against (i) vendors with no ongoing business with the Regional Business or (ii) the buyer or sellers of the Regional Business, the Prepetition ABL Secured Parties or the Prepetition Parent Facility Secured Parties or any of their affiliates. The term "Regional Business" shall have the definition assigned to it in Doc. No. 7 filed in the Chapter 7 Case of Q'Max America and further limited to the Debtors' business operations in the northeast of the continental United States.

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE  TRUSTEE  TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND  (VII) GRANTING RELATED RELIEF                                                                 PAGE | 15

the Prepetition Parent Facility Secured Parties are hereby granted the following (collectively, "**Prepetition Parent Facility Adequate Protection**"):

      (a)    <u>Adequate Protection Liens</u>. The Prepetition Parent Facility Agent (for itself and for the benefit of the Prepetition Parent Facility Lenders) is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements, or other agreements), a valid, perfected replacement security interest in and lien upon ("**Prepetition Parent Facility Adequate Protection Liens**") the NM Collateral, which Prepetition Parent Facility Adequate Protection Liens shall secure the Prepetition Parent Facility Adequate Protection Claims, if any, and shall be subject and subordinate only to the NM Liens, the Prepetition ABL Facility Adequate Protection Liens, pursuant to and to the extent provided in this Interim Order and the Prepetition Intercreditor Agreement, and the Permitted Prior Liens.

      (b)    <u>Adequate Protection Claims</u>. The Prepetition Parent Facility Agent, for the benefit of the Prepetition Parent Facility Lenders, is hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code, for and equal in amount to the aggregate diminution in the value of the Prepetition Parent Facility Secured Parties' prepetition security interests in the Prepetition Parent Facility Collateral from and after the Petition Date with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code ("**Prepetition Parent Facility Adequate Protection Claims**"), subject and subordinate to the NM Superpriority Claims and Prepetition ABL Adequate Protection Claims, which Prepetition Parent Facility Adequate Protection Claims shall have recourse to and be payable from all of the NM Collateral. The Prepetition Parent

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND  (VII) GRANTING RELATED RELIEF
PAGE | 16

Facility Adequate Protection Claims shall be subject in all respects to the priorities set forth in the Prepetition Intercreditor Agreement.

12.     *Adequate Protection of Prepetition ABL Secured Parties*. The Prepetition ABL Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition ABL Collateral, for the reasons provided for under the Bankruptcy Code, including the provisions of this Interim Order granting priming liens on the Prepetition ABL Collateral, the Debtors' use, sale or lease of Cash Collateral, the imposition of the automatic stay. In consideration of the foregoing, the Prepetition ABL Secured Parties are hereby granted the following (collectively, "**Prepetition ABL Adequate Protection**" and together with the Prepetition Parent Facility Adequate Protection, "**Adequate Protection**"):

(a)     <u>Adequate Protection Liens</u>.  The Prepetition ABL Agent is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements, or other agreements), a valid, perfected replacement security interest in and lien upon (the "**Prepetition ABL Adequate Protection Liens**" and together with the Prepetition Parent Facility Adequate Protection Liens, "**Adequate Protection Liens**") the NM Collateral, which Prepetition ABL Adequate Protection Liens shall secure the Prepetition ABL Adequate Protection Claims, if any, and shall be subject and subordinate only to the NM Liens and the Prepetition Parent Facility Adequate Protection Liens, pursuant to and to the extent provided in this Interim Order and the Prepetition Intercreditor Agreement, and the Permitted Prior Liens.

(b)     <u>Adequate Protection Claims</u>.  The Prepetition ABL Agent hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code, for and equal in amount to the aggregate diminution in the value of the

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF                                                   PAGE | 17

Prepetition ABL Secured Parties' prepetition security interests in the Prepetition ABL Collateral from and after the Petition Date with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition ABL Adequate Protection Claims**" and together with the Prepetition Parent Facility Adequate Protection Claims, "**Adequate Protection Claims**").  The Prepetition ABL Adequate Protection Claims shall be subject and subordinate to the NM Superpriority Claim, and the Prepetition ABL Adequate Protection Claims shall have recourse to, and be payable from, all of the NM Collateral. The Prepetition ABL Adequate Protection Claims shall be subject in all respects to the priorities set forth in the Prepetition Intercreditor Agreement.

13.    *Reservation of Rights of Prepetition Secured Parties*. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; provided that any of the Prepetition Secured Parties may request further or different adequate protection at any time.

14.    *Collateral Security*. Subject to the exceptions contained in this Interim Order, the NM Agent, for the benefit of the NM Lenders, is hereby granted pursuant to section 364(c)(1), (2), (3) and (d) of the Bankruptcy Code, valid and perfected liens on, and security interests in, all of the NM Collateral, (i) on a first priority post-petition senior priming basis on all present and after acquired ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement) of the NM Borrower, wherever located, but excluding any claims or causes of action under chapter 5 or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law; (ii) in compliance with the Prepetition Intercreditor Agreement, on a second priority post-petition basis on all present and after acquired Parent Facility Priority Collateral (as defined in the

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF                                                                                              PAGE | 18

Prepetition Intercreditor Agreement) other than inventory purchased with proceeds of Cash Collateral of the NM Facility; (iii) on a super-priority administrative expense status pursuant to Section 364(c)(1); (iv) with liens on property of the NM Borrower's estate that is not otherwise subject to a lien under Bankruptcy Code Section 364(c)(2); (v) with junior liens on property of the NM Borrowers estate that is subject to a lien under Bankruptcy Code Section 364(c)(3); and (vi) with liens and security interests in all of the NM Borrower's assets pursuant to Section 364(d)(1) of the Bankruptcy Code for the NM Obligations ("**NM Liens**") to secure the NM Facility and the NM Obligations. The term "**NM Collateral**" as used herein shall mean all present or future, pre-petition and post-petition, existing and after acquired real and personal, tangible and intangible assets of the NM Borrower, including, without limitation, all cash, cash equivalents, deposit accounts, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, leases, leasehold interests, fixtures, real property interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles, all claims for collection against customers and all proceeds thereof, all insurance claims and all proceeds thereof, all claims and, subject to entry of the Final Order, proceeds of actions of the NM Borrower or its estate under sections 502, 544, 545, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code, including, without limitation, proceeds of any avoidance actions under Bankruptcy Code section 547 and 548 and applicable state law brought pursuant to section 549 of the Bankruptcy Code; supporting obligations, letters of credit, letter-of-credit rights, investment property, and all cash or non-cash proceeds, products, offspring, substitutions, and accessions of any of the foregoing, wherever located, whether now or hereafter existing, whether presently owned and hereafter acquired, of every kind and description.

15.    *No Subordination*. Subject to the exceptions contained in the NM Note or this Order, the NM Liens on, and security interests in, the NM Collateral granted to the NM Lenders under this

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF
PAGE | 19

Interim Order and pursuant to the NM Facility shall not be subordinated to, or made *pari passu* with, any other lien or security interest, however and whenever arising, in the Chapter 7 Cases, other than as set forth in the Prepetition Intercreditor Agreement.

16.     *Automatic Perfection of NM Liens*.

(a)     The NM Liens granted to the NM Agent for the benefit of the NM Secured Parties under this Interim Order are valid, binding, continuing, enforceable, fully-perfected, and unavoidable with the priorities herein and therein set forth.

(b)     The NM Agent shall not be required to file any financing statements, mortgages, deeds of trust, notices of lien, or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the NM Liens granted by or pursuant to this Interim Order and the NM Facility.

(c)     In the sole discretion of the NM Agent, a certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of the Interim Order for filing and recording, and such certified copy shall be deemed filed and recorded at the time and on the date of entry of this Interim Order, as the case may be.

17.     *NM Order Event of Default*.  All of NM Borrower's obligations under the NM Facility shall be immediately due and payable and all authority to use the proceeds of the NM Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (each, a "**NM Order Event of Default**"):

(a)     the occurrence of an Event of Default (as defined in the NM Note) in accordance with the NM Facility; or

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF                                    PAGE | 20

(b)      the failure of the NM Borrower to obtain entry of the Final Order on or before the date that is twenty-six (26) days after the Petition Date, unless such date has been extended by consent of the NM Agent in its sole discretion.

18.      *Rights and Remedies Upon an Event of Default*.  Any automatic stay otherwise applicable to the NM Secured Parties is hereby modified so that after the occurrence of any NM Order Event of Default, the NM Agent may file a motion ("**Stay Relief Motion**") seeking emergency relief from the automatic stay on at least five (5) business days' notice to request a further order of the Bankruptcy Court permitting the NM Agent to proceed to protect, enforce and exercise all other rights and remedies provided for in this Interim Order, the NM Facility, and under applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Interim Order or the NM Note or any instrument pursuant to which the NM Facility is evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of any of such NM Secured Parties. The Trustee shall not object to the fact that the Stay Relief Motion is being heard on such shortened notice and the sole issue for determination by the Bankruptcy Court at such hearing shall be the occurrence of a NM Order Event of Default.

19.      *Good Faith*. Having been found to be extending the NM Facility to the Trustee in good faith, the NM Secured Parties and the Participant (as defined in the Participation Agreement) are entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the NM Facility and the NM Superpriority Claims and liens and security interests created or authorized by this Interim Order in the event that this Interim Order or any authorization contained herein is stayed, vacated, reversed, or modified on appeal. If any provision of this Interim Order is hereafter modified, vacated, reversed, or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal, or stay shall not affect the validity, enforceability, and priority of any of the debts,

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF                                                                      PAGE | 21

claims, liens, and security interests granted to the NM Secured Parties under this Interim Order, and the validity, enforceability, or priority of the debtors, claims, liens, and security interests of the NM Secured Parties shall be governed in all respects by the original provisions of this Interim Order, and the NM Secured Parties shall be entitled to all of the rights, privileges, and benefits granted herein, including, without limitation, the liens, security interests, and priorities granted to the NM Lenders in this Interim Order with respect to the NM Facility.

20.     Nothing in this Interim Order, the NM Note, or the other NM Documents shall prejudice whatever rights the Trustee or any other party-in-interest with requisite standing that has been sought and granted by this Court may have to bring an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any one or more of the Prepetition ABL Agent, the Prepetition ABL Secured Parties, the Prepetition ABL Obligations and/or the liens granted the Prepetition ABL Agent for the benefit of the Prepetition ABL Secured Parties (collectively, a "**Challenge Proceeding**"), including, but not limited to, any of the following:

(a)     In the case of the Prepetition ABL Agent and/or the other Prepetition ABL Secured Parties, an objection to or challenge of (i) the validity, extent, perfection, or priority of the security interests and liens of the Prepetition ABL Agent and other Prepetition ABL Secured Parties in and to the Prepetition ABL Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition ABL Obligations, or

(b)     a suit against any one or more of the Prepetition ABL Secured Parties in connection with or related to their respective prepetition claims and/or liens, or the actions or inactions of the such Prepetition ABL Secured Party(ies) arising out of or related to such prepetition claims and/or liens; provided, however, that the Trustee or any other party-in-interest with requisite standing that has been sought and granted by this Court must commence a Challenge Proceeding asserting such objection or challenge, including, without limitation, any claim against any one or more of the Prepetition ABL

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND (VII) GRANTING RELATED RELIEF                                                                                                      PAGE | 22

Agent and/or other Prepetition ABL Secured Parties, as applicable, in the nature of a setoff, counterclaim, or defense to their respective prepetition claims and/or liens (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code), by the later of July 2, 2020 ("**Challenge Period**"; and the date that is the next calendar day after the termination of the Challenge Period, in the event that no Challenge Proceeding has been commenced during the Challenge Period, shall be referred to as the "**Challenge Period Termination Date**").

21.     Upon the Challenge Period Termination Date with respect to one or more or all of the Prepetition ABL Agent and/or other Prepetition ABL Secured Parties, as the case may be, any and all such challenges, claims and/or objections by any party (including, without limitation, the Trustee and any other party-in-interest) ***shall be deemed to be forever waived and barred*** with respect to the Prepetition ABL Agent and/or other Prepetition ABL Secured Parties, as applicable, and the Obligations and prepetition liens as to one or more or all of the Prepetition ABL Agent and/or other Prepetition ABL Secured Parties, as the case may be, shall be deemed to be an allowed fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Debtors' Chapter 7 Cases.

22.     Nothing contained in this Interim Order shall in any way affect, abridge or impair the rights and claims preserved in favor of the Prepetition Parent Facility Agent and the Prepetition Parent Facility Secured Parties, obtained prior to the Petition Date.

23.     *Retention of Jurisdiction*. The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order.

24.     *Effectiveness*. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. This Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

AGREED INTERIM ORDER GRANTING TRUSTEE'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 AND 507, (I) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING FINAL HEARING, AND  (VII) GRANTING RELATED RELIEF                                                                                                    PAGE | 23

25.     *Final Hearing.* A final hearing to consider the Motion is scheduled for [_____], 2020 at [__:__] [a.m./p.m.] Any objections to the Final Order must be filed with the Clerk of the Bankruptcy Court and served upon counsel to the Trustee, the United States Trustee, counsel for the NM Lenders, and the NM Lenders on or before [_____ _____], 2020 at 5:00 p.m.


**SIGNED this_____ day of _____, 2020.**


_____

**CHRISTOPHER M. LOPEZ**
**United States Bankruptcy Judge**


*[SIGNATURES OF COUNSEL APPEAR ON FOLLOWING PAGE]*

**AGREED AS TO FORM AND SUBSTANCE:**

KYUNG S. LEE PLLC

*/s/ Kyung S. Lee*
Kyung S. Lee
Texas Bar No. 12128400
4723 B Oakshire Drive
Houston, Texas 77027-5499
Tel: (713) 301-4751
Email: kslee50@gmail.com

      -and-

RIEMER & BRAUNSTEIN LLP

Donald E. Rothman
Brendan C. Recupero
100 Cambridge Street, 22nd Floor
Boston, Massachusetts 02114
Tel: (617) 523-9000
Fax: (617) 880-3456
Email:  DRothman@riemerlaw.com
       BRecupero@riemerlaw.com

***ATTORNEYS FOR ENCINA BUSINESS
CREDIT, LLC***

MCDOWELL HETHERINGTON LLP

*/s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1001 Fannin Street, Suite 2700
Houston, Texas 77002
Tel: (713) 337-5580
Fax: (713) 337-8850
Email: Jarrod.Martin@mhllp.com

***PROPOSED COUNSEL FOR CHRISTOPHER R. MURRAY,
CHAPTER 7 TRUSTEE***

**<u>Exhibit A</u>**
NM Note
(see attached)

**SENIOR SECURED SUPER-PRIORITY POST-PETITION LINE OF CREDIT PROMISSORY NOTE**

$30,000,000.00

Dated as of June 3, 2020
Houston, Texas

      **FOR VALUE RECEIVED**, the undersigned, Christopher R. Murray,  as the duly appointed Trustee for the (the "Chapter 7 Trustee") chapter 7 bankruptcy estate of **ANCHOR DRILLING FLUIDS USA, LLC and Q'MAX America, Inc.** (the "Borrowers") **HEREBY PROMISE TO PAY** to **ENCINA BUSINESS CREDIT SPV, LLC,** its successors and assigns (hereinafter "Lender"), or order, the lesser of (i) **THIRTY MILLION AND 00/100 DOLLARS ($30,000,000.00),** in lawful money of the United States (the "Loan"), or (ii) the aggregate outstanding unpaid principal amount of all revolving credit advances (hereinafter each being referred to as a "Revolving Advance" and collectively, the "Revolving Advances") and other financial accommodations as may be provided by Lender or its affiliates pursuant to the terms hereof (hereinafter, together with Revolving Advances, each being referred to as an "Advance" and collectively, the "Advances"), in each case together with all interest, fees, costs and expenses with respect thereto, on the Maturity Date, pursuant to this Senior Secured Super-Priority Post-Petition Line of Credit Promissory Note (as amended, restated, extended, renewed, supplemented, modified or replaced from time to time, this "Note").

      Subject to the terms and conditions set forth herein, the Lender agrees to make Revolving Advances to the Borrowers from time to time, on any Business Day, in an aggregate amount not to exceed at any time outstanding the Loan Cap.  Subject to the other terms and conditions hereof, the Borrowers may borrow, repay, and reborrow hereunder.  This Note evidences Borrowers' repayment obligations with respect to all of the foregoing, as applicable. The aggregate outstanding Indebtedness (as hereinafter defined) evidenced by this Note is the amount so reflected from time to time in the records of Lender.

      Agent shall serve as agent for Lender is the same capacity as set forth in the Existing Credit Agreement and all aspects of such role as Agent set forth in the Existing Credit Agreement are incorporated herein by reference including all rights, powers, collateral agent status, exclusions and exculpations of liability and indemnification protections.

      1.     **Defined Terms.**  As used in this Note the following terms shall have the following meanings:

      "Additional Availability Amount" means an amount equal to $1,300,000.

      "Additional Costs" shall have the meaning ascribed thereto in Section 18 hereof.

      "Advance" or "Advances" shall have the meanings as defined in the introductory paragraph.

      "Agent" shall mean Encina Business Credit, LLC in its capacity as agent for Lender.

      "Anti-Terrorism Laws" shall have the meaning ascribed thereto in Section 30 hereof.

      "Asset Purchase Agreement" means that certain Asset Purchase Agreement, dated on or about June 3, 2020, by and among Q'Max America Inc., Anchor Drilling Fluids USA, LLC, and Q'Max Acquisition Corp., as amended or modified.

      "Availability Reserves" has the meaning set forth in the Existing Credit Agreement and shall also include (i) the Carve Out Reserve and (ii) reserves to reflect the amount of any priority or administrative expense claims that, in the Lender's reasonable determination, require payment during the Bankruptcy Case.

      "Avoidance Actions" means all avoidance claims, causes of action, or rights of recovery under Chapter 5 of the Bankruptcy Code or similar state laws available to the Chapter 7 Trustee, that may exist against any current  trade vendors of the Regional Business, but does not include any such causes of action against (i) vendors with no ongoing business with the Regional Business or (ii) the buyer or sellers of the Regional Business, the lenders under the Existing Credit Agreement or the Parent Facility Secured Parties (as defined in the Intercreditor Agreement)

2618771.5

or any of their affiliates.  The term "Regional Business" shall have the definition assigned to it in Doc. No. 7 filed in the Bankruptcy Case of Q'Max America and further limited to the Debtors' business operations in the northeast of the continental United States.

