# Exhibit 4



February 23, 2022 ("Effective Date")

**BY ELECTRONIC MAIL**
Attn: Christopher R. Murray, in his capacity as Chapter 7 Trustee for the bankruptcy estates of Q'Max America, Inc. and Anchor Drilling Fluids USA, LLC pursuant to In re: Q'Max America, Inc., et. al., Case No. 20-60030, United States Bankruptcy Court for the Southern District of Texas, Victoria Division
Jones Murray & Beatty LLP
4119 Montrose Blvd., Suite 230
Houston, Texas 77006
Email: christopher.murray@jmbllp.com

      Re:    *Exclusive Sales Listing Agreement*
                *6,264 Sq. Ft. Building located at 510 Scott Street, Van Buren, Arkansas ("Property")*

Dear Mr. Murray:

    Thank you for selecting CBRE, Inc. ("CBRE", "us", "we", "our") to represent Christopher R. Murray, in his capacity as Chapter 7 Trustee for the bankruptcy estates of Q'Max America, Inc. and Anchor Drilling Fluids USA, LLC pursuant to In re: Q'Max America, Inc., et. al., Case No. 20-60030, United States Bankruptcy Court for the Southern District of Texas, Victoria Division ("you," "your" or "Client"). The terms of this engagement are contained in this agreement ("Agreement"). As used herein, "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Victoria Division. This Agreement and Client's obligations hereunder are subject to approval of the Bankruptcy Court.

1. This Agreement shall commence on the Effective Date and terminate on the one (1) year anniversary of the Effective Date (such period, the "Term"); provided that this Agreement shall earlier terminate: (a) upon thirty (30) days' prior written notice by either party; (b) upon the sale of the Property; (c) immediately upon your giving written notice to us, in the event of our failure or refusal to duly perform and observe each and every term, condition and covenant contained herein, or in the event we have acted or purported to act outside the scope of the limited authority granted to us hereunder, or if you have a good faith reason to believe that we have committed fraud, misconduct, unethical or illegal activities, or have in any way acted in a manner detrimental or contrary to the economic and efficient operation of the Property; or (d) if so ordered by the Bankruptcy Court. As used herein, the "Termination Date" means the date on which this Listing Agreement expires or is terminated pursuant to this Section 1.

2. During the Term, you appoint us as your agent with the exclusive right to list and market the Property for sale and to negotiate agreements for the sale of the Property.

3. We will commit the appropriate number of qualified and licensed professionals to this engagement. Your "Listing Team" is comprised of <u>David Erstine and Alex Schemel</u>. We will have the right to change members of the Listing Team as necessary and appropriate upon advance notice to you. The Listing Team shall owe you duties of trust, confidence and loyalty.

4. CBRE shall exercise best efforts to market the Property for sale, subject to the terms, conditions and limitations of this Agreement, and shall actively solicit and procure purchasers for the Property using accepted and appropriate methods for such activities. Without in any way limiting the foregoing, CBRE's duties shall include the following:

        i. <u>Signage.</u> Subject to (A) the prior review and approval by Client as to form, content, location and expense thereof, and (B) all applicable law, building rules and regulations,

                CBRE shall prepare, maintain and install, signage advertising space "For Sale" in each Property. At Client's request, CBRE shall remove any such signage in a safe and lawful manner, shall repair any damage caused by such removal, and shall restore the Property to its condition existing prior to the installation of such signage.

      ii. <u>Proposals.</u> CBRE shall prepare all sale proposals and letters of intent and assist in the negotiation of letters of intent.

      iii. <u>Co-Brokers.</u> To cooperate fully with all other brokers who are duly licensed to do business within the jurisdiction in which the Property is located (hereinafter "Cooperating Brokers"), and upon receipt of payment of commissions from Client to promptly distribute any fees or commissions due to any and all Co-Brokers. The terms and conditions of all agreements of co-brokerage shall be disclosed in writing to Client, and shall be consistent with market standard.

      iv. <u>Compliance with Laws.</u> To at all times comply with any and all federal, state, county and municipal statutes, ordinances, codes and regulations, including but not limited to, any such legal requirements pertaining to non-discrimination against, or segregation of, any person or group of persons, on account of race, color, creed, religion, age, gender, sexual orientation, marital status, national origin, or ancestry, in the leasing, subleasing, transferring, use or occupancy of all or any portion of the Property.

5. In the performance of its duties and obligations under this Agreement, CBRE shall perform diligently and in good faith.