"Lender" shall have the meaning as defined in the introductory paragraph.

"Bankruptcy Case" shall mean the chapter 7 case commenced by Anchor Drilling Fluids USA, LLC and Q'Max America, Inc. on May 24, 2020 with the Bankruptcy Court.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas (Victoria Division).

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the rate of interest in effect for such day as publicly announced from time to time by Reference Bank as its "prime rate"; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) the LIBOR Rate for a one month interest period as determined on such day, plus 1.00%.  Any change in Reference Bank's prime rate, the Federal Funds Rate or the LIBOR Rate, respectively, shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Advance" means Advances deemed to bear interest at the Base Rate plus the Margin under the terms of this Note.

"Borrowers" shall have the meaning as defined in the introductory paragraph.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)        the face amount of Eligible Insured Receivables (net of Receivables Reserves applicable thereto) *multiplied by* the Eligible Insured Receivables Advance Rate; *plus*

(b)        the face amount of Eligible Uninsured Receivables (net of Receivables Reserves applicable thereto) *multiplied by* the Eligible Uninsured Receivables Advance Rate; *plus*

(c)        the lesser of (i) the face amount of Eligible Unbilled Receivables (net of Receivables Reserves applicable thereto) *multiplied by* the Eligible Unbilled Receivables Advance Rate and (ii) $2,200,000 (with such amount reducing by $200,000 for each week after the date hereof); *plus*

(d)        the Additional Availability Amount, *minus*

(e)        an amount equal to the current outstanding and unpaid amount of the Existing Liabilities.

Without duplication of any Receivables Reserves applied pursuant to clauses (a) through (c) above, the then amount of all Availability Reserves.

In connection with the implementation of Reserves, the Borrowing Base shall be reduced by the then amount of all Reserves, without duplication of any items that are otherwise addressed through eligibility criteria, which the Agent deems necessary in the exercise of its Permitted Discretion, to maintain with respect to the Borrower. Any determination by the Lender in respect of the Borrowing Base shall be based on the Agent's Permitted Discretion.

"Borrowing Base Certificate" means the certificate, signed and certified as accurate and complete by an authorized officer or person of Borrower submitted by Borrower to Agent the time of each request for an Advance hereunder, substantially in the form submitted by Borrower to Agent under the Existing Credit Agreement (with adjustments to reflect the Borrowing Base as defined in this Note) or such other form which is acceptable to Agent in its sole discretion.

"Budget" means the financial projections and budget for the Borrower covering the thirteen-week period commencing on the Petition Date on a weekly basis, which projections and budget shall include, at a minimum, projected availability under the Borrowing Base, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements (including, for the avoidance of doubt, professional fees) and inventory for the period covered thereby, substantially in the form of the initial Budget annexed hereto as Schedule 2, and any subsequent projections furnished pursuant to this Note, in each case, in form and substance satisfactory to Agent.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state where the Lender's office is located.

"Carve Out" means all accrued and unpaid fees, disbursements, costs and expenses, allowed at any time by the Bankruptcy Court and incurred by professionals retained by the Chapter 7 Trustee in an aggregate amount not to exceed $200,000.

"Carve Out Reserve" means an Availability Reserve established by the Agent in the amount of the Carve Out.

"Closing Date" means the first date all the conditions precedent to the making of Advances hereunder are satisfied or waived.

"Collateral" has the meaning set forth in the Existing Security Agreement.

"Compliance Authority" shall have the meaning ascribed thereto in Section 30 hereof.

"Default Interest Rate" shall have the meaning ascribed thereto in Section 6 hereof.

"Dollars" shall mean United States Dollars.

"Eligible Insured Receivables" has the meaning set forth in the Existing Credit Agreement.

"Eligible Insured Receivables Advance Rate" has the meaning set forth in the Existing Credit Agreement.

"Eligible Unbilled Receivables" has the meaning set forth in the Existing Credit Agreement.

"Eligible Unbilled Receivables Advance Rate" has the meaning set forth in the Existing Credit Agreement.

"Eligible Uninsured Receivables" has the meaning set forth in the Existing Credit Agreement.

"Eligible Uninsured Receivables Advance Rate" has the meaning set forth in the Existing Credit Agreement.

"Event of Default" shall mean any of the events or conditions specified in Section 13 hereof.

"Existing Credit Agreement" means that certain Credit Agreement, dated September 6, 2019, by and among Q'Max America Inc., Anchor Drilling Fluids USA, LLC, Agent and the Lender.

"Existing Credit Parties" shall mean the Credit Parties as that term is defined in the Existing Credit Agreement.

"Existing Liabilities" means (i) the "Obligations", as defined in the Existing Credit Agreement, and (ii) the "Secured Obligations", as defined in the security documents executed and delivered in connection with the Existing Credit Agreement.

"Existing Security Agreement" means that certain Security Agreement, dated September 6, 2019, by and between the Lender and Anchor Drilling Fluids USA, LLC.

"Final Order" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Case substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to Agent, which order shall (a) have been entered on such prior notice to such parties as may be satisfactory to the Agent and (b) not have been vacated, reversed, modified, amended or stayed.

"Final Order Date" means the date of the entry of the Final Order.

"Final Roll-Up" has the meaning set forth in the Interim Order.

"Government Lists" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control ("OFAC"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Governmental Lists".

"Indebtedness" shall mean all items of indebtedness, obligation or liability, whether matured or unmatured, liquidated or unliquidated, funded or unfunded, direct or contingent, joint or several, which would properly be included in the liability section of a balance sheet or in a footnote to a financial statement in accordance with generally accepted accounting principles, and shall also include (a) all indebtedness guaranteed, directly or indirectly in any manner, or endorsed (other than for collection or deposit in the ordinary course of business) or sold with recourse, (b) all indebtedness in effect guaranteed, directly or indirectly, through agreements, contingent or otherwise, and (c) all indebtedness secured by (or for which the holder of such indebtedness has a right, contingent or otherwise, to be secured by) any mortgage, deed of trust, pledge, assignment, lien, security interest or other charge or encumbrance upon property owned or acquired subject thereto, whether or not the liabilities secured thereby have been assumed or guaranteed.

"Indemnified Party" or "Indemnified Parties" shall have the meanings as defined in Section 28 hereof.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of September 6, 2019, by and among Lender and HSBC Bank Canada, as amended as of the date hereof and otherwise permitted to be amended in accordance with the terms thereof.

"Interest" shall mean the annual rate of interest payable on the outstanding Advances in accordance with Sections 5 and 6 hereof.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Bankruptcy Case substantially in the form of Exhibit A hereto and otherwise acceptable to the Lender, approving, inter alia, this Loan, and (a) authorizing the incurrence by the Borrower of secured indebtedness on an interim basis in accordance with this Note, (b) approving the Interim Roll-Up, and (c) subject to the terms thereof, approving the payment by the Borrower of the fees and other amounts contemplated by this Note, which order shall not have been vacated, reversed, modified, amended or stayed.

"Interim Order Period" means the period of time from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"Interim Roll-Up" has the meaning set forth in the Interim Order.

"LIBOR Rate" means for any period of determination the rate (expressed as a percentage per annum and rounded upward, if necessary, to the next nearest 1/100 of 1%) for deposits in Dollars, for a one-month period,

that appears on Bloomberg Screen US0001M (or the successor thereto) as the London interbank offered rate for deposits in Dollars as of 11:00 a.m., London time, as of two Business Days prior to the commencement of such period, which determination shall be made by Agent and shall be conclusive in the absence of manifest error. Notwithstanding the foregoing, in no event shall the "LIBOR Rate" hereunder be less than 1.25%.

"<u>Loan</u>" shall have the meaning ascribed thereto in the introductory paragraph.

"<u>Loan Cap</u>" shall have the meaning ascribed thereto in Section 2(b) hereof.

"<u>Loan Deficit</u>" shall have the meaning ascribed thereto in Section 2(b) hereof.

"<u>Loan Documents</u>" shall mean this Note, the Intercreditor Agreement, the Ratification Agreement, the Participation Agreement, the Existing Security Agreement, the Existing Credit Agreement, and any other document, instrument, or agreement and any amendments thereto, evidencing or securing the Obligations, or now or at any time hereafter executed and/or delivered or recorded in connection with the Obligations, including, without limitation, all other intercreditor agreements, any other note, any loan commitment, requisition, letter agreement, line of credit agreement, commercial financing agreement, security agreement, guaranty of payment, mortgage, deed of trust, pledge agreement, loan agreement, loan and security agreement, hypothecation agreement, indemnity agreement, letter of credit application and agreement, and assignment, all as amended, restated, extended, renewed, supplemented, modified or replaced from time to time.

"<u>Margin</u>" shall mean (i) 6.00 percentage points per annum for the LIBOR Rate and (ii) 3.00 percentage points per annum for the Base Rate.

"<u>Maturity Date</u>" shall mean earlier of: (i) June 5, 2020, unless on or before such date the Interim Order shall have been entered in accordance with the terms hereof; (ii) thirty (30) days following the Petition Date, unless on or before such date, the Final Order shall have been entered in accordance with the terms hereof; (iii) July 3, 2020, unless on or before such date, an order approving the Sale Motion shall have been entered in accordance with the terms hereof, (iv) July 15, 2020, unless on or before such date a sale under section 363 of the Bankruptcy Code and/or other disposition of the assets of the Borrower shall have been consummated pursuant to the Asset Purchase Agreement or a higher and/or better bid pursuant to which all of the Obligations under this Agreement and the Existing Credit Agreement shall have been satisfied in full, in cash; (v) the termination of the Asset Purchase Agreement pursuant to its terms; (vi) immediately at any time if the Chapter 7 Trustee is not authorized to operate the Borrower's business to complete on-going projects in accordance with the Budget or (vii) July 17, 2020.

"<u>Minimum Advance</u>" shall have the meaning ascribed thereto in Section 3(c) hereof.

"<u>NM Fee Letter</u>" means that certain fee letter, dated as of the date of this Note, by and between the Chapter 7 Trustee and the Lender.

"<u>NM Superpriority Claim</u>" means the allowed superpriority administrative expense claim granted to the Lender in the Bankruptcy Case pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all administrative expense claims and unsecured claims against the debtor or its estate in the Bankruptcy Case, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtor and its estate, and any trustee or other estate representative; provided, however, that the NM Superpriority Claim shall not have recourse to any Avoidance Actions (as defined in the Orders) or the proceeds thereof, other than (i) the proceeds of Avoidance Actions arising under Section 549 of the Bankruptcy Code and (ii) the proceeds of other Avoidance Actions in the amounts necessary to reimburse the Lender for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions; provided, further, that the NM Superpriority Claim shall be subject to the Carve Out.

"<u>Note</u>" shall have the meaning ascribed thereto in the introductory paragraph.

"<u>Obligations</u>" shall mean means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of Borrower, arising under this Note or otherwise with respect to any Advance (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter.

"<u>Obligor</u>" shall mean Borrower, each endorser and surety of this Note, any person who is primarily or secondarily liable for the repayment of this Note or any portion thereof, any person who has granted security for the repayment of the Note, together with the heirs, personal representatives, successors and assigns of all of the foregoing.

"<u>OFAC</u>" shall have the meaning ascribed thereto in the definition of "Government Lists".

"<u>Overadvances</u>" shall have the meaning ascribed thereto in Section 2(b) hereof.

"<u>Participant</u>" means Q Drilling Holdco LLC or any assignee thereof

"<u>Participation Agreement</u>" means that certain Participation Agreement, dated as of even date herewith, by and between Encina Business Credit SPV, LLC and Participant.

"<u>Permitted Discretion</u>" means a determination made by Agent in the good faith exercise of its reasonable (from the perspective of an asset-based secured lender) business judgment in accordance with customary business practices.

"<u>Permitted Liens</u>" shall have the meaning ascribed thereto in Section 13(f) hereof.

"<u>Person</u>" or "<u>person</u>" means any individual, corporation, partnership, limited liability company, joint venture, joint stock association, association, bank, business trust, trust, unincorporated organization, any foreign governmental authority, the United States of America, any state of the United States and any political subdivision of any of the foregoing or any other form of entity.

"<u>Petition Date</u>" means May 24, 2020.

"<u>Prohibited Person</u>" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"<u>Ratification Agreement</u>" means the Ratification Agreement dated as of the date hereof by, among others, the Borrower and the Agent in form and substance reasonably acceptable to the Agent and Participant, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"<u>Receivables Reserves</u>" has the meaning set forth in the Existing Credit Agreement.

"<u>Reference Bank</u>" means Wells Fargo Bank, National Association.

"<u>Reportable Compliance Event</u>" shall have the meaning ascribed thereto in Section 30 hereof.

"<u>Reported Fee Accruals</u>" means all accrued and unpaid fees, disbursements, costs and expenses, allowed by the Bankruptcy Court and incurred by professionals retained by the Chapter 7 Trustee.

"<u>Reserves</u>" has the meaning set forth in the Existing Credit Agreement.

"<u>Sale Motion</u>" has the meaning set forth in Section 12(b)(v) hereof.

"Sale Order" means an Order approving the Sale Motion.

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, and (b) if Borrower has operations outside of the United States, the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Sanctioned Country" shall have the meaning ascribed thereto in Section 30 hereof.

"Sanctioned Person" shall have the meaning ascribed thereto in Section 30 hereof.

"Security Documents" means the Existing Agreement, the Ratification Agreement, and each other security agreement or other instrument or document executed and delivered to Agent or Lender pursuant to this Agreement or any other Loan Document granting a lien to secure any of the Obligations, including any such agreement, instrument or document executed and/or delivered pursuant to the Existing Credit Agreement, as each such agreement, instrument and document has been ratified by the Loan Parties pursuant to the Ratification Agreement.

"Total Disbursements" means the sum of total operating disbursements and total non-operating disbursements as provided in the Budget.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of Texas.

Capitalized terms defined in the UCC that are not otherwise defined herein shall have the respective meanings ascribed to them in the UCC.

2.      **Borrowing Base; Overadvances**.

(a)      The Borrowing Base is and shall be calculated in accordance with the computation contained in the Borrowing Base Certificate.

(b)      Lender has approved a committed line of credit to Borrower in a principal amount not to exceed the lesser of (i) the Borrowing Base; and (ii) $30,000,000.00 (the "Loan Cap").  In the event the aggregate outstanding amount of any Revolving Advances at any time collectively exceeds the Loan Cap (the "Loan Deficit"), Borrower agrees to immediately pay, without notice or demand by Lender, an aggregate amount equal to the Loan Deficit, together with accrued and unpaid interest on the Loan Deficit.  The payment by Borrower of any Loan Deficit shall be applied to the outstanding principal and interest of any Advances as Lender determines.  "Overadvances" means any Advances made by Lender to Borrower in excess of the net amount of availability as stated in the most recent Borrowing Base Certificate, up to a maximum amount of $3,500,000 at any one time outstanding, provided, however, that the Agent or Lender shall only make Overadvances hereunder up to the amount of any funded participation in this Note pursuant to the Participation Agreement.

3.      **Advances**.

(a)      Each request by Borrower for a Revolving Advance shall be received by Lender not later than 10:00 a.m., Chicago local time on the date of the proposed Revolving Advance.

(b)      Each request for a Revolving Advance shall specify inter alia (i) the requested date of such Revolving Advance, and (ii) the requested amount of such Revolving Advance.

(c)      Subject to the terms and conditions hereof and the terms and conditions set forth in the other Loan Documents, Revolving Advances that are repaid or prepaid may be re-borrowed on a revolving basis up to the maximum amount of this Note subject to the Loan Cap.

(d)      Borrower shall utilize the Advances in accordance with the Budget.

4.      **Certain Bankruptcy Matters**.

(a)      Except to the extent expressly provided otherwise in the Interim or Final Order, the Borrower hereby agrees that, subject only to the Carve Out, the Obligations shall be deemed to (i) constitute NM Superpriority Claims over all administrative expense claims and claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in the Interim and Final Orders.

(b)      In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)      Notwithstanding anything to the contrary contained herein or elsewhere:

(i)      the parties hereto agree, and the Orders shall provide, that the Borrower shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the liens on the Collateral granted by or pursuant to this Note, the Interim and Final Orders or any other Loan Document.  If the Lender (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Lender's liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 4(c) or of the perfection of any other liens in favor of the Lender, on the Collateral; and

(ii)      except as otherwise agreed to by the Lender, the liens, lien priorities, NM Superpriority Claims and other rights and remedies granted to the Lender pursuant to this Note, the Interim and Final Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the liens provided for herein and therein, and the NM Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal of the Bankruptcy Case, or by any other act or omission whatsoever.

(d)      Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)      subject only to the Carve Out and to the extent provided in any of the Interim and Final Orders and subject to the Interim and Final Orders, no costs or expenses of administration which have been or may be incurred in the Bankruptcy Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of Lender against the Borrower in respect of any Obligations;

(ii)      other than as provided in the Interim and Final Orders or the Loan Documents, the Lender's liens on the Collateral shall constitute valid, enforceable and perfected liens, and, except with respect to the Carve Out and Permitted Liens (and as otherwise set forth in the Orders), shall be prior to all other liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)      the parties hereto agree, and the Interim and Final Orders shall provide, that the Lender's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of lien or similar instruments or to otherwise perfect the Lender's liens under applicable non-bankruptcy law.

(e)      In connection with any sale or other disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any sale or foreclosure conducted by the Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Agent and Lender shall have the power and right, without assent by Borrower, to "credit bid" the full amount of all Obligations and any Existing Liabilities then outstanding, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.  The Agent and Lender hereby expressly consent to the transactions set forth in the Asset Purchase Agreement, and the Agent and Lender hereby covenant and agree not to "credit bid" to acquire or otherwise purchase (either directly or through one or more acquisition vehicles) the Acquired Assets (as defined in the Asset Purchase Agreement), so long as the Buyer (as defined in the Asset Purchase Agreement) is the party purchasing the Acquired Assets and the terms of the Asset Purchase Agreement have not been amended, restated or otherwise modified without the written consent of Agent.

5.      **Principal and Interest**.