6. CBRE agrees to carry at its own expense the following types of insurance: (a) commercial general liability insurance, including coverage for bodily injury, property damage, personal injury and contractual liability, on an occurrence basis, with a limit of $1,000,000 per occurrence and $3,000,000 general aggregate; and (b) business automobile liability covering all owned, non-owned and hired vehicles with a combined single limit of $1,000,000. Client shall have no responsibility for providing workmen's compensation insurance or any other type of insurance for the employees or agents of CBRE who are engaged in the performance of this Agreement. CBRE hereby agrees to obtain all necessary workmen's compensation insurance and other insurance required for its employees and agents. A certificate evidencing such insurance issued by a reputable insurance carrier reasonably acceptable to Client shall be delivered to the Client within 30 days after the date hereof and as to replacement certificates not later than the date on which such insurance would otherwise have expired but for the renewal set forth in such replacement certificate. Such insurance shall provide that the insurer shall endeavor to give thirty (30) days advance written notice to Client of any modification, cancellation or termination. CBRE acknowledges that it is an independent contractor and not an employee of Client. All policies of insurance shall be issued by insurers having a rating of A-, Category IX or better in the most recent edition of Best's Key Rating Guide. CBRE further agrees to reimburse Client for court costs and other reasonable expenses, including attorneys' fees, incurred by Client in defending any action brought against Client for injury or damage claimed to have been suffered as a result of or in any way connected with CBRE's negligence or that of its employees or otherwise arising by reason of the failure of CBRE to perform its responsibilities pursuant to this Agreement. The provisions of this Section shall survive the termination of this Agreement.

7. Upon the expiration or earlier termination of this Agreement, CBRE shall:
    i. Promptly remove all signage on or about the Property which contains CBRE's name or corporate logo, repair any damage caused by such removal, and restore the Property to its condition existing prior to the installation of such signage at CBRE's expense;

    ii. Promptly return to Client any and all written materials regarding the Property, the Client, and the Client's affiliates; and

      iii. During the fifteen (15) business days subsequent to the expiration of this Agreement, or during the fifteen (15) business days subsequent to Client's notice of early termination of this Agreement, CBRE shall have the right to submit to Client the list of Existing Prospects (defined below).

8. CBRE shall defend, indemnify, and hold Client harmless from and against any and all losses, claims, causes of action, liabilities and damages (including, but not limited to, reasonable attorneys' fees and costs) arising out of or in connection with (a) any claim by another broker (including, without limitation, any Cooperating Broker) for the payment of a real estate commission that CBRE has agreed, in writing, to pay to such other broker; provided, however, that the foregoing shall be applicable only if and to the extent CBRE has been paid the applicable commission by Client, if any; (b) any misrepresentations made by CBRE and any alleged contract, agreement or negotiation entered into by or which is alleged to have taken place with CBRE and not Client, (c) any negligence or willful misconduct of CBRE, or its agents, employees or representatives, and/or (d) any breach of CBRE's obligations under this Agreement.

9. We will offer the Property at an initial listing price of $165,000_____.
However, it is your right to: (a) approve, modify, reject or disapprove any and all proposals and offers as well as any prospective purchasers for the Property and (b) adjust the terms and conditions of any offer made, including but not limited to, adjusting the Property's listing price. We understand and agree that such terms may be subject to further approval by the Bankruptcy Court.

10. We will work with you to create and implement a sales strategy for the Property, including preparation of appropriate and customary marketing materials (such as an offering brochure). In developing the strategy, we will rely on (without requirement to verify) any information provided to us by you, your agents, affiliates and/or any of the Property's managers. However, we will not issue any written marketing materials without your prior written approval. Further, you authorize us to place one or more signs on the Property as we deem appropriate.

11. The success of this engagement relies, in part, on cooperation and communication between you and CBRE. Therefore, you agree to: (i) provide us with all available information in your reasonable possession or control to assist us in marketing the Property; (ii) immediately refer to us all purchase inquiries for the Property; and (iii) conduct all negotiations with prospective purchasers exclusively through us.

12. We will present all offers to you and assist you in developing and negotiating counteroffers until a purchase and sale agreement ("PSA") is signed and all contingencies are satisfied or waived. You agree that you and/or your legal counsel are solely responsible for determining the legal sufficiency of any documents to be executed by you in any transaction contemplated by this engagement as well as the tax consequences of any such transaction. You are also responsible for evaluating any offers and determining with whom you will negotiate or enter into a transaction. While we may assist you in gathering reasonably available information, we cannot represent or warrant the creditworthiness of any prospect and/or their ability to satisfy their obligations under a PSA. All final business and legal decisions shall be made solely by you. Notwithstanding any designation of us as "agent" in this Agreement, we will have no right, power, or authority to enter into any agreement with any prospective purchaser, real estate broker, or any other person in the name of, on behalf of, or otherwise binding upon you.