(a)      Interest shall be payable on the outstanding daily unpaid principal amount of each Advance from the date hereof until payment in full is made and shall accrue and be payable at the rates set forth or provided for herein, before and after default, before and after maturity, and before and after judgment, with interest on overdue interest to bear interest and to be compounded at the Default Interest Rate, in each case, to the fullest extent permitted by applicable laws.

(b)      Interest accrued on each Advance shall be due and payable in arrears on the first Business Day of each calendar month commencing on the first day of the first full month following the date of such Advance and at maturity (whether as stated or by acceleration).  Except as otherwise provided in Section 6, the unpaid principal amount of each Advance shall bear interest at a rate per annum equal to LIBOR Rate plus the Margin (subject to Sections 18 and 19 hereof).

(c)      The unpaid principal amount of any Advance may, at any time and from time to time, be voluntarily paid or prepaid in whole or in part.

(d)      If not sooner paid, the unpaid principal amount of each Advance shall be due and payable on the earlier of: (i) the Maturity Date or (ii) the occurrence of an Event of Default.

(e)      Lender may act without liability upon the basis of telephonic or electronic mail notice believed by Lender in good faith to be from Borrower.  Borrower shall immediately confirm to Lender, in writing (which may be made by electronic mail), each telephonic notice.  Borrower hereby expressly authorizes Lender to record in its computer system the amount and date of each Advance, the applicable rate of interest, the maturity date, and each payment of principal and interest thereon.  In the event of any discrepancy between any such notation by Lender and any records of Borrower, the records of Lender shall be controlling and conclusive, absent manifest error.

6.      **Default Rate**.  At the option of Lender, upon the occurrence and during the continuance of any Event of Default, and in any event if any installment of principal or interest or any fee or cost or other amount payable under this Note, or any other Loan Document, is not paid when due, the Obligations shall thereafter bear interest at a per annum interest rate equal to the interest rate charged on each Advance at all times equal to the rate otherwise applicable thereto plus two (2%) percent per annum (the "Default Interest Rate"), to the fullest extent permitted by applicable law.

7.      **Computation of Interest and Fees**.

(a) Computation of interest on the Loan and all fees under this Note shall be calculated on the basis of a year of 360 days and the actual number of days elapsed. Borrower acknowledges that such latter calculation method will result in a higher yield to Lender than a method based on a year of 365 or 366 days.

(b) Under no circumstances or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Note exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such court determines Lender has charged or received interest hereunder in excess of the highest applicable rate, Lender shall apply, in its sole discretion, and set off such excess interest received by Lender against other Obligations due or to become due and such rate shall automatically be reduced to the maximum rate permitted by such law.

8. **Manner and Treatment of Payments**.

(a) Each payment due on this Note, or under any other Loan Document, shall be made to Agent, pursuant to the payment instructions set forth in the Existing Credit Agreement. For purposes of determining the Borrowing Base, such amounts will be credited to the Borrower's loan account and the Collateral balances to which they relate upon Agent's receipt of an advice from Agent's bank that such items have been credited to Agent's account at Agent's Bank (or upon Agent's deposit thereof at Agent's Bank in the case of payments received by Agent in kind), in each case subject to final payment and collection. For purposes of computing interest on the Obligations, such items shall be deemed applied by Agent three Business Days after Agent's receipt of advice of deposit thereof at Agent's bank.

(b) Lender shall have the unconditional right and discretion (and Borrower hereby authorizes Lender) to charge Borrower's operating and/or deposit account(s) for all of Borrower's Obligations as they become due from time to time under this Note, or any other Loan Document, including, without limitation, interest, principal, fees, indemnification obligations and reimbursement of expenses.

(c) Any payment due under this Note which is paid by check or draft shall be subject to the condition that any receipt issued therefore shall be ineffective unless and until the amount due is actually received by Lender. Each payment received by Lender shall be applied as follows: first, to the payment of any and all costs, fees and expenses incurred by or payable to Lender in connection with the collection or enforcement of this Note; second, to the payment of all unpaid late charges (if any); third, to the payment of all accrued and unpaid interest hereunder; and fourth, to the payment of the unpaid principal balance of this Note, or in any other manner which Lender may, in its sole discretion, elect from time to time.

9. **Security Interest in Collateral**.

(a) To secure payment to Lender and performance of the Obligations, Borrower hereby grants to Agent a continuing security interest in, a general lien upon and a right of set-off against the Collateral, in accordance with the ratification of the Existing Security Agreement.

(b) The Security Documents, taken together with the Interim Order and/or the Final Order, are effective to create in favor of Agent, a legal, valid, continuing and enforceable security interest in the Collateral pledged hereunder or thereunder, in each case subject to no liens other than the Carve Out and Permitted Liens. Pursuant to the terms of the Interim Order and/or Final Order, no filing or other action will be necessary to perfect or protect such liens and security interests. Pursuant to and to the extent provided in the Interim Order and/or the Final Order, the Obligations of the Borrower under this Note will constitute allowed NM Superpriority Claims.

(c) Following the occurrence and during the continuation of an Event of Default, Agent, at its discretion, whether any of the Obligations be due may, in its name or in the name of Borrower or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Collateral, but shall be under no obligation so to do, or Agent may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting any liability of Borrower. Agent shall not be required to take any steps necessary to preserve any

rights of prior parties to any of the Collateral.  Upon default hereunder or in connection with any of the Obligations (whether such default be that of Borrower or of any other party obligated thereon), Agent shall have the rights and remedies provided by law and Agent may sell or cause to be sold, in one or more sales or parcels, at such price as Agent may deem best, and for cash or on credit or for future delivery, without assumption of any credit risk, all or any of the Collateral, at any brokers' board or at public or private sale, without demand of performance or notice of intention to sell or of time or place of sale (except such notice as is required by applicable statute and cannot be waived), and Agent or anyone else may be the purchaser of any or all of the Collateral so sold and thereafter hold the same, absolutely free from any claim or right of whatsoever kind, including any equity of redemption, of Borrower, any such demand, notice or right and equity being hereby waived and released.  Borrower will pay to Agent, all reasonable out of pocket expenses (including reasonable expense for legal services of every kind) of, or incidental to, the enforcement of any of the provisions hereof or of any of the Obligations, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement of any of the Collateral or receipt of the proceeds thereof, and for the care of the Collateral and defending or asserting the rights and claims of Agent in respect thereof, by litigation or otherwise, including expense of insurance, and all such expenses shall be Indebtedness within the terms of this Note.  Agent, at any time, at its option, may apply the net cash receipts from the Collateral to the payment of principal of and/or interest on any of the Obligations, whether or not then due, making proper rebate of interest or discount.  Notwithstanding that Agent, whether in its own behalf and/or in behalf of another and/or of others, may continue to hold Collateral and regardless of the value thereof, Borrower shall be and remain liable for the payment in full, principal and interest, of any balance of the Obligations and expenses at any time unpaid.

10.    **Right of Set-Off**.  To secure payment of this Note and all other Obligations of Borrower to Agent, Borrower and any Obligor of this Note hereby grant Agent a continuing lien and/or right of set-off upon any and all deposit and/or operating accounts now or hereafter maintained with Agent, any and all securities and other property of Borrower and any Obligor and the proceeds thereof now or hereafter coming into the possession or control of Agent, hereby authorize Agent, at any time, without prior notice, to appropriate and apply such deposits or the proceeds of the sale of such securities or other property to any such Obligations, although contingent and although unmatured, it being understood that Agent shall be under no obligation to effect any such appropriation and application.

11.    **Repayment Extension**.  If any payment of principal or interest shall be due on a Saturday, Sunday or any other day on which banking institutions in the State of Texas are required or permitted to be closed, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of the payment of interest.

12.    **Covenants**.

(a)    Performance Within Budget.  At all times following the date hereof, Borrower will strictly perform in accordance with the Budget, including having made all scheduled payments to the Existing Credit Parties and Agent as applicable as and when required, subject to the following (the "Permitted Variances"):

(i)    the Borrower's weekly cash flow receipts shall be at least 90% of the projected amounts set forth in the Budget;

(ii)    the Borrower's cumulative Total Disbursements shall not exceed in the aggregate 110% of the projected amounts set forth in the Budget with respect thereto, although in each case the variances under the Variance Report in accordance with Section 23(d) shall be calculated on a line-item (and not an aggregate) basis.

The foregoing shall be reported on Wednesday of each week (on a cumulative basis commencing with the first such day to occur after the third full calendar week following the Closing Date) following the Closing Date, and thereafter on a trailing four (4) week basis (each of the foregoing periods, a "Testing Period") pursuant to the Variance Report delivered by the Borrower to the Agent in accordance with Section 23(d).

(b)    Additional Information.  Borrower will:

11

(i)      as soon as practicable in advance of filing with the Bankruptcy Court of all documents, motions and pleadings related to the Interim and Final Orders or this Note, deliver to the Agent all such documents to be filed and provide the Agent with a reasonable opportunity to review and comment on all such documents;

(ii)      deliver to the Agent promptly after the same are available, copies of all pleadings, applications, judicial information, financial information and other documents filed on behalf of Borrower with the Bankruptcy Court in the Bankruptcy Case; and

(iii)      allow the Agent access to, upon reasonable notice during normal business hours, all financial professionals engaged by the Chapter 7 Trustee and the Borrower.

(c)      <u>Bankruptcy Related Affirmative Covenants</u>.

(i)      On or before June 4, 2020, the Chapter 7 Trustee shall file a motion in form and substance acceptable to Agent seeking authorization and approval of the Loan;

(ii)      On or before five (5) days after the Petition Date, the Bankruptcy Court shall have entered an order authorizing the Chapter 7 Trustee to operate the Borrower's business in accordance with the Budget, which Order shall be in form and substance acceptable to Agent;

(iii)      On or before June 5, 2020, the Bankruptcy Court shall have entered the Interim Order, which Order shall be in form and substance acceptable to Agent;

(iv)      On or before thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, which Order shall be in form and substance acceptable to Agent;

(v)      On or before June 4, 2020, the Chapter 7 Trustee shall file a motion (the "<u>Sale Motion</u>") requesting approval of a Section 363 sale process the purpose of which is to sell the assets related to the Regional Business pursuant to the Asset Purchase Agreement subject to higher and better bids;

(vi)      On or before June 25, 2020, any auction in connection with the Section 363 sale process shall be completed;

(vii)      On or before July 3, 2020, the Bankruptcy Court shall have entered the Sale Order, which Order shall in form and substance acceptable to Agent; and

(viii)      On or before July 15, 2020 the transaction set forth in the Asset Purchase Agreement or such transaction contemplated by a higher and/or better bid pursuant to which all of the Obligations under this Agreement and the Existing Credit Agreement are satisfied in full shall have been consummated.

(e)      The Loan Parties shall promptly, punctually, and faithfully perform all of the terms and conditions of the Orders.

(d)      <u>Insurance</u>. Borrower shall maintain customary liability and property insurance policies, endorsed to the name of Agent as an additional insured and Agent's loss payee, as applicable, with respect to all of its Collateral, in each case with a sound and reputable insurance company and in such amounts as necessary to cover all customary risks generally insured against by companies engaged in similar businesses.

(e)      <u>Use of Collateral</u>.  Borrower shall not use or permit the use of Collateral, proceeds of Loans, portion of the Carve Out or any other amounts directly or indirectly by any of the Borrower, the Chapter 7 Trustee or other estate representative appointed in the Bankruptcy Case or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(i)        other than as expressly permitted in the Interim and Final Orders, to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the liens granted under the Loan Documents or the NM Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Agent in "full" in cash; or

(ii)        to pursue (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the Agent or the Existing Credit Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation: (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the NM Superpriority Claims, the liens granted under the Loan Documents, the Loan Documents, the Existing Credit Agreement, the Existing Liabilities; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agent hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the Orders).

(f)        Bankruptcy Related Negative Covenants.  Neither the Borrowers, nor the Chapter 7 Trustee on behalf of the Borrowers, shall consent to or permit to exist any of the following without prior written consent of the Lender:

(i)        any modification, stay, vacation or amendment to the Interim or Final Orders to which the Agent has not consented in writing;

(ii)        a priority claim or administrative expense or unsecured claim against Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331,  364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent in respect of the Obligations, except with respect to the Existing Liabilities, Permitted Liens and the Carve Out;

(iii)        except as agreed to by the Agent, any order which authorizes the return of any of the Borrower's property pursuant to Section 546(h) of the Bankruptcy Code;

(iv)        any order which authorizes the payment of any Indebtedness (other than the Existing Liabilities, Indebtedness reflected in the Budget, and other Indebtedness approved by the Agent) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a lien (other than as expressly set forth in the Interim or Final Orders or the Budget); or

(v)        any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

13.        **Events of Default**.  The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Note:

(a)        Payments - if Borrower, or any other Obligor, fails to make any payment of principal or interest under the Obligations when such payment is due and payable; or

(b)    <u>Other Charges</u> - if Borrower, or any other Obligor, fails to pay any other charges, fees, expenses or other monetary obligations owing to Agent arising out of or incurred in connection with this Note when such payment is due and payable; or

(c)    <u>Particular Covenant Defaults</u> - if Borrower fails to perform, comply with or observe any covenant or undertaking contained in this Note or in any other Loan Document; or

(d)    <u>Financial Information</u> - if any statement, report, financial statement, or certificate made or delivered by Borrower, or any other Obligor, to Agent is not true and correct in all material respects when made or delivered; or

(e)    [Reserved]

(f)    <u>Liens</u> - if any security interest in favor of Agent with respect to any Collateral shall cease to be valid, enforceable, and perfected and prior to all other security interests therein, other than the Permitted Liens set forth on <u>Schedule 1</u> attached hereto; or

(g)    <u>Case Motions, Etc.</u>  Any of the following shall occur in the Bankruptcy Case:

(i)    without the prior consent of the Agent, the Chapter 7 Trustee shall file a pleading seeking to vacate modify any of the Interim or Final Orders in a manner adverse to the Agent or Lender;

(ii)    without the prior consent of the Agent, entry of an order amending, supplementing or otherwise modifying the Interim or Final Orders in a manner adverse to the Agent or Lender;

(iii)    without the prior consent of the Agent, entry of any order that authorizes any of the following:

(A)    a priority claim or administrative expense or unsecured claim against the Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent in respect of the Obligations, except with respect to the Carve Out;

(B)    any lien on any Collateral having a priority equal or superior to the lien securing the Obligations, except (a) with respect to the Carve Out, or (b) Permitted Liens;

(C)    except as consented to by the Agent, the return of any of the Borrower's property pursuant to section 546(h) of the Bankruptcy Code; or

(D)    the payment of any Indebtedness (other than Indebtedness reflected in the Budget) or as permitted by the Interim and Final Orders;

(iv)    reversal, vacation or stay of the effectiveness of any of the Interim or Final Orders;

(v)    any violation of the terms of Interim or Final Order;

(vi)    without the prior consent of the Agent, the dismissal of the Bankruptcy Case, or the filing of any motion to so dismiss brought by the Chapter 7 Trustee; or

(vii)    without the prior consent of the Agent, the filing by the Chapter 7 Trustee of, or the consummation of any sale of all or substantially all the working capital assets of the Borrower pursuant to Section 363 of the Bankruptcy Code, or the occurrence of any such sale without the net proceeds thereof

being remitted, contemporaneously therewith, to the Agent for payment in full of the Obligations and the Existing Liabilities;

(viii)    except as provided for herein or in the Interim and Final Orders, granting of relief from the automatic stay in the Bankruptcy Case to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of the Borrower;

(ix)    the Chapter 7 Trustee's filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated herein or in the Interim and Final Orders) that is senior to or pari passu with the Agent's claims under the Loan Documents and the transactions contemplated thereby to the extent that, upon approval of such motion and closing of the transactions contemplated thereby, the Obligations and the Existing Liabilities would not be paid in full;

(x)    payment of or granting adequate protection with respect to prepetition Indebtedness, other than as expressly set forth in the Interim and Final Orders and the Budget; or

(xi)    any of the liens or the NM Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect;

(h)    any variance to a Budget shall occur, other than Permitted Variances;

(i)    the failure to meet any of the milestones contained in Section 12(c); or

(j)    the Chapter 7 Trustee engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Existing Credit Agreement or the Existing Loan Documents or the liens securing the Existing Credit Agreement or the Existing Loan Documents, including without limitation seeking to equitably subordinate or avoid the liens securing the Existing Credit Agreement; or engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Existing Credit Parties; or

(k)    without the prior consent of the Agent, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Sections 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral.

14.    **Rights and Remedies upon Demand or Default**.  Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Interim and Final Orders, following the occurrence of an Event of Default hereunder, Agent may:  (a) declare the entire outstanding principal balance of this Note, together with all accrued interest and all other sums due under this Note to be immediately due and payable, and the same shall thereupon become immediately due and payable without diligence, presentment, demand, presentment, or notice, which are hereby expressly waived; (b) exercise its right of set-off against any money, funds, credits or other property of any nature whatsoever of Borrower or any other Obligor now or at any time hereafter in the possession of, in transit to or from, under the control or custody of, or on deposit with, Agent or any affiliate of Agent in any capacity whatsoever, including without limitation, any balance of any deposit account and any credits with Agent or any affiliate of Agent; (c) terminate any outstanding commitments of Lender to Borrower or any Obligor; and (d) exercise any or all rights, powers, and remedies provided for herein and in the other Loan Documents, or now or hereafter existing at law (including the rights and remedies of a secured party under the UCC), in equity, by statute or otherwise.  Such rights and remedies of a secured party shall include, without limitation the right to (i) take possession of any Collateral, (ii) enter any premises where Collateral is located and store Collateral on such premises until sold, (iii) demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Collateral including, without limitation, instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to Agent, (iv) withdraw all moneys, instruments, securities and other property in any Agent or Lender, financial securities, deposit or other account of any Obligor constituting Collateral for application to the Obligations, (v) exercise any and all rights as beneficial and legal owner of the Collateral, including, without limitation, perfecting

15

assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Collateral, and (vi) sell or otherwise dispose of any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale, with such notice as may be required by applicable law, in lots or in bulk, at such locations, all as Agent, in its discretion, deems advisable.  In furtherance of the rights and remedies of Agent as a secured party under the UCC, Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all trademarks, copyrights, and other intellectual property of Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property and rights used or useful in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral.