13. We will earn, and you agree to pay us, a commission in accordance with this Agreement and the attached (Exhibit "A") to this Agreement ("Commission Schedule") if either of the following occur:

    (a) during the Term, you enter into an agreement to sell the Property to a purchaser, whether procured by us, you or anyone else, and the sale closes during or any time after the Term; or

Rev. 01/2018
UT

4375914.2

(b) within ninety (90) days after the expiration of the Term or after the Agreement otherwise earlier terminates (the "Post-Term"), the Property is sold to, or negotiations continue, resume or commence leading to a sale of the Property at any time during the Post-Term or thereafter to any person or entity with whom, CBRE negotiated (either directly or through another broker or agent) or to whom the Property was submitted during the Term, or to any such person's or entity's successors, assigns, or affiliates ("Existing Prospect"), or you enter into an agreement to sell the Property to an Existing Prospect and the sale of the Property subsequently closes (whether during or after the Post-Term). We will submit to you a list of such Existing Prospects no later than fifteen (15) business days following the expiration or earlier termination of the Term; provided, however, that if a written offer has been submitted prior to said expiration or termination date and provided to Client, then it shall not be necessary to include the offeror's name on the list.

Notwithstanding the foregoing, we agree that you owe a commission only upon the closing of the sale of the Property during the Term or during the Post-Term to an Existing Prospect.

14. You agree that we are authorized to cooperate with and, if appropriate, share our commission with "Cooperating Brokers" (such as a broker representing a purchaser). We will be responsible for paying the fee or commission due to the Cooperating Broker (if any) provided the Cooperating Broker: (i) represents the prospective purchaser pursuant to a written agreement, a copy of which is furnished to us prior to the execution of the transaction; (ii) is properly licensed; and (iii) executes and delivers to us an acceptable cooperating brokerage agreement.

15. The Listing Team are your agents to the exclusion of all of CBRE's other licensees. All other CBRE licensees shall be referred to as "Non-Listing Team Agents" and shall be considered Cooperating Brokers. You acknowledge that CBRE is an international brokerage firm and that it may represent prospective purchasers, thereby creating a dual agency. You hereby consent to our representation of such prospects. You acknowledge that Non-Listing Team Agents owe duties of trust, confidence and loyalty exclusively to their clients. In the event that CBRE has a potential conflict of interest (such as CBRE proposing to act as a dual agent), then we will disclose the conflict to you and obtain your written consent to the conflict in advance of any negotiations with a potential purchaser. The Listing Team and Non-Listing Team Agents shall not disclose the confidential information of one principal to the other.

16. Questions regarding environmental and zoning issues may arise during the course of our representation. CBRE is not obligated to perform, and has not made any investigation of the physical conditions or zoning issues relating to the Property. You agree to disclose to us and allow us to disclose to prospective purchasers everything you know regarding present and future property issues including, but not limited to, structural, mechanical, hazardous materials, zoning and environmental matters affecting the Property and/or the Property's condition.

17. If the Property becomes the subject of foreclosure proceedings before the expiration of the Term, then in our sole and absolute discretion we may: (a) suspend this Agreement until we may elect to reinstate it or (b) terminate this Agreement and enter into a listing agreement with any receiver, party initiating foreclosure, party purchasing the Property at a foreclosure sale, or any other third party.

18. While we are confident that this relationship will be mutually satisfactory, the parties agree to resolve any disputes subject to the following:

(a) if either party institutes a legal proceeding against the other party relating to this Agreement, the prevailing party shall recover from the non-prevailing party all of its (i) reasonable attorneys' fees and costs, (ii) expert-related fees and costs and (iii) other related

Rev. 01/2018
UT

4375914.2

expenses. No party will be entitled to punitive, special and/or consequential damages, and we each waive all rights to and claims for relief other than for compensatory damages; and

(b) **EACH PARTY KNOWINGLY AGREES TO WAIVE ANY AND ALL RIGHTS TO HAVE A DISPUTE ON ANY MATTER RELATING TO, OR ARISING FROM THIS AGREEMENT DETERMINED BY A JURY.**

19. You and CBRE agree to comply with all applicable laws, regulations, codes, ordinances and administrative orders governing each party's respective participation in any transaction contemplated by this Agreement. Further, we both acknowledge that: (a) it is illegal to refuse to display or lease or sell to or from any person because of one's membership in a protected class, *e.g.*: race, color, religion, national origin, sex, ancestry, age, marital status, physical or mental handicap, familial status or any other class protected by applicable law and (b) the Property will be offered in compliance with all applicable anti-discrimination laws.