Neither the Borrower, the Chapter 7 Trustee, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the Interim and Final Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents.  The Chapter 7 Trustee shall cooperate fully with the Agent in its exercise of rights and remedies, whether against the Collateral or otherwise.  The Borrower and the Chapter 7 Trustee hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Agent set forth in the Interim and Final Orders and in the Loan Documents.

Subject to the Interim and Final Orders, in case any one or more of the covenants and/or agreements set forth in this Note or any other Loan Document shall have been breached by the Borrower or the Chapter 7 Trustee, then the Agent may proceed to protect and enforce the Agent's rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Note or such other Loan Document.  Without limitation of the foregoing, the Borrower and the Chapter 7 Trustee agree that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof.  The Agent shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof.

15.  **Remedies Cumulative**.  Each right, power and remedy of the Agent hereunder, under the other Loan Documents, or now or hereafter existing at law, in equity, by statute or otherwise shall be cumulative and concurrent, and the exercise or the beginning of the exercise of any one or more of them shall not preclude the simultaneous or later exercise by Agent of any or all such other rights, powers or remedies.  No failure or delay by the Agent to insist upon the strict performance of any one or more provisions of this Note or of any of the other Loan Documents or to exercise any right, power or remedy consequent upon a breach thereof or a default hereunder shall constitute a waiver thereof, or preclude the Agent from exercising any such other rights, powers or remedy.  By accepting full or partial payment after the due date of any amount of principal or interest on this Note, or other amounts payable on demand, the Agent shall not be deemed to have waived the right either to require prompt payment when due and payable of all other amounts of principal or interest on this Note or other amounts payable on demand, or to exercise any rights and remedies available to it in order to collect all such other amounts due and payable under this Note.

16.  **Inability to Determine LIBOR**.  If Agent shall have determined (which determination shall be conclusive and binding upon Borrower, absent manifest error) that LIBOR cannot be determined by any of the means set forth in the definition of "LIBOR" and, by reason of circumstances affecting the London Interbank Market, quotations of interest rates are not being provided to Agent in the relevant amount or for the relevant maturities for purposes of determining LIBOR, Agent shall forthwith furnish notice of such determination, confirmed in writing, to Borrower and thereafter any outstanding LIBOR Advance shall be converted to a Base Rate Advance.

17.  **Illegality**.  Notwithstanding any other provision herein, if the adoption of or any change in any law, rule, regulation, guideline or order, or the interpretation or application thereof shall make it unlawful for Lender to make or maintain LIBOR Advances as contemplated hereunder (a) Lender shall promptly give notice thereof to Borrower, (b) the obligation of Lender to make LIBOR Advances, continue LIBOR Advances as such and convert Base Rate Advances to LIBOR Advances shall forthwith be cancelled and (c) Lender's outstanding LIBOR Advances,

if any, shall be converted automatically to Base Rate Advances as of the date notice is given to Borrower under Subsection (a) hereof.

18.     **Additional Costs**.  If, as a result of any change in applicable law, regulation, guideline or order, or in the interpretation or application thereof by any governmental authority charged with the administration thereof, there shall be imposed upon or made applicable to Lender any reserve requirement against this Note or any other costs or assessments (hereinafter "Additional Costs"), Borrower shall pay to Lender, on demand (which demand shall be in writing and which will set forth a calculation of such Additional Costs), an amount sufficient to compensate Lender for such Additional Cost.  Lender's calculation of the amount of such Additional Costs shall be presumed correct absent manifest error.

19.     **Taxes**.  Any and all payments by or on account of any Obligations hereunder shall be made free and clear and without deduction for any taxes; provided, that, if Borrower shall be required to deduct any taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this paragraph) Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant governmental authority in accordance with applicable law.

20.     **Collection Expenses**.  Borrower agrees to pay to Agent, upon demand costs and expenses, including all reasonable attorneys' fees and court costs, payable, paid, or incurred by Agent in connection with the enforcement or collection of this Note (whether or not any action has been commenced by Agent to enforce or collect this Note) or in defending any counterclaim or other legal proceeding brought by Borrower contesting Agent's right collect the outstanding principal balance of this Note.  The obligation of Borrower to pay all such costs and expenses shall not be merged into any judgment by confession against Borrower.  All of such costs and expenses shall bear interest at the highest rate of Interest permitted under this Note from the date of payment by Agent until repaid in full.

21.     **Certain Waivers by Borrower**.  Borrower waives demand, presentment, protest and notice of demand, of non-payment, of dishonor, and of protest of this Note.  Agent, without notice to or further consent of Borrower or any other Obligor or Person and without in any respect compromising, impairing, releasing, lessening or affecting the obligations of Borrower hereunder or under any of the other Loan Documents, may:  (a) release, surrender, waive, add, substitute, settle, exchange, compromise, modify, extend or grant indulgences with respect to (i) this Note, (ii) any of the other Loan Documents, and/or (iii) all or any part of any collateral or security for this Note; and/or (iv) any Obligor; (b) complete any blank space in this Note according to the terms upon which the Loan evidenced hereby is made; and (c) grant any extension or other postponements of the time of payment hereof; provided, however, that the foregoing release does not apply to claims of fraud, intentional misconduct, breach of fiduciary duty or gross negligence.

22.     **Reporting**.  Borrower shall furnish to Agent such books, records, and other information as Agent may reasonably request from time to time, in each case in form and substance satisfactory to Agent, including without limitation, the following:

        (a)     Within forty-five (45) days after the Petition Date, a proposed revised Budget inclusive of periods through the Maturity Date, which shall be subject to the reasonable approval of the Agent, it being further agreed that, if such proposal (or any further revision thereof) does not receive such approval, (i) the Borrower shall use its commercially reasonable efforts to revise and resubmit such proposal in response to comments received thereon from the Agent and (ii) until such time as the revised Budget is approved, the then existing Budget will remain in effect as the approved Budget;

        (b)     On Wednesday of each week during the pendency of the Bankruptcy Case (or, if such day is not a Business Day, on the next succeeding Business Day),  a Borrowing Base Certificate, together with such supporting documentation as Agent may request, , in form and substance satisfactory to Agent;

        (c)     On Wednesday of each week during the pendency of the Bankruptcy Case (or, if such day is not a Business Day, on the next succeeding Business Day), commencing on the Wednesday following the first full calendar week after the Petition Date, (i) a weekly cash flow forecast for the subsequent 13-week period prepared by

an authorized senior officer of the Borrower, and (ii) a variance report prepared by an authorized senior officer of the Borrower (the "Variance Report") setting forth actual cash receipts and disbursements of the Borrower for the preceding one calendar week period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such calendar week as compared to the Budget and the most recent weekly cash flow forecast delivered by the Borrower, in each case, for each Testing Period (and each such Variance Report shall include reasonably detailed explanations for all material variances (including Permitted Variances) and shall be certified by an authorized senior officer of the Borrower);

(d)     Upon the reasonable request of the Agent, periodic estimated summaries of the then Reported Fee Accruals;

(e)     All documents and information required to be delivered pursuant to the Interim and Final Orders; and

(f)     Promptly following the request therefor, such other information, statements, and reports respecting the condition or operations, financial or otherwise, of Borrower as shall be reasonably requested by Agent.

23.     **Choice of Law; Forum Selection; Consent to Jurisdiction**.  THIS NOTE AND THE OTHER LOAN DOCUMENTS WERE NEGOTIATED IN THE STATE OF TEXAS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE TRANSACTIONS CONTEMPLATED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, CONSTRUED, AND ENFORCED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS.  Each Borrower hereby irrevocably submits to the jurisdiction of Bankruptcy Court in any action or proceeding arising out of or relating to this Note, and hereby irrevocably waives any objection to the laying of venue of any such action or proceeding in any such court and any claim that any such action or proceeding has been brought in an inconvenient forum.  A final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law.

24.     **Subsequent Holders**.  In the event that any holder of this Note transfers this Note for value, Borrower agrees that except with respect to a subsequent holder with actual knowledge of a claim or defense, no subsequent holder of this Note shall be subject to any claims or defenses which Borrowers may have against a prior holder (which claims or defenses are not waived as to prior holder), all of which are waived as to the subsequent holder, and that all such subsequent holders shall have all of the rights of a holder in due course with respect to Borrowers even though the subsequent holder may not qualify, under applicable law, absent this paragraph, as a holder in due course.

25.     **Invalidity of Any Part**.  If any provision or part of any provision of this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or any remaining part of any provision) of this Note, and this Note shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained in this Note, but only to the extent of its invalidity, illegality, or unenforceability.  In any event, if any such provision pertains to the repayment of the Obligations evidenced by this Note, then and in such event, at Agent's option, the outstanding principal balance of this Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable.

26.     **WAIVER OF JURY TRIAL.  EACH BORROWER HEREBY (i) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY A JURY, AND (ii) WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH AGENT AND BORROWERS MAY BE PARTIES ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY PERTAINING TO THIS NOTE, ANY OF THE OTHER LOAN DOCUMENTS AND/OR ANY TRANSACTIONS, OCCURRENCES, COMMUNICATIONS, OR UNDERSTANDINGS (OR THE LACK OF ANY OF THE FOREGOING) RELATING IN ANY WAY TO BORROWER-LENDER RELATIONSHIP BETWEEN THE PARTIES.  IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS NOTE. THIS WAIVER OF JURY TRIAL IS SEPARATELY GIVEN, KNOWINGLY, WILLINGLY AND**

**VOLUNTARILY MADE BY BORROWERS AND BORROWERS HEREBY AGREE THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. AGENT IS HEREBY AUTHORIZED TO SUBMIT THIS NOTE TO ANY COURT HAVING JURISDICTION OVER THE SUBJECT MATTER AND BORROWERS SO AS TO SERVE AS CONCLUSIVE EVIDENCE OF SUCH WAIVER OF RIGHT TO TRIAL BY JURY. BORROWERS REPRESENTS AND WARRANTS THAT THEY HAVE BEEN REPRESENTED IN THE SIGNING OF THIS NOTE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND/OR THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL**.

27.     **Waiver of Defenses, Counterclaims, etc.**   Borrowers hereby waive the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Agent or Lender or its agents, or otherwise offset any obligations to make payments required hereunder or under any of the other Loan Documents.  Any assignee of Lender's interest in and to this Note and/or any of the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrowers may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrowers in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrowers.

28.     **Patriot Act Compliance**.

(a)     Borrowers shall comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction over Borrowers and the Property, including those relating to money laundering and terrorism.  Agent shall have the right to audit Borrowers' compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction over Borrowers and the Property, including those relating to money laundering and terrorism.  In the event that Borrowers fail to comply with the Patriot Act or any such requirements of governmental authorities, then Agent may, at its option, cause to comply therewith and any and all reasonable costs and expenses incurred by Agent in connection therewith shall be secured by the Note and the other Loan Documents and shall be immediately due and payable.  For purposes hereof, the term "Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(b)     The Patriot Act and federal regulations issued with respect thereto require all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution.  Consequently, Agent may from time-to-time request, and Borrowers shall provide to Agent, Borrowers' name, address, relevant tax identification number and/or such other identification information as shall be necessary for Agent to comply with federal law.  An "account" for this purpose may include, without limitation, a deposit account, cash management service, a transaction or asset account, a credit account, a loan or other extension of credit, and/or other financial services product.

(c)     Neither Borrowers nor any partner in Borrowers or member of such partner nor any owner of a direct or indirect interest in Borrowers (i) is listed on any Government Lists, (ii) is a Prohibited Person, (iii) is a Sanctioned Person, (iv) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude, or (v) is currently under investigation by any governmental authority for alleged criminal activity.

29.     **Anti-Money Laundering/International Trade Law Compliance**.  Borrower hereby represents and warrants and agrees that:

(a)     The proceeds of the Loan will not be used to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any law, regulation, order or directive enforced by any Compliance Authority.

(b)     The funds used to repay the Loan are not derived from any unlawful activity.

19

(c)     Each Covered Entity is in compliance with, and no Covered Entity engages in any dealings or transactions prohibited by, any laws of the United States, including but not limited to any Anti-Terrorism Laws.

(d)     It shall immediately notify Agent in writing upon the occurrence of a Reportable Compliance Event.

(e)     As used herein: "Anti-Terrorism Laws" means any laws relating to terrorism, trade Sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "Compliance Authority" means each and all of the (a) U.S. Treasury Department/Office of Foreign Assets Control, (b) U.S. Treasury Department/Financial Crimes Enforcement Network, (c) U.S. State Department/Directorate of Defense Trade Controls, (d) U.S. Commerce Department/Bureau of Industry and Security, (e) U.S. Internal Revenue Service, (f) U.S. Justice Department, and (g) U.S. Securities and Exchange Commission; "Covered Entity" means each of the Borrowers, their affiliates and subsidiaries, all guarantors, pledgors of collateral, all owners of the foregoing, and all brokers or other agents of Borrowers acting in any capacity in connection with the Loan; "Reportable Compliance Event" means that any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; "Sanctioned Country" means a country subject to a Sanctions program maintained by any Compliance Authority; and "Sanctioned Person" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any order or directive of any Compliance Authority or otherwise subject to, or specially designated under, any Sanctions program maintained by any Compliance Authority.

(f)     All of the representations and warranties in this Section 33 and elsewhere in the Loan Documents (i) shall survive the funding and repayment of the Loan and (ii) shall be deemed to have been relied upon by Agent notwithstanding any investigation heretofore or hereafter made by Agent or on its behalf.

30.     **[Reserved].**

31.     **Miscellaneous**.  Time is of the essence under this Note.  The paragraph headings of this Note are for convenience only, and shall not limit or otherwise affect any of the terms hereof.  This Note and the other Loan Documents, if any, constitute the entire agreement between the parties with respect to their subject matter and supersede all prior letters, representations, or agreements, oral or written, with respect thereto.  No modification, release or waiver of this Note shall be deemed to be made by Lender unless in writing signed by Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved.  No course of dealing or conduct shall be effective to modify, release or waive any provisions of this Note or any of the other Loan Documents. Borrowers acknowledge that this Note is an instrument for the payment of money only. This Note shall inure to the benefit of and be enforceable by Agent, Lender and Lender's successors and assigns and any other person to whom Agent or Lender may grant an interest in the obligations evidenced by this Note and shall be binding upon and enforceable against Borrowers and Borrowers' successors and assigns, it being understood that Borrowers may not assign this Note without the prior written consent of Lender.  Borrowers  agree that Lender may at any time  sell, assign, transfer, hypothecate or pledge one or more interests or participations in all or part of its rights and obligations in this Note. Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. Lender may grant participations in this Note in accordance with the provisions set forth in Section 15.10 of the Existing Credit Agreement.  The Obligations under this Note and the grant of a security interest in Collateral to secure this Note shall be subject to the terms and conditions of the Intercreditor Agreement and shall be deemed DIP Financing provided in accordance with Section 6.1(a) of the Intercreditor Agreement.

**_Borrowers_:**

**Christopher R. Murray, as Trustee for the Chapter 7**
**Bankruptcy Estate of Anchor Drilling Fluids USA, LLC and Q'MAX AMERICA, INC.**


By: _____
Name: Christopher R. Murray
Title:    Trustee

<u>SCHEDULE 1</u>

<u>Permitted Liens</u>

1.  Liens permitted under the Intercreditor Agreement; and

2.  Permitted Liens as defined in the Existing Credit Agreement and in existence prior to the Petition Date.

2618771.13

## SCHEDULE 2

## Budget

| | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| **Beginning A/R** | | 23,930,910 | 24,412,146 | 25,112,098 | 25,734,373 | 26,286,119 |
| Billings | | 1,617,350 | 1,453,292 | 1,363,637 | 1,355,422 | 1,339,582 |
| Collections | | (1,388,043) | (1,182,226) | (1,184,639) | (1,244,692) | (1,166,656) |
| Sales Moved from Unbilled | | 251,928 | 428,886 | 443,278 | 441,016 | 391,679 |
| Ending A/R | 23,930,910 | 24,412,146 | 25,112,098 | 25,734,373 | 26,286,119 | 26,850,724 |
| | | | | | | |
| Beginning Unbilled A/R | | 3,600,258 | 3,348,329 | 2,919,444 | 2,476,166 | 2,035,150 |
| Unbilled to Billed | | (251,928) | (428,886) | (443,278) | (441,016) | (391,679) |
| **Ending Unbilled A/R** | 3,600,258 | 3,348,329 | 2,919,444 | 2,476,166 | 2,035,150 | 1,643,472 |
| **Total Ending Gross A/R** | 27,531,167 | 27,760,475 | 28,031,541 | 28,210,539 | 28,321,269 | 28,494,196 |
| **Calculated Borrowing Base** | | 18,443,546 | 18,653,050 | 18,745,591 | 18,785,779 | 19,541,622 |
| *Implied Blended Advance Rate* | | *66%* | *67%* | *66%* | *66%* | *69%* |

### Eligible A/R After Ineligibles Applying Advance Rates -- Detailed Calculations Below

| | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|
| Total Eligible Billed A/R - Insured | 13,887,826 | 14,238,559 | 14,542,752 | 14,804,868 | 15,072,117 |
| *Advance Rate* | *90.0%* | *90.0%* | *90.0%* | *90.0%* | *90.0%* |
| **Calculated Availability** | **12,499,043** | **12,814,703** | **13,088,477** | **13,324,381** | **13,564,905** |
| | | | | | |
| Total Eligible Unnamed A/R - Uninsured | 5,199,415 | 5,362,410 | 5,502,843 | 5,622,896 | 5,745,173 |
| *Advance Rate* | *85.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* |
| **Calculated Availability** | **4,419,503** | **4,558,049** | **4,677,416** | **4,779,461** | **4,883,397** |
| | | | | | |
| Total Eligible unbilled A/R | 2,996,755 | 2,607,063 | 2,206,264 | 1,809,249 | 1,457,759 |
| *Advance Rate* | *75.0%* | *75.0%* | *75.0%* | *75.0%* | *75.0%* |
| Calculated Availability | 2,247,566 | 1,955,297 | 1,654,698 | 1,356,937 | 1,093,320 |
| *Unbilled CAP* | *2,200,000* | *2,000,000* | *1,800,000* | *1,600,000* | *1,400,000* |
| **Selected Availability** | **2,200,000** | **1,955,297** | **1,654,698** | **1,356,937** | **1,093,320** |
| **Total Availability** | **19,118,546** | **19,328,050** | **19,420,591** | **19,460,779** | **19,541,622** |