20. This Agreement is the entire agreement and supersedes all prior understandings between you and CBRE regarding this engagement. The Agreement is governed by the laws of the state where the Property is located, without regard to its conflict of laws principles. This Agreement will be binding and inure to the benefit of your and CBRE's lawful representatives, heirs, successors, designees and assignees. It may not be altered or terminated except in a writing signed by both you and CBRE and approved by the Bankruptcy Court. Neither party's failure to exercise any of its rights under this Agreement will relieve the other party of its obligations hereunder. Nothing herein is or may be deemed a waiver or full statement of any of either party's respective rights or remedies, whether at law or in equity, all of which are expressly reserved. If any provision of this Agreement is unenforceable or void under applicable law, the remaining provisions will continue to be binding. This Agreement and the rights, interests or obligations created hereunder will not be assigned by either of the parties without the prior written consent of the other party. Each party agrees that each has participated equally in the negotiation and drafting of this Agreement. This Agreement will be binding whether signatures are exchanged electronically or by hand, mail, fax, electronic transfer or image, photocopy or in counterparts. Notwithstanding the foregoing, CBRE shall not assign this Agreement or any of the rights, duties or benefits hereunder without Client's prior written consent and if applicable the approval of the Bankruptcy Court.

21. Except where provided otherwise, notices under this Agreement shall be in writing and shall be deemed to have been fully given and received when delivered by e-mail, or by hand, or sent by nationally recognized overnight courier, and properly addressed to the respective party at the following addresses:

> If to Client: Christopher R. Murray
> Chapter 7 Trustee for the bankruptcy estates of
> Q'Max America, Inc. and Anchor Drilling Fluids USA, LLC
> Jones Murray & Beatty LLP
> 4119 Montrose Blvd., Suite 230
> Houston, Texas 77006
> Email: christopher.murray@jmbllp.com
>
> With a copy, which shall not constitute notice, to:
>
> Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C.
> 1200 Smith Street
> 14th Floor
> Houston, Texas 77002
> Attn.: Jarrod B. Martin, Esq.
> Email: jarrod.martin@chamberlainlaw.com

Rev. 01/2018
UT

4375914.2

5

        If to CBRE:    CBRE, Inc.
                                438 E Millsap Rd, Suite 103
                                Fayetteville AR 72703
                                Attn: David Erstine

Thank you again for this opportunity. We look forward to working with you.

                                                            Very truly yours,

**CBRE, Inc**
**Licensed Real Estate Broker**

By: _/s/ David Erstine_
Name: David Erstine
Title: Senior Vice President / Executive Broker
Date: 2.23.2022

**CBRE, Inc**
**Managing Director**

By: _/s/ Leland Wallis_
Name: Lee Wallis
Title: Managing Director
Date: 2/23/2022

**AGREED:**

Christopher R. Murray, solely in his capacity as
Chapter 7 Trustee for the Bankruptcy Estate of Q'Max America, Inc.

By:_____
     Christopher R. Murray, Trustee

Christopher R. Murray, solely in his capacity as
Chapter 7 Trustee for the Bankruptcy Estate of Anchor Drilling Fluids USA, LLC

By:_____
     Christopher R. Murray, Trustee

Rev. 01/2018
UT

4375914.2

**EXHIBIT A – Commission Schedule**

A. *Sale*. If the Property is sold, CBRE's commission shall be <u>five</u> percent (<u>5</u>%) of the gross sales price if only Listing Team is involved. Should an outside broker represent the buyer, the commission shall be increased of six (6%) percent of the gross sales price. Gross sales price shall include any and all consideration received or receivable, in whatever form, including but not limited to assumption or release of existing liabilities. The commission shall be earned and paid on the date title to the Property is transferred to the purchaser; provided, however, that if the transaction involves an installment contract, then payment shall be made upon execution of such contract.

   1. *Definitions*. Under this Agreement the terms "sell," "sale" or "sold" shall mean: (a) an exchange of the Property; (b) the granting of an option to purchase the Property; or (c) any other transfer, conveyance or contribution of a controlling interest in the Property or in the entity which owns the Property, including, but not limited to, situations where you are a corporation, partnership or other business entity and a controlling interest in such corporation, partnership or other business entity is transferred, whether by merger, outright purchase or otherwise, in lieu of a sale of the Property.

   2. *Option to Purchase*. If you grant an option to purchase the Property, you agree to pay us a commission in accordance with this Commission Schedule, on the price paid for the option and for any extensions when you receive payment for any such option and/or extensions. If the option is exercised, whether during the Term or after, we will earn a further commission in accordance with this Agreement. Notwithstanding the foregoing, to the extent that all or part of the price paid for the option or any extension thereof is applied to the sales price of the Property, then any commission previously paid by you to us on account of the option payments will be credited against the commission payable to us on account of the exercise of the option.

Rev. 01/2018
UT

4375914.2