### Availability & Reserves Applied

| | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|
| **Additional Availability** | - | - | - | - | - |
| | | | | | |
| Availability Block | - | - | - | - | - |
| Accounts Receivable Insurance Deductible Reserve | (500,000) | (500,000) | (500,000) | (500,000) | - |
| Texas Personal Property Tax | (175,000) | (175,000) | (175,000) | (175,000) | - |
| **Total Reserves** | **(675,000)** | **(675,000)** | **(675,000)** | **(675,000)** | **-** |

### Calculated Borrowing Base (Availability Net of Advance Rates + Addtl Availability + Total Reserves)

| | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|
| Total Availability | 19,118,546 | 19,328,050 | 19,420,591 | 19,460,779 | 19,541,622 |
| Additional Availability | - | - | - | - | - |
| Total Reserves | (675,000) | (675,000) | (675,000) | (675,000) | - |
| **Borrowing Base** | **18,443,546** | **18,653,050** | **18,745,591** | **18,785,779** | **19,541,622** |

### Detailed Calculations

**Borrowing Base Breakdown**

| | | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| Gross Ending A/R (Excl Unbilled) | | 24,412,146 | 25,112,098 | 25,734,373 | 26,286,119 | 26,850,724 |
| Billed A/R - Named | 63% | 15,379,652 | 15,820,621 | 16,212,655 | 16,560,255 | 16,915,956 |
| Billed A/R - Unnamed | 37% | 9,032,494 | 9,291,476 | 9,521,718 | 9,725,864 | 9,934,768 |
| **Subtotal** | | **24,412,146** | **25,112,098** | **25,734,373** | **26,286,119** | **26,850,724** |

**Advance Rates**

| | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|
| Billed A/R - Named | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| Billed A/R - Unnamed | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| Unbilled A/R | 75.0% | 75.0% | 75.0% | 75.0% | 75.0% |

| Eligible Named A/R Calculation | | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|---|
| Billed A/R - Named | | | 15,379,652 | 15,820,621 | 16,212,655 | 16,560,255 | 16,915,956 |
| Ineligibles - Aged (>120 DPD) | | | (815,122) | (854,314) | (891,696) | (927,374) | (964,210) |
| Ineligibles - Cross Aged (>50% of A/R >60 DPD) | | | (492,149) | (522,081) | (551,230) | (579,609) | (608,974) |
| Implied Ineligibles - Over Credit Limit | | | (184,556) | (205,668) | (226,977) | (248,404) | (270,655) |
| Subtotal Ineligibles | | | (1,491,826) | (1,582,062) | (1,669,903) | (1,755,387) | (1,843,839) |
| Total Eligible Billed A/R - Insured | | | 13,887,826 | 14,238,559 | 14,542,752 | 14,804,868 | 15,072,117 |

| Billed A/R Ineligible Factors | Adjustment | | | | | | |
|---|---|---|---|---|---|---|---|
| Ineligibles - Aged (>120 DPD) | 5.2% | | 5.3% | 5.4% | 5.5% | 5.6% | 5.7% |
| Ineligibles - Cross Aged (>50% of A/R >60 DPD) | 3.1% | | 3.2% | 3.3% | 3.4% | 3.5% | 3.6% |
| Implied Ineligibles - Over Credit Limit | 1.1% | | 1.2% | 1.3% | 1.4% | 1.5% | 1.6% |

| Eligible Unnamed A/R Calculation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Billed A/R - Unnamed | | | 9,032,494 | 9,291,476 | 9,521,718 | 9,725,864 | 9,934,768 |
| Ineligibles - Bankrupt Accounts | | 1,457,533 | (1,457,533) | (1,457,533) | (1,457,533) | (1,457,533) | (1,457,533) |
| Ineligibles - Aged (>60 DPD) | | | (2,041,344) | (2,109,165) | (2,170,952) | (2,227,223) | (2,284,997) |
| Ineligibles - Cross Aged (>50% of A/R >60 DPD) | | | (171,617) | (185,830) | (199,956) | (213,969) | (228,500) |
| Implied Ineligibles - Other | | | (162,585) | (176,538) | (190,434) | (204,243) | (218,565) |
| Subtotal Ineligibles | | | (3,833,079) | (3,929,066) | (4,018,876) | (4,102,968) | (4,189,595) |
| Total Eligible Unnamed A/R - Uninsured | | | 5,199,415 | 5,362,410 | 5,502,843 | 5,622,896 | 5,745,173 |

| Unnamed A/R Ineligible Factors | Adjustment | | | | | | |
|---|---|---|---|---|---|---|---|
| Ineligibles - Bankrupt Accounts | 22.5% | | 22.6% | 22.7% | 22.8% | 22.9% | 23.0% |
| Ineligibles - Aged (>60 DPD) | 1.8% | | 1.9% | 2.0% | 2.1% | 2.2% | 2.3% |
| Ineligibles - Cross Aged (>50% of A/R >60 DPD) | 1.7% | | 1.8% | 1.9% | 2.0% | 2.1% | 2.2% |

| Eligible Unbilled A/R Calculation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unbilled A/R | | | 3,348,329 | 2,919,444 | 2,476,166 | 2,035,150 | 1,643,472 |
| Less: Ineligibles - Aged (>60 DPD) | | | (348,226) | (306,542) | (262,474) | (217,761) | (177,495) |
| Less: Implied Ineligibles - Other | | | (3,348) | (5,839) | (7,428) | (8,141) | (8,217) |
| Subtotal Ineligibles | | | (351,575) | (312,380) | (269,902) | (225,902) | (185,712) |
| Total Eligible unbilled A/R | | | 2,996,755 | 2,607,063 | 2,206,264 | 1,809,249 | 1,457,759 |
| Advance Rate | | | 75% | 75% | 75% | 75% | 75% |
| Total Eligible unbilled A/R | | | 2,247,566 | 1,955,297 | 1,654,698 | 1,356,937 | 1,093,320 |
| Unbilled CAP | | | 2,200,000 | 2,000,000 | 1,800,000 | 1,600,000 | 1,400,000 |
| Selected Availability | | | 2,200,000 | 1,955,297 | 1,654,698 | 1,356,937 | 1,093,320 |

| Unbilled A/R Ineligible Factors | Adjustment | | | | | | |
|---|---|---|---|---|---|---|---|
| Less: Ineligibles - Aged (>60 DPD) | 10.3% | | 10.4% | 10.5% | 10.6% | 10.7% | 10.8% |
| Less: Implied Ineligibles - Other | 0.0% | | 0.1% | 0.2% | 0.3% | 0.4% | 0.5% |

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in 000's*

| | | | | | | Post-Petition | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week #** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | **Total** | **Notes** |
| **Week Ending** | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | | |
| Total Receipts | | | | | | | | | | | | | | | | | | | |
| Customer Receipts US: Pre-Petition | 1,388 | 1,182 | 1,185 | 1,245 | 1,167 | - | - | - | - | - | - | - | - | - | - | - | - | 6,166 | Assumes Pre-Petition A/R collection |
| Customer Receipts US: Post-Petition | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Proceeds: ProfitCo Sale (Entity) | - | - | - | - | 7,000 | - | - | - | - | - | - | - | - | - | - | - | - | 7,000 | Asset Sale Proceeds |
| Total Receipts | 1,388 | 1,182 | 1,185 | 1,245 | 8,167 | - | - | - | - | - | - | - | - | - | - | - | - | 13,166 | |
| | | | | | | | | | | | | | | | | | | | |
| Operating Cash Disbursements | | | | | | | | | | | | | | | | | | | |
| Payroll & Benefits (BCBS Ins.) | (331) | (766) | (219) | (215) | (419) | - | - | - | - | - | - | - | - | - | - | - | - | (1,950) | See Schedule 1 |
| Logistics | (188) | (177) | (143) | (143) | (142) | - | - | - | - | - | - | - | - | - | - | - | - | (793) | See Schedule 1 |
| Vendor Payments - COD | (806) | (682) | (627) | (622) | (613) | - | - | - | - | - | - | - | - | - | - | - | - | (3,350) | See Schedule 1 |
| Critical Suppliers | (200) | (200) | (300) | (700) | (700) | - | - | - | - | - | - | - | - | - | - | - | - | (2,100) | Estimated Lien Hold Costs |
| Vendors & Contractors | (307) | (285) | (277) | (273) | (258) | - | - | - | - | - | - | - | - | - | - | - | - | (1,399) | See Schedule 1 |
| Rent | (176) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (176) | See Schedule 2 |
| Utility Reserve | - | (55) | (20) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (75) | See Schedule 3 |
| Repairs & Maintenance | (10) | (10) | (10) | (10) | (10) | - | - | - | - | - | - | - | - | - | - | - | - | (50) | Assumes $10k / week |
| Pcard, Fuel, Mud Engineer Exp | (34) | (26) | (21) | (21) | (19) | - | - | - | - | - | - | - | - | - | - | - | - | (121) | See Schedule 1 |
| Other (Leases, Sales Tax, Int., Misc.) | (81) | (110) | (46) | (224) | (447) | - | - | - | - | - | - | - | - | - | - | - | - | (908) | See Schedule 4 |
| Total Operating Disbursements | (2,133) | (2,310) | (1,663) | (2,207) | (2,609) | - | - | - | - | - | - | - | - | - | - | - | - | (10,922) | |
| Net Operating Cash Flow | (745) | (1,128) | (478) | (963) | 5,558 | - | - | - | - | - | - | - | - | - | - | - | - | 2,244 | |
| | | | | | | | | | | | | | | | | | | | |
| Corporate Non-Operating | | | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | (60) | (60) | (57) | (16) | (68) | - | - | - | - | - | - | - | - | - | - | - | - | (263) | See Schedule 5 |
| Other (State taxes, PRP Ins., IT, Misc.) | (10) | (240) | (232) | (32) | (275) | - | - | - | - | - | - | - | - | - | - | - | - | (789) | See Schedule 6 |
| Total Corporate Non-Oper. Disbursements | (70) | (300) | (289) | (48) | (343) | - | - | - | - | - | - | - | - | - | - | - | - | (1,052) | |
| | | | | | | | | | | | | | | | | | | | |
| Trustee Operating Costs | | | | | | | | | | | | | | | | | | | |
| Trustee Legal Advisors | - | - | - | - | (250) | - | - | - | - | - | - | - | - | - | - | - | - | (250) | Initial Estimate of legal fees |
| Trustee Financial Advisors | - | - | - | - | (400) | - | - | - | - | - | - | - | - | - | - | - | - | (400) | Initial Estimate of FA fees |
| Trustee Fees | - | - | - | - | (660) | - | - | - | - | - | - | - | - | - | - | - | - | (660) | Trustee Fee on disbursements |
| HSBC Canadian Receiver | - | - | - | - | (6,767) | - | - | - | - | - | - | - | - | - | - | - | - | (6,767) | Sales proceeds net of Trustee fee |
| New Money Loan Fee | - | - | - | (600) | - | - | - | - | - | - | - | - | - | - | - | - | - | (600) | EBC Loan Fee |
| Total Trustee Operating Costs | - | - | - | (600) | (8,077) | - | - | - | - | - | - | - | - | - | - | - | - | (8,677) | |
| | | | | | | | | | | | | | | | | | | | |
| Total Disbursements | (2,203) | (2,610) | (1,952) | (2,855) | (11,029) | - | - | - | - | - | - | - | - | - | - | - | - | (20,650) | |
| | | | | | | | | | | | | | | | | | | | |
| Cash & Liquidity | | | | | | | | | | | | | | | | | | | |
| Beginning Cash (Anchor US/ Corp) | - | - | 500 | 500 | 500 | (6,567) | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | | |
| Funds Drawn | 2,203 | 3,110 | 1,952 | 2,855 | 3,962 | 6,767 | - | - | - | - | - | - | - | - | - | - | - | | |
| Disbursements | (2,203) | (2,610) | (1,952) | (2,855) | (11,029) | - | - | - | - | - | - | - | - | - | - | - | - | | |
| Ending Cash (Anchor US/ Corp) | - | 500 | 500 | 500 | (6,567) | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | | |
| | | | | | | | | | | | | | | | | | | | |
| Gross Receipts To Encina | 1,388 | 1,182 | 1,185 | 1,245 | 8,167 | - | - | - | - | - | - | - | - | - | - | - | - | | |
| Gross Disbursements | (2,203) | (2,610) | (1,952) | (2,855) | (11,029) | - | - | - | - | - | - | - | - | - | - | - | - | | |

**Notes:**
1) 3% on funds disbursed and calculated at closing
2) $250k for Trustee Legal Advisors
3) $400k for Trustee Financial Advisors
4) $200k for Unsecured
5) If Trustee saves from 2 and 3, he keeps and it goes to 4 or if there is overage in 2 or 3 to pay the other .

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in 000's*

| | | | | | | Post-Petition | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Total | Notes |
| Week Ending | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | | |
| **A/R Rollforward** | | | | | | | | | | | | | | | | | | | |
| Beginning A/R Balance | 27,531 | 27,760 | 28,032 | 28,211 | 28,321 | - | - | - | - | - | - | - | - | - | - | - | - | | |
| + New Billings | 1,617 | 1,453 | 1,364 | 1,355 | 1,340 | | | | | | | | | | | | | | |
| - Collections | (1,388) | (1,182) | (1,185) | (1,245) | (1,167) | | | | | | | | | | | | | | |
| - Sale of A/R to NewCo Adjustment (Non-Ca | | | | | (28,494) | | | | | | | | | | | | | | |
| Ending A/R Balance | 27,760 | 28,032 | 28,211 | 28,321 | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| - Ineligibles | (8,642) | (8,703) | (8,790) | (8,860) | - | | | | | | | | | | | | | | |
| Collateral (Borrowing Base) | 19,119 | 19,328 | 19,421 | 19,461 | - | | | | | | | | | | | | | | |
| Additional Reserves | (675) | (675) | (675) | (675) | - | | | | | | | | | | | | | | |
| Net Available Collateral (Borrowing Base) | 18,444 | 18,653 | 18,746 | 18,786 | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| **ABL - Pre-Petition** | | | | | | | | | | | | | | | | | | | |
| Beginning Balance - Pre-Petition | 19,581 | 13,941 | 12,759 | 11,575 | 10,330 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Pre-Petition Receipts | (1,388) | (1,182) | (1,185) | (1,245) | (1,167) | - | | | | | | | | | | | | | |
| Encina: Draws | - | - | - | - | | | | | | | | | | | | | | | |
| Proceeds: ProfitCo Sale (Entity) | | | | | | | | | | | | | | | | | | | |
| Transfer of Debt to NewCo | | | | | (9,163) | | | | | | | | | | | | | | |
| Reconciling Payment | (4,252) | - | - | - | | | | | | | | | | | | | | | |
| Ending Balance - Pre-Petition | 13,941 | 12,759 | 11,575 | 10,330 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **New Money Loan** | | | | | | | | | | | | | | | | | | | |
| Beginning Balance - DIP Loan | - | 2,203 | 5,314 | 7,171 | 8,456 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Pre-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| Post-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| New Money Draws | 2,203 | 3,110 | 1,857 | 1,285 | 3,821 | | | | | | | | | | | | | | |
| Transfer of Debt to NewCo | | - | - | - | (12,277) | | | | | | | | | | | | | | |
| Ending Balance - DIP Loan | 2,203 | 5,314 | 7,171 | 8,456 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **Consolidated Debt** | | | | | | | | | | | | | | | | | | | |
| Beginning Balance - Consolidated | 19,581 | 16,145 | 18,073 | 18,746 | 18,786 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Pre-Petition Receipts | (1,388) | (1,182) | (1,185) | (1,245) | (1,167) | - | | | | | | | | | | | | | |
| Post-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| Total Draws | 2,203 | 3,110 | 1,857 | 1,285 | 3,821 | | | | | | | | | | | | | | |
| Proceeds: ProfitCo Sale (Entity) | | | | | | | | | | | | | | | | | | | |
| Transfer of Debt to NewCo | | | - | - | (21,440) | | | | | | | | | | | | | | |
| Reconciling Payment | (4,252) | - | - | - | - | | | | | | | | | | | | | | |
| Ending Balance - Consolidated | 16,145 | 18,073 | 18,746 | 18,786 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| *Excess / (Overadvance) Availability* | *2,299* | *580* | *0* | *0* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | | |
| **Palladium DIP** | | | | | | | | | | | | | | | | | | | |
| Beginning Balance - Consolidated | - | - | - | 95 | 1,665 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | | |
| Pre-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| Post-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| Total Draws | - | - | 95 | 1,570 | 141 | 6,767 | | | | | | | | | | | | | |
| Proceeds: Asset Sales & Inventory | - | - | - | - | - | | | | | | | | | | | | | | |
| Proceeds: ProfitCo Sale (Entity) | - | - | - | - | - | | | | | | | | | | | | | | |
| Transfer of Debt to NewCo | - | - | - | - | - | | | | | | | | | | | | | | |
| Reconciling Payment | - | - | - | - | | (6,767) | | | | | | | | | | | | | |
| Ending Balance - Consolidated | - | - | 95 | 1,665 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | | |
| *Excess / (Overadvance) Availability* | *3,500* | *3,500* | *3,405* | *1,835* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | | |
| Total Debt | 16,145 | 18,073 | 18,840 | 20,451 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | | |

**Anchor Drilling Fluids USA, LLC - Rig Operations Summary**                                                                                                                                 Schedule 1

*USD in Actuals*

| Rig Number | Customer | Rig Name | A/R at Risk | Revenue[1] | Inventory | Logistics | Personnel[2] | Contractors | Other Overhead | Overhead: Anchor G&A | Total Rig Expenses | Total Operating Income | Completion Date: Pad/Job/Well |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Customer 1 | #252 | $ 4,006,771 | $ 130,039 | $ - | $ 14,643 | $ 117,635 | $ 75,140 | $ 6,138 | $ - | $ 213,556 | $ (83,517) | 8/1/2020 |
| 2 | Customer 6 | #24 | 1,481,257 | 175,000 | - | 19,706 | 117,635 | 75,140 | 6,138 | - | 218,618 | (43,618) | 9/1/2020 |
| 3 | Customer 6 | #25 | - | 175,000 | - | 19,706 | 117,635 | 75,140 | 6,138 | - | 218,618 | (43,618) | 9/1/2020 |
| 4 | Customer 1 | #581 | - | 687,717 | 224,617 | 77,440 | 117,635 | 75,140 | 6,138 | - | 500,970 | 186,747 | 9/1/2020 |
| 5 | Customer 1 | #584 | - | 608,472 | 322,960 | 68,517 | 117,635 | 75,140 | 6,138 | - | 590,396 | 18,076 | 9/1/2020 |
| 6 | Customer 2 | #598 | 256,952 | 828 | 762 | 147 | 685 | - | 175 | - | 1,768 | (940) | 5/30/2020 |
| 7 | Customer 2 | #T47 | - | 37 | 36 | 7 | 685 | - | 175 | - | 903 | (866) | 5/30/2020 |
| 8 | Customer 2 | #461 | - | 127 | 133 | 23 | 271 | - | 175 | - | 602 | (475) | 5/30/2020 |
| 9 | Customer 2 | #19 | - | - | - | - | - | - | - | - | - | - | 5/17/2020 |
| 10 | Customer 2 | #101 | - | 531 | 483 | 94 | 2,054 | - | 526 | - | 3,157 | (2,626) | 6/1/2020 |
| 11 | Customer 2 | #31 | - | 289 | 267 | 51 | 685 | - | 175 | - | 1,178 | (889) | 5/30/2020 |
| 12 | Customer 2 | #582 | - | 3,602 | 3,503 | 637 | 271 | - | 175 | - | 4,587 | (985) | 5/30/2020 |
| 13 | Customer 3 | #257 | 1,525,627 | - | - | - | - | - | - | - | - | - | 5/29/2020 |
| 14 | Customer 3 | #815 | - | 40,984 | 39,151 | 7,252 | 8,217 | 10,714 | 2,104 | - | 67,439 | (26,455) | 6/10/2020 |
| 15 | Customer 4 | #126 | 2,698,700 | 37,200 | 20,100 | 6,583 | 15,684 | - | 2,104 | - | 44,471 | (7,271) | 6/10/2020 |
| 16 | Customer 4 | #129 | - | 2,299 | 1,242 | 407 | 1,307 | - | 175 | - | 3,132 | (832) | 5/30/2020 |
| 17 | Customer 4 | #167 | - | - | - | - | - | - | - | - | - | - | 5/23/2020 |
| 18 | Customer 4 | #135 | - | 1,291 | 698 | 228 | 1,307 | - | 175 | - | 2,408 | (1,117) | 5/30/2020 |
| 19 | Customer 4 | #132 | - | 23,625 | 12,765 | 4,180 | 15,684 | - | 2,104 | - | 34,734 | (11,109) | 6/10/2020 |
| 20 | Customer 4 | #575 | - | 4,724 | 2,553 | 836 | 1,307 | - | 175 | - | 4,871 | (147) | 5/30/2020 |
| 21 | Customer 4 | #103 | - | - | - | - | - | - | - | - | - | - | 5/21/2020 |
| 22 | Customer 4 | #108 | - | 31,843 | 17,205 | 5,635 | 15,684 | - | 2,104 | - | 40,629 | (8,786) | 6/10/2020 |
| 23 | Customer 4 | #168 | - | 38,894 | 21,015 | 6,882 | 15,684 | - | 2,104 | - | 45,686 | (6,792) | 6/10/2020 |
| 24 | Customer 5 | #571 | 864,859 | 316,446 | 176,365 | 35,633 | 67,181 | 37,570 | 6,138 | - | 322,887 | (6,441) | 9/1/2020 |
| 25 | Customer 5 | #580 | - | 452,044 | 251,200 | 50,902 | 67,181 | 37,570 | 6,138 | - | 412,992 | 39,052 | 9/1/2020 |
| 26 | Customer 14 | #539 | - | 452,044 | 251,200 | 50,902 | 67,181 | 37,570 | 6,138 | - | 412,992 | 39,052 | 9/1/2020 |
| 27 | Customer 6 | #294 | - | 620,090 | 325,359 | 69,825 | 117,635 | 75,140 | 6,138 | - | 594,096 | 25,993 | 9/1/2020 |
| 28 | Customer 7 | #247 | 49,125 | - | - | - | - | - | - | - | - | - | 5/26/2020 |
| 29 | Customer 8 | #564 | 1,448,489 | 35,733 | 30,036 | 6,323 | 4,794 | 8,465 | 1,228 | - | 50,845 | (15,112) | 6/5/2020 |
| 30 | Customer 9 | #162 | 560,444 | 26,580 | 24,415 | 1,710 | 43,173 | 5,850 | 1,228 | - | 76,375 | (49,795) | 6/5/2020 |
| 31 | Customer 9 | #462 | - | 56,720 | 52,100 | 3,650 | 43,173 | 5,850 | 1,228 | - | 105,999 | (49,279) | 6/5/2020 |
| 32 | Customer 10 | #X06 | 480,022 | 52,399 | 41,310 | 2,529 | 45,102 | 11,200 | 2,806 | - | 102,947 | (50,548) | 6/14/2020 |
| 33 | Customer 11 | #42 | 3,245,788 | 601,570 | 241,736 | 67,740 | 117,635 | 127,640 | 6,138 | - | 560,888 | 40,682 | 9/1/2020 |
| 34 | Customer 11 | #43 | - | 555,461 | 205,220 | 62,548 | 117,635 | 127,640 | 6,138 | - | 519,180 | 36,281 | 7/15/2020 |
| 35 | Customer 11 | #44 | - | 443,988 | 166,187 | 49,995 | 117,635 | 127,640 | 6,138 | - | 467,595 | (23,607) | 9/1/2020 |
| 36 | Customer 11 | #46 | - | 356,212 | 269,455 | 40,111 | 117,635 | 127,640 | 6,138 | - | 560,979 | (204,766) | 7/24/2020 |
| 37 | Customer 11 | #45 | - | 434,492 | 328,669 | 48,926 | 117,635 | 127,640 | 6,138 | - | 629,008 | (194,515) | 9/1/2020 |
| 38 | Customer 12 | #339 | - | 41,534 | 19,099 | 4,677 | 90,747 | 57,965 | 4,735 | - | 177,223 | (135,689) | 6/25/2020 |
| 39 | Customer 13 | #X34 | 323,194 | - | - | - | - | - | - | - | - | - | 4/29/2020 |
| 40 | Customer 13 | #END 1 | - | 67,888 | 50,744 | 3,276 | 29,849 | 22,400 | 5,612 | - | 111,881 | (43,993) | 6/30/2020 |
| 41 | Customer 6 | #277 | - | 543,295 | 249,828 | 61,178 | 117,635 | 75,140 | 6,138 | - | 509,918 | 33,377 | 9/1/2020 |
| N/A | | Overhead: Anchor G&A | - | - | - | - | - | - | - | 130,381 | 130,381 | (130,381) | N/A |
| | | **Total** | $ 16,941,228 | $ 7,019,002 | $ 3,350,417 | $ 792,900 | $ 1,949,528 | $ 1,399,334 | $ 121,351 | $ 130,381 | $ 7,743,911 | $ (724,910) | |

**Notes:**

1) Revenue is gross billings and not adjusted for sales tax.

Anchor Drilling Fluids USA, LLC
Palladium Proposal - Chapter 7 Sale of Assets
USD in Actuals $

Schedule 2 - Operating Rent

| Locations suporting well completions and sale to Newco | | | | | |
|---|---|---|---|---|---|
| Name of Warehouse Location | Address | City | State | zip | Monthly Rent |
| HORSEHEADS WAREHOUSE | 124 Wygant Road, Bldg B | Horseheads | NY | 14845 | $16,146 |
| NEWCOMERSTOWN WAREHOUSE | 200 Enterprise Drive | Newcomerstown | OH | 43832 | $20,500 |
| MIDLAND SOLIDS CONTROL | 2106 East Country Road 120 | Midland | TX | 79706 | $18,500 |
| WELLSVILLE MUD PLANT | 2400 Clark Avenue | Wellsville | OH | 43968 | $10,000 |
| WELLSVILLE MUD PLANT | 45,000 sf of land Wellsville OH | Wellsville | OH | | 1250 |
| LEETSDALE PLANT | 545 W. Park Road | Leetsdale | PA | 15056 | $33,906 |
| TULSA OFFICE | 7335 S. Lewis Avenue, Ste. 209 | Tulsa | OK | 74136 | 1969 |
| emplyee housing | 3518 N. Voyager | Odessa | TX | 79764 | $450 |
| emplyee housing | 3512 N. Voyager | Odessa | TX | 79764 | $450 |
| emplyee housing | 1122 West State Street | Newcomerstown | OH | 43832 | $1,500 |
| | | Total | | | $104,671 |

| Lease Locations required to complete operations - to be rejected for July rent | | | | | |
|---|---|---|---|---|---|
| Name of Warehouse Location | Address | City | State | zip | Monthly Rent |
| Pecos | 1.5  acres in Pecos, TX | Pecos | TX | 79772 | $12,600 |
| THREE RIVERS WAREHOUSE | 3067 S. Hwy 37 Access | Three Rivers | TX | 78071 | $8,776 |
| MIDLAND | 6417 W. Industrial Avenue | Midland | TX | 79706 | $34,891 |
| BRIGHTON WAREHOUSE | 995 North 5th Avenue | Brighton | CO | 80603 | $9,157 |
| MINDEN WAREHOUSE / MUD PLANT | 148 McIntyre Road | Minden | LA | 71055 | $4,000 |
| CHEYENNE PRODUCT STORAGE | | Carpenter | WY | | $1,600 |
| | | Total | | | $71,024 |
| | | | | | |
| | Grand Total | | | | $175,695 |

**Anchor Drilling Fluids USA, LLC**

Palladium Proposal - Chapter 7 Sale of Assets

Schedule 3 - Utilities

*USD in 000's*

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | Total |
| **Utility Reserve** | | | | | | | | | | | | | | | | | | |
| Electric | - | (37) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (37) |
| Water | - | (5) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (5) |
| Fuel / Propane | - | (2) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (2) |
| Internet at 50% | - | (6) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (6) |
| Land Lines (Phone) | - | (5) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (5) |
| Utility Reserve - Other | - | - | (20) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (20) |
| **Total** | - | **(55)** | **(20)** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | **(75)** |

| | Jan | Feb | Mar | April | Average |
|---|---|---|---|---|---|
| **Electric** | $ 53,128 | $ 52,349 | $ 60,383 | $ 36,921 | $ **50,695** |
| **Water** | $ 10,537 | $ 7,586 | $ 7,311 | $ 5,053 | $ **7,621** |
| **Security** | $ 67 | $ 66 | $ 33 | | $ **55** |
| **Fuel/Propane** | $ 3,608 | $ 2,565 | $ 525 | $ 1,791 | $ **2,122** |
| **Internet** | $ 14,615 | $ 16,770 | $ 14,442 | $ 11,261 | $ **14,272** |
| **Cell Phone** | $ 10,073 | $ 11,090 | $ 11,880 | $ 9,944 | $ **10,747** |
| **Phone** | $ 9,244 | $ 9,600 | $ 6,315 | $ 5,099 | $ **7,565** |
| **Total** | $ 101,272 | $ 100,026 | $ 100,889 | $ 70,070 | $ **93,078** |

**Anchor Drilling Fluids USA, LLC**
Palladium Proposal - Chapter 7 Sale of Assets
*USD in 000's*

Schedule 4 - Other Operating Disbursements

| Week #<br>Week Ending | 1<br>6/5 | 2<br>6/12 | 3<br>6/19 | 4<br>6/26 | 5<br>7/3 | 6<br>7/10 | 7<br>7/17 | 8<br>7/24 | 9<br>7/31 | 10<br>8/7 | 11<br>8/14 | 12<br>8/21 | 13<br>8/28 | 14<br>9/4 | 15<br>9/11 | 16<br>9/18 | 17<br>9/25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Other Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| NewCo: Sales Tax (Avalara) | - | - | - | (162) | (240) | - | - | - | - | - | - | - | - | - | - | - | - | (402) |
| NewCo Vehicle Leases | - | (95) | - | (36) | - | - | - | - | - | - | - | - | - | - | - | - | - | (131) |
| NewCo: Lease | (50) | (15) | (25) | (15) | (50) | - | - | - | - | - | - | - | - | - | - | - | - | (155) |
| Disc Ops: Sales Tax (Avalara) | - | - | (10) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (10) |
| Disc Ops: Vehicle Leases | - | - | - | (10) | - | - | - | - | - | - | - | - | - | - | - | - | - | (10) |
| Cell Phones | - | - | (11) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (11) |
| NewCo: Cash Interest | (23) | - | - | - | (114) | - | - | - | - | - | - | - | - | - | - | - | - | (137) |
| Disc Ops: Cash Interest | (8) | - | - | - | (43) | - | - | - | - | - | - | - | - | - | - | - | - | (51) |
| **Total** | **(81)** | **(110)** | **(46)** | **(224)** | **(447)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(908)** |

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in Actuals $*

Schedule 5 - Corporate Payroll & Benefits

| Week #<br>Week Ending | 1<br>6/5 | 2<br>6/12 | 3<br>6/19 | 4<br>6/26 | 5<br>7/3 | 6<br>7/10 | 7<br>7/17 | 8<br>7/24 | 9<br>7/31 | 10<br>8/7 | 11<br>8/14 | 12<br>8/21 | 13<br>8/28 | 14<br>9/4 | 15<br>9/11 | 16<br>9/18 | 17<br>9/25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Corporate EE's Assumed Costs** | | | | | | | | | | | | | | | | | | |
| Campbell, Marc | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Coe, Brian | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Glover, Eric | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3 |
| Richey, Linda Lee Norvell | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Derrick William | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Brad Hilliard | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Rosen, Max | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2 |
| **Total** | **7** | **7** | **6** | **5** | **5** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **30** |
| | | | | | | | | | | | | | | | | | | |
| **Corporate EE's Assumed Costs** | | | | | | | | | | | | | | | | | | |
| Campbell, Marc | 1,794 | 1,794 | 1,794 | 1,794 | 1,794 | - | - | - | - | - | - | - | - | - | - | - | - | 8,970 |
| Coe, Brian | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 |
| Glover, Eric | 15,000 | 15,000 | 15,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 45,000 |
| Richey, Linda Lee Norvell | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | - | - | - | - | - | - | - | - | - | - | - | - | 15,625 |
| Derrick William | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | - | - | - | - | - | - | - | - | - | - | - | - | 15,000 |
| Brad Hilliard | 3,391 | 3,391 | 3,391 | 3,391 | 3,391 | - | - | - | - | - | - | - | - | - | - | - | - | 16,956 |
| Rosen, Max | 3,021 | 3,021 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 6,042 |
| **Total** | **34,331** | **34,331** | **31,310** | **16,310** | **16,310** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **132,593** |
| | | | | | | | | | | | | | | | | | | |
| **Other Corporate OH** | | | | | | | | | | | | | | | | | | |
| Rig Operations G&A Corporate | 26,076 | 26,076 | 26,076 | - | 52,152 | - | - | - | - | - | - | - | - | - | - | - | - | 130,381 |
| | | | | | | | | | | | | | | | | | | |
| **Total Corporate Payroll & Benefits** | **60,407** | **60,407** | **57,386** | **16,310** | **68,463** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **262,974** |

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in 000's*

Schedule 6 - Corporate Other Disbursements

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | |
| **Corporate Other Disbursements** | | | | | | | | | | | | | | | | | | |
| Taxes: Other States | - | - | (25) | - | (175) | - | - | - | - | - | - | - | - | - | - | - | - | (200) |
| Workers' Compensation | - | - | (147) | - | (100) | - | - | - | - | - | - | - | - | - | - | - | - | (247) |
| WD Costs: IT/Facility-Related | - | - | (50) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (50) |
| Insurance: 45 Day Policy | - | (200) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (200) |
| DIP: Interest & Fees | - | - | - | (22) | - | - | - | - | - | - | - | - | - | - | - | - | - | (22) |
| Other Corporate | (10) | (40) | (10) | (10) | - | - | - | - | - | - | - | - | - | - | - | - | - | (70) |
| **Total** | **(10)** | **(240)** | **(232)** | **(32)** | **(275)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(789)** |

**<u>Exhibit B</u>**
Budget
(see attached)

| | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| **Beginning A/R** | | 23,930,910 | 24,412,146 | 25,112,098 | 25,734,373 | 26,286,119 |
| Billings | | 1,617,350 | 1,453,292 | 1,363,637 | 1,355,422 | 1,339,582 |
| Collections | | (1,388,043) | (1,182,226) | (1,184,639) | (1,244,692) | (1,166,656) |
| Sales Moved from Unbilled | | 251,928 | 428,886 | 443,278 | 441,016 | 391,679 |
| Ending A/R | 23,930,910 | 24,412,146 | 25,112,098 | 25,734,373 | 26,286,119 | 26,850,724 |
| | | | | | | |
| Beginning Unbilled A/R | | 3,600,258 | 3,348,329 | 2,919,444 | 2,476,166 | 2,035,150 |
| Unbilled to Billed | | (251,928) | (428,886) | (443,278) | (441,016) | (391,679) |
| **Ending Unbilled A/R** | 3,600,258 | 3,348,329 | 2,919,444 | 2,476,166 | 2,035,150 | 1,643,472 |
| | | | | | | |
| **Total Ending Gross A/R** | 27,531,167 | 27,760,475 | 28,031,541 | 28,210,539 | 28,321,269 | 28,494,196 |
| **Calculated Borrowing Base** | | 18,443,546 | 18,653,050 | 18,745,591 | 18,785,779 | 19,541,622 |
| *Implied Blended Advance Rate* | | *66%* | *67%* | *66%* | *66%* | *69%* |

| **Eligible A/R After Ineligibles Applying Advance Rates -- Detailed Calculations Below** | | | | | |
|---|---|---|---|---|---|
| Total Eligible Billed A/R - Insured | 13,887,826 | 14,238,559 | 14,542,752 | 14,804,868 | 15,072,117 |
| *Advance Rate* | *90.0%* | *90.0%* | *90.0%* | *90.0%* | *90.0%* |
| **Calculated Availability** | 12,499,043 | 12,814,703 | 13,088,477 | 13,324,381 | 13,564,905 |
| | | | | | |
| Total Eligible Unnamed A/R - Uninsured | 5,199,415 | 5,362,410 | 5,502,843 | 5,622,896 | 5,745,173 |
| *Advance Rate* | *85.0%* | *85.0%* | *85.0%* | *85.0%* | *85.0%* |
| **Calculated Availability** | 4,419,503 | 4,558,049 | 4,677,416 | 4,779,461 | 4,883,397 |
| | | | | | |
| Total Eligible unbilled A/R | 2,996,755 | 2,607,063 | 2,206,264 | 1,809,249 | 1,457,759 |
| *Advance Rate* | *75.0%* | *75.0%* | *75.0%* | *75.0%* | *75.0%* |
| Calculated Availability | 2,247,566 | 1,955,297 | 1,654,698 | 1,356,937 | 1,093,320 |
| *Unbilled CAP* | *2,200,000* | *2,000,000* | *1,800,000* | *1,600,000* | *1,400,000* |
| **Selected Availability** | **2,200,000** | **1,955,297** | **1,654,698** | **1,356,937** | **1,093,320** |
| **Total Availability** | 19,118,546 | 19,328,050 | 19,420,591 | 19,460,779 | 19,541,622 |

| **Availability & Reserves Applied** | | | | | |
|---|---|---|---|---|---|
| **Additional Availability** | - | - | - | - | - |
| Availability Block | - | - | - | - | - |
| Accounts Receivable Insurance Deductible Reserve | (500,000) | (500,000) | (500,000) | (500,000) | - |
| Texas Personal Property Tax | (175,000) | (175,000) | (175,000) | (175,000) | - |
| **Total Reserves** | **(675,000)** | **(675,000)** | **(675,000)** | **(675,000)** | **-** |

| **Calculated Borrowing Base (Availability Net of Advance Rates + Addtl Availability + Total Reserves)** | | | | | |
|---|---|---|---|---|---|
| Total Availability | 19,118,546 | 19,328,050 | 19,420,591 | 19,460,779 | 19,541,622 |
| Additional Availability | - | - | - | - | - |
| Total Reserves | (675,000) | (675,000) | (675,000) | (675,000) | - |
| **Borrowing Base** | **18,443,546** | **18,653,050** | **18,745,591** | **18,785,779** | **19,541,622** |

| **Detailed Calculations** | | | | | | |
|---|---|---|---|---|---|---|
| **Borrowing Base Breakdown** | | | | | | |
| Gross Ending A/R (Excl Unbilled) | | 24,412,146 | 25,112,098 | 25,734,373 | 26,286,119 | 26,850,724 |
| Billed A/R - Named | 63% | 15,379,652 | 15,820,621 | 16,212,655 | 16,560,255 | 16,915,956 |
| Billed A/R - Unnamed | 37% | 9,032,494 | 9,291,476 | 9,521,718 | 9,725,864 | 9,934,768 |
| **Subtotal** | | 24,412,146 | 25,112,098 | 25,734,373 | 26,286,119 | 26,850,724 |

| **Advance Rates** | | | | | |
|---|---|---|---|---|---|
| Billed A/R - Named | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| Billed A/R - Unnamed | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| Unbilled A/R | 75.0% | 75.0% | 75.0% | 75.0% | 75.0% |

### Eligible Named A/R Calculation

| | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| Billed A/R - Named | | 15,379,652 | 15,820,621 | 16,212,655 | 16,560,255 | 16,915,956 |
| Ineligibles - Aged (>120 DPD) | | (815,122) | (854,314) | (891,696) | (927,374) | (964,210) |
| Ineligibles - Cross Aged (>50% of A/R >60 DPD) | | (492,149) | (522,081) | (551,230) | (579,609) | (608,974) |
| Implied Ineligibles - Over Credit Limit | | (184,556) | (205,668) | (226,977) | (248,404) | (270,655) |
| Subtotal Ineligibles | | (1,491,826) | (1,582,062) | (1,669,903) | (1,755,387) | (1,843,839) |
| Total Eligible Billed A/R - Insured | | 13,887,826 | 14,238,559 | 14,542,752 | 14,804,868 | 15,072,117 |

**Billed A/R Ineligible Factors**

| | Adjustment | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| Ineligibles - Aged (>120 DPD) | 5.2% | 5.3% | 5.4% | 5.5% | 5.6% | 5.7% |
| Ineligibles - Cross Aged (>50% of A/R >60 DPD) | 3.1% | 3.2% | 3.3% | 3.4% | 3.5% | 3.6% |
| Implied Ineligibles - Over Credit Limit | 1.1% | 1.2% | 1.3% | 1.4% | 1.5% | 1.6% |

### Eligible Unnamed A/R Calculation

| | Adjustment | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| Billed A/R - Unnamed | | 9,032,494 | 9,291,476 | 9,521,718 | 9,725,864 | 9,934,768 |
| Ineligibles - Bankrupt Accounts | 1,457,533 | (1,457,533) | (1,457,533) | (1,457,533) | (1,457,533) | (1,457,533) |
| Ineligibles - Aged (>60 DPD) | | (2,041,344) | (2,109,165) | (2,170,952) | (2,227,223) | (2,284,997) |
| Ineligibles - Cross Aged (>50% of A/R >60 DPD) | | (171,617) | (185,830) | (199,956) | (213,969) | (228,500) |
| Implied Ineligibles - Other | | (162,585) | (176,538) | (190,434) | (204,243) | (218,565) |
| Subtotal Ineligibles | | (3,833,079) | (3,929,066) | (4,018,876) | (4,102,968) | (4,189,595) |
| Total Eligible Unnamed A/R - Uninsured | | 5,199,415 | 5,362,410 | 5,502,843 | 5,622,896 | 5,745,173 |

**Unnamed A/R Ineligible Factors**

| | Adjustment | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| Ineligibles - Bankrupt Accounts | 22.5% | 22.6% | 22.7% | 22.8% | 22.9% | 23.0% |
| Ineligibles - Aged (>60 DPD) | 1.8% | 1.9% | 2.0% | 2.1% | 2.2% | 2.3% |
| Ineligibles - Cross Aged (>50% of A/R >60 DPD) | 1.7% | 1.8% | 1.9% | 2.0% | 2.1% | 2.2% |

### Eligible Unbilled A/R Calculation

| | Adjustment | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| Unbilled A/R | | 3,348,329 | 2,919,444 | 2,476,166 | 2,035,150 | 1,643,472 |
| Less: Ineligibles - Aged (>60 DPD) | | (348,226) | (306,542) | (262,474) | (217,761) | (177,495) |
| Less: Implied Ineligibles - Other | | (3,348) | (5,839) | (7,428) | (8,141) | (8,217) |
| Subtotal Ineligibles | | (351,575) | (312,380) | (269,902) | (225,902) | (185,712) |
| Total Eligible unbilled A/R | | 2,996,755 | 2,607,063 | 2,206,264 | 1,809,249 | 1,457,759 |
| Advance Rate | | 75% | 75% | 75% | 75% | 75% |
| Total Eligible unbilled A/R | | 2,247,566 | 1,955,297 | 1,654,698 | 1,356,937 | 1,093,320 |
| Unbilled CAP | | 2,200,000 | 2,000,000 | 1,800,000 | 1,600,000 | 1,400,000 |
| **Selected Availability** | | **2,200,000** | **1,955,297** | **1,654,698** | **1,356,937** | **1,093,320** |

**Unbilled A/R Ineligible Factors**

| | Adjustment | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|
| Less: Ineligibles - Aged (>60 DPD) | 10.3% | 10.4% | 10.5% | 10.6% | 10.7% | 10.8% |
| Less: Implied Ineligibles - Other | 0.0% | 0.1% | 0.2% | 0.3% | 0.4% | 0.5% |

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in 000's*

| | | | | | | Post-Petition | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week #** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** | **14** | **15** | **16** | **17** | **Total** | **Notes** |
| **Week Ending** | **6/5** | **6/12** | **6/19** | **6/26** | **7/3** | **7/10** | **7/17** | **7/24** | **7/31** | **8/7** | **8/14** | **8/21** | **8/28** | **9/4** | **9/11** | **9/18** | **9/25** | | |
| <u>Total Receipts</u> | | | | | | | | | | | | | | | | | | | |
| Customer Receipts US: Pre-Petition | 1,388 | 1,182 | 1,185 | 1,245 | 1,167 | - | - | - | - | - | - | - | - | - | - | - | - | 6,166 | Assumes Pre-Petition A/R collection |
| Customer Receipts US: Post-Petition | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Proceeds: ProfitCo Sale (Entity) | - | - | - | - | 7,000 | - | - | - | - | - | - | - | - | - | - | - | - | 7,000 | Asset Sale Proceeds |
| Total Receipts | 1,388 | 1,182 | 1,185 | 1,245 | 8,167 | - | - | - | - | - | - | - | - | - | - | - | - | 13,166 | |
| | | | | | | | | | | | | | | | | | | | |
| <u>Operating Cash Disbursements</u> | | | | | | | | | | | | | | | | | | | |
| Payroll & Benefits (BCBS Ins.) | (331) | (766) | (219) | (215) | (419) | - | - | - | - | - | - | - | - | - | - | - | - | (1,950) | See Schedule 1 |
| Logistics | (188) | (177) | (143) | (143) | (142) | - | - | - | - | - | - | - | - | - | - | - | - | (793) | See Schedule 1 |
| Vendor Payments - COD | (806) | (682) | (627) | (622) | (613) | - | - | - | - | - | - | - | - | - | - | - | - | (3,350) | See Schedule 1 |
| Critical Suppliers | (200) | (200) | (300) | (700) | (700) | - | - | - | - | - | - | - | - | - | - | - | - | (2,100) | Estimated Lien Hold Costs |
| Vendors & Contractors | (307) | (285) | (277) | (273) | (258) | - | - | - | - | - | - | - | - | - | - | - | - | (1,399) | See Schedule 1 |
| Rent | (176) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (176) | See Schedule 2 |
| Utility Reserve | - | (55) | (20) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (75) | See Schedule 3 |
| Repairs & Maintenance | (10) | (10) | (10) | (10) | (10) | - | - | - | - | - | - | - | - | - | - | - | - | (50) | Assumes $10k / week |
| Pcard, Fuel, Mud Engineer Exp | (34) | (26) | (21) | (21) | (19) | - | - | - | - | - | - | - | - | - | - | - | - | (121) | See Schedule 1 |
| Other (Leases, Sales Tax, Int., Misc.) | (81) | (110) | (46) | (224) | (447) | - | - | - | - | - | - | - | - | - | - | - | - | (908) | See Schedule 4 |
| Total Operating Disbursements | (2,133) | (2,310) | (1,663) | (2,207) | (2,609) | - | - | - | - | - | - | - | - | - | - | - | - | (10,922) | |
| **Net Operating Cash Flow** | **(745)** | **(1,128)** | **(478)** | **(963)** | **5,558** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **2,244** | |
| | | | | | | | | | | | | | | | | | | | |
| <u>Corporate Non-Operating</u> | | | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | (60) | (60) | (57) | (16) | (68) | - | - | - | - | - | - | - | - | - | - | - | - | (263) | See Schedule 5 |
| Other (State taxes, PRP Ins., IT, Misc.) | (10) | (240) | (232) | (32) | (275) | - | - | - | - | - | - | - | - | - | - | - | - | (789) | See Schedule 6 |
| Total Corporate Non-Oper. Disbursements | (70) | (300) | (289) | (48) | (343) | - | - | - | - | - | - | - | - | - | - | - | - | (1,052) | |
| | | | | | | | | | | | | | | | | | | | |
| <u>Trustee Operating Costs</u> | | | | | | | | | | | | | | | | | | | |
| Trustee Legal Advisors | - | - | - | - | (250) | - | - | - | - | - | - | - | - | - | - | - | - | (250) | Initial Estimate of legal fees |
| Trustee Financial Advisors | - | - | - | - | (400) | - | - | - | - | - | - | - | - | - | - | - | - | (400) | Initial Estimate of FA fees |
| Trustee Fees | - | - | - | - | (660) | - | - | - | - | - | - | - | - | - | - | - | - | (660) | Trustee Fee on disbursements |
| HSBC Canadian Receiver | - | - | - | - | (6,767) | - | - | - | - | - | - | - | - | - | - | - | - | (6,767) | Sales proceeds net of Trustee fee |
| New Money Loan Fee | - | - | - | (600) | - | - | - | - | - | - | - | - | - | - | - | - | - | (600) | EBC Loan Fee |
| Total Trustee Operating Costs | - | - | - | (600) | (8,077) | - | - | - | - | - | - | - | - | - | - | - | - | (8,677) | |
| | | | | | | | | | | | | | | | | | | | |
| Total Disbursements | (2,203) | (2,610) | (1,952) | (2,855) | (11,029) | - | - | - | - | - | - | - | - | - | - | - | - | (20,650) | |
| | | | | | | | | | | | | | | | | | | | |
| <u>**Cash & Liquidity**</u> | | | | | | | | | | | | | | | | | | | |
| Beginning Cash (Anchor US/ Corp) | - | - | 500 | 500 | 500 | (6,567) | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | | |
| Funds Drawn | 2,203 | 3,110 | 1,952 | 2,855 | 3,962 | 6,767 | - | - | - | - | - | - | - | - | - | - | - | | |
| Disbursements | (2,203) | (2,610) | (1,952) | (2,855) | (11,029) | - | - | - | - | - | - | - | - | - | - | - | - | | |
| **Ending Cash (Anchor US/ Corp)** | **-** | **500** | **500** | **500** | **(6,567)** | **200** | **200** | **200** | **200** | **200** | **200** | **200** | **200** | **200** | **200** | **200** | **200** | | |
| | | | | | | | | | | | | | | | | | | | |
| Gross Receipts To Encina | 1,388 | 1,182 | 1,185 | 1,245 | 8,167 | - | - | - | - | - | - | - | - | - | - | - | - | | |
| Gross Disbursements | (2,203) | (2,610) | (1,952) | (2,855) | (11,029) | - | - | - | - | - | - | - | - | - | - | - | - | | |

**Notes:**
1) 3% on funds disbursed and calculated at closing
2) $250k for Trustee Legal Advisors
3) $400k for Trustee Financial Advisors
4) $200k for Unsecured
5) If Trustee saves from 2 and 3, he keeps and it goes to 4 or if there is overage in 2 or 3 to pay the other .

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in 000's*

| | | | | | | Post-Petition | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Total | Notes |
| Week Ending | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | | |
| **A/R  Rollforward** | | | | | | | | | | | | | | | | | | | |
| Beginning A/R Balance | 27,531 | 27,760 | 28,032 | 28,211 | 28,321 | - | - | - | - | - | - | - | - | - | - | - | - | | |
| + New Billings | 1,617 | 1,453 | 1,364 | 1,355 | 1,340 | | | | | | | | | | | | | | |
| - Collections | (1,388) | (1,182) | (1,185) | (1,245) | (1,167) | | | | | | | | | | | | | | |
| - Sale of A/R to NewCo Adjustment (Non-Ca | | | | | (28,494) | | | | | | | | | | | | | | |
| Ending A/R Balance | 27,760 | 28,032 | 28,211 | 28,321 | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| - Ineligibles | (8,642) | (8,703) | (8,790) | (8,860) | | | | | | | | | | | | | | | |
| Collateral (Borrowing Base) | 19,119 | 19,328 | 19,421 | 19,461 | - | | | | | | | | | | | | | | |
| Additional Reserves | (675) | (675) | (675) | (675) | - | | | | | | | | | | | | | | |
| Net Available Collateral (Borrowing Base) | 18,444 | 18,653 | 18,746 | 18,786 | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| **ABL - Pre-Petition** | | | | | | | | | | | | | | | | | | | |
| Beginning Balance - Pre-Petition | 19,581 | 13,941 | 12,759 | 11,575 | 10,330 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Pre-Petition Receipts | (1,388) | (1,182) | (1,185) | (1,245) | (1,167) | - | - | - | - | - | - | - | - | - | - | - | - | | |
| Encina: Draws | - | - | - | - | - | | | | | | | | | | | | | | |
| Proceeds: ProfitCo Sale (Entity) | - | - | - | - | | | | | | | | | | | | | | | |
| Transfer of Debt to NewCo | - | - | - | - | (9,163) | | | | | | | | | | | | | | |
| Reconciling Payment | (4,252) | - | - | - | - | | | | | | | | | | | | | | |
| Ending Balance - Pre-Petition | 13,941 | 12,759 | 11,575 | 10,330 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **New Money Loan** | | | | | | | | | | | | | | | | | | | |
| Beginning Balance - DIP Loan | - | 2,203 | 5,314 | 7,171 | 8,456 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Pre-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| Post-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| New Money Draws | 2,203 | 3,110 | 1,857 | 1,285 | 3,821 | | | | | | | | | | | | | | |
| Transfer of Debt to NewCo | - | - | - | - | (12,277) | | | | | | | | | | | | | | |
| Ending Balance - DIP Loan | 2,203 | 5,314 | 7,171 | 8,456 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| **Consolidated Debt** | | | | | | | | | | | | | | | | | | | |
| Beginning Balance - Consolidated | 19,581 | 16,145 | 18,073 | 18,746 | 18,786 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Pre-Petition Receipts | (1,388) | (1,182) | (1,185) | (1,245) | (1,167) | - | - | - | - | - | - | - | - | - | - | - | - | | |
| Post-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| Total Draws | 2,203 | 3,110 | 1,857 | 1,285 | 3,821 | | | | | | | | | | | | | | |
| Proceeds: ProfitCo Sale (Entity) | - | - | - | - | - | | | | | | | | | | | | | | |
| Transfer of Debt to NewCo | - | - | - | - | (21,440) | | | | | | | | | | | | | | |
| Reconciling Payment | (4,252) | - | - | - | - | | | | | | | | | | | | | | |
| Ending Balance - Consolidated | 16,145 | 18,073 | 18,746 | 18,786 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| *Excess / (Overadvance) Availability* | *2,299* | *580* | *0* | *0* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | *(0)* | | |
| **Palladium DIP** | | | | | | | | | | | | | | | | | | | |
| Beginning Balance - Consolidated | - | - | - | 95 | 1,665 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | | |
| Pre-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| Post-Petition Receipts | - | - | - | - | - | | | | | | | | | | | | | | |
| Total Draws | - | - | 95 | 1,570 | 141 | 6,767 | | | | | | | | | | | | | |
| Proceeds: Asset Sales & Inventory | - | - | - | - | - | | | | | | | | | | | | | | |
| Proceeds: ProfitCo Sale (Entity) | - | - | - | - | - | | | | | | | | | | | | | | |
| Transfer of Debt to NewCo | - | - | - | - | - | | | | | | | | | | | | | | |
| Reconciling Payment | - | - | - | - | - | (6,767) | | | | | | | | | | | | | |
| Ending Balance - Consolidated | - | - | 95 | 1,665 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | | |
| *Excess / (Overadvance) Availability* | *3,500* | *3,500* | *3,405* | *1,835* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | *1,694* | | |
| Total Debt | 16,145 | 18,073 | 18,840 | 20,451 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | 1,806 | | |

**Anchor Drilling Fluids USA, LLC - Rig Operations Summary**

*USD in Actuals*

Schedule 1

| Rig Number | Customer | Rig Name | A/R at Risk | Revenue[1] | Inventory | Logistics | Personnel[2] | Contractors | Other Overhead | Overhead: Anchor G&A | Total Rig Expenses | Total Operating Income | Completion Date: Pad/Job/Well |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Customer 1 | #252 | $ 4,006,771 | $ 130,039 | $ - | $ 14,643 | $ 117,635 | $ 75,140 | $ 6,138 | $ - | $ 213,556 | $ (83,517) | 8/1/2020 |
| 2 | Customer 6 | #24 | 1,481,257 | 175,000 | - | 19,706 | 117,635 | 75,140 | 6,138 | - | 218,618 | (43,618) | 9/1/2020 |
| 3 | Customer 6 | #25 | - | 175,000 | - | 19,706 | 117,635 | 75,140 | 6,138 | - | 218,618 | (43,618) | 9/1/2020 |
| 4 | Customer 1 | #581 | - | 687,717 | 224,617 | 77,440 | 117,635 | 75,140 | 6,138 | - | 500,970 | 186,747 | 9/1/2020 |
| 5 | Customer 1 | #584 | - | 608,472 | 322,967 | 68,517 | 117,635 | 75,140 | 6,138 | - | 590,396 | 18,076 | 9/1/2020 |
| 6 | Customer 2 | #598 | 256,952 | 828 | 762 | 147 | 685 | - | 175 | - | 1,768 | (940) | 5/30/2020 |
| 7 | Customer 2 | #T47 | - | 37 | 36 | 7 | 685 | - | 175 | - | 903 | (866) | 5/30/2020 |
| 8 | Customer 2 | #461 | - | 127 | 133 | 23 | 271 | - | 175 | - | 602 | (475) | 5/30/2020 |
| 9 | Customer 2 | #19 | - | - | - | - | - | - | - | - | - | - | 5/17/2020 |
| 10 | Customer 2 | #101 | - | 531 | 483 | 94 | 2,054 | - | 526 | - | 3,157 | (2,626) | 6/1/2020 |
| 11 | Customer 2 | #31 | - | 289 | 267 | 51 | 685 | - | 175 | - | 1,178 | (889) | 5/30/2020 |
| 12 | Customer 2 | #582 | - | 3,602 | 3,503 | 637 | 271 | - | 175 | - | 4,587 | (985) | 5/30/2020 |
| 13 | Customer 3 | #257 | 1,525,627 | - | - | - | - | - | - | - | - | - | 5/29/2020 |
| 14 | Customer 3 | #815 | - | 40,984 | 39,151 | 7,252 | 8,217 | 10,714 | 2,104 | - | 67,439 | (26,455) | 6/10/2020 |
| 15 | Customer 4 | #126 | 2,698,700 | 37,200 | 20,100 | 6,583 | 15,684 | - | 2,104 | - | 44,471 | (7,271) | 6/10/2020 |
| 16 | Customer 4 | #129 | - | 2,299 | 1,242 | 407 | 1,307 | - | 175 | - | 3,132 | (832) | 5/30/2020 |
| 17 | Customer 4 | #167 | - | - | - | - | - | - | - | - | - | - | 5/23/2020 |
| 18 | Customer 4 | #135 | - | 1,291 | 698 | 228 | 1,307 | - | 175 | - | 2,408 | (1,117) | 5/30/2020 |
| 19 | Customer 4 | #132 | - | 23,625 | 12,765 | 4,180 | 15,684 | - | 2,104 | - | 34,734 | (11,109) | 6/10/2020 |
| 20 | Customer 4 | #575 | - | 4,724 | 2,553 | 836 | 1,307 | - | 175 | - | 4,871 | (147) | 5/30/2020 |
| 21 | Customer 4 | #103 | - | - | - | - | - | - | - | - | - | - | 5/21/2020 |
| 22 | Customer 4 | #108 | - | 31,843 | 17,205 | 5,635 | 15,684 | - | 2,104 | - | 40,629 | (8,786) | 6/10/2020 |
| 23 | Customer 4 | #168 | - | 38,894 | 21,015 | 6,882 | 15,684 | - | 2,104 | - | 45,686 | (6,792) | 6/10/2020 |
| 24 | Customer 5 | #571 | 864,859 | 316,446 | 176,365 | 35,633 | 67,181 | 37,570 | 6,138 | - | 322,887 | (6,441) | 9/1/2020 |
| 25 | Customer 5 | #580 | - | 452,044 | 251,200 | 50,902 | 67,181 | 37,570 | 6,138 | - | 412,992 | 39,052 | 9/1/2020 |
| 26 | Customer 14 | #539 | - | 452,044 | 251,200 | 50,902 | 67,181 | 37,570 | 6,138 | - | 412,992 | 39,052 | 9/1/2020 |
| 27 | Customer 6 | #294 | - | 620,090 | 325,359 | 69,825 | 117,635 | 75,140 | 6,138 | - | 594,096 | 25,993 | 9/1/2020 |
| 28 | Customer 7 | #247 | 49,125 | - | - | - | - | - | - | - | - | - | 5/26/2020 |
| 29 | Customer 8 | #564 | 1,448,489 | 35,733 | 30,036 | 6,323 | 4,794 | 8,465 | 1,228 | - | 50,845 | (15,112) | 6/5/2020 |
| 30 | Customer 9 | #162 | 560,444 | 26,580 | 24,415 | 1,710 | 43,173 | 5,850 | 1,228 | - | 76,375 | (49,795) | 6/5/2020 |
| 31 | Customer 9 | #462 | - | 56,720 | 52,100 | 3,650 | 43,173 | 5,850 | 1,228 | - | 105,999 | (49,279) | 6/5/2020 |
| 32 | Customer 10 | #X06 | 480,022 | 52,399 | 41,310 | 2,529 | 45,102 | 11,200 | 2,806 | - | 102,947 | (50,548) | 6/14/2020 |
| 33 | Customer 11 | #42 | 3,245,788 | 601,570 | 241,736 | 67,740 | 117,635 | 127,640 | 6,138 | - | 560,888 | 40,682 | 9/1/2020 |
| 34 | Customer 11 | #43 | - | 555,461 | 205,220 | 62,548 | 117,635 | 127,640 | 6,138 | - | 519,180 | 36,281 | 7/15/2020 |
| 35 | Customer 11 | #44 | - | 443,988 | 166,187 | 49,995 | 117,635 | 127,640 | 6,138 | - | 467,595 | (23,607) | 9/1/2020 |
| 36 | Customer 11 | #46 | - | 356,212 | 269,455 | 40,111 | 117,635 | 127,640 | 6,138 | - | 560,979 | (204,766) | 7/24/2020 |
| 37 | Customer 11 | #45 | - | 434,492 | 328,669 | 48,926 | 117,635 | 127,640 | 6,138 | - | 629,008 | (194,515) | 9/1/2020 |
| 38 | Customer 12 | #339 | - | 41,534 | 19,099 | 4,677 | 90,747 | 57,965 | 4,735 | - | 177,223 | (135,689) | 6/25/2020 |
| 39 | Customer 13 | #X34 | 323,194 | - | - | - | - | - | - | - | - | - | 4/29/2020 |
| 40 | Customer 13 | #END 1 | - | 67,888 | 50,744 | 3,276 | 29,849 | 22,400 | 5,612 | - | 111,881 | (43,993) | 6/30/2020 |
| 41 | Customer 6 | #277 | - | 543,295 | 249,828 | 61,178 | 117,635 | 75,140 | 6,138 | - | 509,918 | 33,377 | 9/1/2020 |
| N/A | | Overhead: Anchor G&A | - | - | - | - | - | - | - | 130,381 | 130,381 | (130,381) | N/A |
| | | **Total** | $ 16,941,228 | $ 7,019,002 | $ 3,350,417 | $ 792,900 | $ 1,949,528 | $ 1,399,334 | $ 121,351 | $ 130,381 | $ 7,743,911 | $ (724,910) | |

**Notes:**

1) Revenue is gross billings and not adjusted for sales tax.

**Locations suporting well completions and sale to Newco**

| Name of Warehouse Location | Address | City | State | zip | Monthly Rent |
|---|---|---|---|---|---|
| HORSEHEADS WAREHOUSE | 124 Wygant Road, Bldg B | Horseheads | NY | 14845 | $16,146 |
| NEWCOMERSTOWN WAREHOUSE | 200 Enterprise Drive | Newcomerstown | OH | 43832 | $20,500 |
| MIDLAND SOLIDS CONTROL | 2106 East Country Road 120 | Midland | TX | 79706 | $18,500 |
| WELLSVILLE MUD PLANT | 2400 Clark Avenue | Wellsville | OH | 43968 | $10,000 |
| WELLSVILLE MUD PLANT | 45,000 sf of land Wellsville OH | Wellsville | OH | | 1250 |
| LEETSDALE PLANT | 545 W. Park Road | Leetsdale | PA | 15056 | $33,906 |
| TULSA OFFICE | 7335 S. Lewis Avenue, Ste. 209 | Tulsa | OK | 74136 | 1969 |
| emplyee housing | 3518 N. Voyager | Odessa | TX | 79764 | $450 |
| emplyee housing | 3512 N. Voyager | Odessa | TX | 79764 | $450 |
| emplyee housing | 1122 West State Street | Newcomerstown | OH | 43832 | $1,500 |
| | | Total | | | **$104,671** |

**Lease Locations required to complete operations - to be rejected for July rent**

| Name of Warehouse Location | Address | City | State | zip | Monthly Rent |
|---|---|---|---|---|---|
| Pecos | 1.5 acres in Pecos, TX | Pecos | TX | 79772 | $12,600 |
| THREE RIVERS WAREHOUSE | 3067 S. Hwy 37 Access | Three Rivers | TX | 78071 | $8,776 |
| MIDLAND | 6417 W. Industrial Avenue | Midland | TX | 79706 | $34,891 |
| BRIGHTON WAREHOUSE | 995 North 5th Avenue | Brighton | CO | 80603 | $9,157 |
| MINDEN WAREHOUSE / MUD PLANT | 148 McIntyre Road | Minden | LA | 71055 | $4,000 |
| CHEYENNE PRODUCT STORAGE | | Carpenter | WY | | $1,600 |
| | | Total | | | **$71,024** |
| | **Grand Total** | | | | **$175,695** |

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in 000's*

Schedule 3 - Utilities

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Total |
| Week Ending | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Utility Reserve** | | | | | | | | | | | | | | | | | | |
| Electric | - | (37) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (37) |
| Water | - | (5) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (5) |
| Fuel / Propane | - | (2) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (2) |
| Internet at 50% | - | (6) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (6) |
| Land Lines (Phone) | - | (5) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (5) |
| Utility Reserve - Other | - | - | (20) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (20) |
| **Total** | - | **(55)** | **(20)** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | **(75)** |

| | Jan | Feb | Mar | April | Average |
|---|---|---|---|---|---|
| **Electric** | $ 53,128 | $ 52,349 | $ 60,383 | $ 36,921 | $ **50,695** |
| **Water** | $ 10,537 | $ 7,586 | $ 7,311 | $ 5,053 | $ **7,621** |
| **Security** | $ 67 | $ 66 | $ 33 | | $ **55** |
| **Fuel/Propane** | $ 3,608 | $ 2,565 | $ 525 | $ 1,791 | $ **2,122** |
| **Internet** | $ 14,615 | $ 16,770 | $ 14,442 | $ 11,261 | $ **14,272** |
| **Cell Phone** | $ 10,073 | $ 11,090 | $ 11,880 | $ 9,944 | $ **10,747** |
| **Phone** | $ 9,244 | $ 9,600 | $ 6,315 | $ 5,099 | $ **7,565** |
| **Total** | $ 101,272 | $ 100,026 | $ 100,889 | $ 70,070 | $ **93,078** |

**Anchor Drilling Fluids USA, LLC**
Palladium Proposal - Chapter 7 Sale of Assets
*USD in 000's*

Schedule 4 - Other Operating Disbursements

| Week #<br>Week Ending | 1<br>6/5 | 2<br>6/12 | 3<br>6/19 | 4<br>6/26 | 5<br>7/3 | 6<br>7/10 | 7<br>7/17 | 8<br>7/24 | 9<br>7/31 | 10<br>8/7 | 11<br>8/14 | 12<br>8/21 | 13<br>8/28 | 14<br>9/4 | 15<br>9/11 | 16<br>9/18 | 17<br>9/25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Other Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| NewCo: Sales Tax (Avalara) | - | - | - | (162) | (240) | - | - | - | - | - | - | - | - | - | - | - | - | (402) |
| NewCo Vehicle Leases | - | (95) | - | (36) | - | - | - | - | - | - | - | - | - | - | - | - | - | (131) |
| NewCo: Lease | (50) | (15) | (25) | (15) | (50) | - | - | - | - | - | - | - | - | - | - | - | - | (155) |
| Disc Ops: Sales Tax (Avalara) | - | - | (10) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (10) |
| Disc Ops: Vehicle Leases | - | - | - | (10) | - | - | - | - | - | - | - | - | - | - | - | - | - | (10) |
| Cell Phones | - | - | (11) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (11) |
| NewCo: Cash Interest | (23) | - | - | - | (114) | - | - | - | - | - | - | - | - | - | - | - | - | (137) |
| Disc Ops: Cash Interest | (8) | - | - | - | (43) | - | - | - | - | - | - | - | - | - | - | - | - | (51) |
| **Total** | **(81)** | **(110)** | **(46)** | **(224)** | **(447)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(908)** |

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in Actuals $*

Schedule 5 - Corporate Payroll & Benefits

| Week #<br>Week Ending | 1<br>6/5 | 2<br>6/12 | 3<br>6/19 | 4<br>6/26 | 5<br>7/3 | 6<br>7/10 | 7<br>7/17 | 8<br>7/24 | 9<br>7/31 | 10<br>8/7 | 11<br>8/14 | 12<br>8/21 | 13<br>8/28 | 14<br>9/4 | 15<br>9/11 | 16<br>9/18 | 17<br>9/25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Corporate EE's Assumed Costs** | | | | | | | | | | | | | | | | | | |
| Campbell, Marc | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Coe, Brian | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Glover, Eric | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3 |
| Richey, Linda Lee Norvell | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Derrick William | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Brad Hilliard | 1 | 1 | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | 5 |
| Rosen, Max | 1 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2 |
| **Total** | **7** | **7** | **6** | **5** | **5** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **30** |
| | | | | | | | | | | | | | | | | | | |
| **Corporate EE's Assumed Costs** | | | | | | | | | | | | | | | | | | |
| Campbell, Marc | 1,794 | 1,794 | 1,794 | 1,794 | 1,794 | - | - | - | - | - | - | - | - | - | - | - | - | 8,970 |
| Coe, Brian | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 |
| Glover, Eric | 15,000 | 15,000 | 15,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 45,000 |
| Richey, Linda Lee Norvell | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | - | - | - | - | - | - | - | - | - | - | - | - | 15,625 |
| Derrick William | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | - | - | - | - | - | - | - | - | - | - | - | - | 15,000 |
| Brad Hilliard | 3,391 | 3,391 | 3,391 | 3,391 | 3,391 | - | - | - | - | - | - | - | - | - | - | - | - | 16,956 |
| Rosen, Max | 3,021 | 3,021 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 6,042 |
| **Total** | **34,331** | **34,331** | **31,310** | **16,310** | **16,310** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **132,593** |
| | | | | | | | | | | | | | | | | | | |
| **Other Corporate OH** | | | | | | | | | | | | | | | | | | |
| Rig Operations G&A Corporate | 26,076 | 26,076 | 26,076 | - | 52,152 | - | - | - | - | - | - | - | - | - | - | - | - | 130,381 |
| | | | | | | | | | | | | | | | | | | |
| **Total Corporate Payroll & Benefits** | **60,407** | **60,407** | **57,386** | **16,310** | **68,463** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **262,974** |

**Anchor Drilling Fluids USA, LLC**
**Palladium Proposal - Chapter 7 Sale of Assets**
*USD in 000's*

Schedule 6 - Corporate Other Disbursements

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | |
| **Corporate Other Disbursements** | | | | | | | | | | | | | | | | | | |
| Taxes: Other States | - | - | (25) | - | (175) | - | - | - | - | - | - | - | - | - | - | - | - | (200) |
| Workers' Compensation | - | - | (147) | - | (100) | - | - | - | - | - | - | - | - | - | - | - | - | (247) |
| WD Costs: IT/Facility-Related | - | - | (50) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (50) |
| Insurance: 45 Day Policy | - | (200) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (200) |
| DIP: Interest & Fees | - | - | - | (22) | - | - | - | - | - | - | - | - | - | - | - | - | - | (22) |
| Other Corporate | (10) | (40) | (10) | (10) | - | - | - | - | - | - | - | - | - | - | - | - | - | (70) |
| **Total** | **(10)** | **(240)** | **(232)** | **(32)** | **(275)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(789)** |