# Exhibit A

## TERMINATION AND RELEASE AGREEMENT REGARDING
## Q'MAX TRANSITION SERVICES AGREEMENT

This Termination and Release Agreement Regarding Q'Max Transition Services Agreement (this "**Agreement**"), dated as of _____, 2022 (the "**Effective Date**"), is entered into by and among Christopher R. Murray, Chapter 7 Trustee for the bankruptcy estate of Q'Max America Inc., a company incorporated under the laws of Delaware ("**QAI**"), Christopher R. Murray, Chapter 7 Trustee for the bankruptcy estate of Anchor Drilling Fluids USA, LLC, a Delaware limited liability company ("**Anchor Drilling**"), KPMG Inc., receiver of Q'Max Solutions Inc., a corporation incorporated under the laws of British Columbia, Canada ("**QSI**" and, together with QAI and Anchor Drilling, "**Q'Max**"), QMax Acquisition Corp., a Delaware corporation ("**QMax Acquisition**"), and Paragon Integrated Services Group, LLC f/k/a Drilling Services, LLC, a Delaware corporation ("**Assignee**" and, together with QMax Acquisition, "**Buyer**"). Q'Max and Buyer may be referred to herein individually as a "**Party**" or collectively as "**Parties**".

## RECITALS:

WHEREAS, QMax Acquisition, as buyer, and QAI and Anchor Drilling, as sellers, entered into that certain Second Amended and Restated Asset Purchase Agreement, dated as of July 2, 2020 (as amended, the "**APA**"), pursuant to which QMax Acquisition acquired certain assets (the "**Acquired Assets**") of QAI and Anchor Drilling in connection with the Chapter 7 bankruptcy proceedings of QAI and Anchor Drilling (the "**Acquisition**");

WHEREAS, pursuant to that certain Assignment and Assumption Agreement, dated June 12, 2020, QMax Acquisition assigned its rights and obligations under the APA to Assignee;

WHEREAS, QSI is an Affiliate of QAI and Anchor Drilling;

WHEREAS, the Parties entered into that certain Q'Max Transition Services Agreement, dated as of July 2, 2020 (the "**Original Agreement**"), pursuant to Section 3.1(b)(viii) and 3.1(c)(vi) of the APA to set forth the terms under which (i) Q'Max would provide certain assistance to Buyer in connection with use and operation of the Acquired Assets following the Acquisition; and (ii) Buyer would provide the services of certain personnel to Q'Max following the Acquisition; and

WHEREAS, the Parties have concluded the provision of the Services to one another, and desire to terminate the Original Agreement on the terms and subject to the conditions set forth herein, and mutually release each other of any and all Claims (as defined below) with respect to, and only with respect to, the provisions and performance of the obligations of the Parties under the Original Agreement;

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual, covenants and obligations set forth in the Original Agreement and in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as set forth below. All capitalized terms used in this Agreement that are not defined in this Agreement will have the meanings assigned to those terms in the Original Agreement and in the APA.

## ARTICLE I
## TERMINATION PAYMENT AND OTHER COVENANTS AND AGREEMENTS

Section 1.1    Termination of the Original Agreement. Subject to the terms and conditions of this Agreement, the Original Agreement is hereby terminated as of the Effective Date. From and after the Effective Date, the Original Agreement will be of no further force or effect, and the rights and obligations of each of the Parties thereunder shall terminate, except for (a) any rights and obligations of the Parties under ARTICLE IV (Confidentiality); ARTICLE V (Intellectual Property and Confidential Data); ARTICLE VI (Disclaimers; Limitations of Liability); ARTICLE VII (Indemnification); ARTICLE X (Miscellaneous) of the Original Agreement, in each case, subject to the terms and conditions of this Agreement.

Section 1.2    Termination Payments and Other Covenants and Agreements. As material consideration for the covenants, agreements and undertakings of the Parties under this Agreement:

(a)    Simultaneously with the execution of this Agreement, QAI and Anchor Drilling shall pay Assignee an aggregate of $90,704.79 in connection with the provision of the Services. Specifically, such payment shall be comprised of: (i) $20,000, as a refund of a deposit paid to QAI and Anchor Drilling for the purchase of certain assets located in the Permian Basin; (ii) $25,458.91, as a refund of monies paid on behalf of QAI and Anchor Drilling to Mountain Mud Service & Supply, Inc.; and (iii) $44,704.79, as a refund of monies overpaid by Buyer in connection with the provision of benefits under the Benefit Plans incurred by the Continuing Employees.

(b)    Subject to the terms and conditions of a Bill of Sale, substantially in the form attached hereto as **Exhibit B** ("**Bill of Sale**"), effective as of the date of such Bill of Sale, QAI and Anchor Drilling shall sell, assign, transfer and deliver to Assignee, and Assignee shall purchase and acquire from QAI and Anchor Drilling, all of QAI's and Anchor Drilling's right, title and interest, free and clear of all Liens, in each and all of the assets set forth on **Exhibit A** (collectively, the "**Purchased Assets**") in exchange for a purchase price of $100,000 in cash. Assignee, QAI and Anchor Drilling agree to execute a Bill of Sale for the sale and purchase of the Purchased Assets simultaneously with the execution of this Agreement.  Assignee, QAI and Anchor Drilling acknowledge and agree that the Purchased Assets are already in the full possession and control of Assignee.  Assignee, QAI and Anchor Drilling acknowledge and agree that (i) the Purchased Assets include the inventory set forth on **Exhibit A-1** (which is part of the Purchased Assets, the "**Excluded Inventory**"); (ii) effective as of the applicable Bill of Sale, QAI and Anchor Drilling assign to Assignee, and Assignee hereby assumes and shall pay when due, perform and discharge, in due course, without duplication, all Liabilities (including Environmental Liabilities and Obligations) related to or associated with the Purchased Assets (including the Excluded Inventory), including, without limitation, any and all clean-up or remediation obligations under applicable Environmental Laws; and (iii) QSI, QAI, Anchor Drilling and Christopher Murray, in his capacity as Trustee, and their Affiliates shall have no further obligations whatsoever with respect to the Purchased Assets.

(c)    Buyer has finalized the purchase of the laptop computers listed on **Exhibit C** attached hereto (the "**Laptops**") from Dell Financial Services L.L.C. ("**Dell**"), pursuant to the terms of that certain Master Lease Agreement, dated November 17, 2014, by and between Dell and Q'Max America Inc., as assumed by Buyer under the terms of the APA. Buyer shall sell, assign, transfer and deliver to QAI and Anchor Drilling, and QAI and Anchor Drilling shall purchase and acquire from Buyer, all of Buyer's right, title and interest, free and clear of all Liens, in the Laptops in exchange for a purchase price of $9,836.30 in cash.  Such Parties agree to

simultaneously with the execution of this Agreement execute a Bill of Sale, substantially in the form attached hereto as **Exhibit B**, for the sale and purchase of the Laptops.

(d)        The Parties hereby acknowledge and agree that, effective as of August 31, 2020, that certain Exclusive License Agreement, dated May 22, 2020, a copy of which is attached hereto as **Exhibit D** ("**Prior License**"), was terminated in full and is null and void and without legal effect. Buyer represents and warrants to Q'Max that (i) Buyer has not assigned, sold, pledged, gifted or otherwise transferred its obligations and rights under the Prior License to any Person; and (ii) except for this Agreement, there are no other licenses, sublicenses, intellectual property transfer agreements or other similar agreements that Buyer or its predecessors are parties to regarding the ownership or use of the MaxSite Suite software.

Section 1.3        Payments. All payments to be made in connection with the performance of this Agreement shall be made by wire transfer of immediately available funds in accordance with each Parties' wire transfer instructions, which each Party acknowledges it has received from the other Party, immediately prior to the execution of this Agreement. Notwithstanding the foregoing, upon the mutual agreement of the parties, QAI, Anchor Drilling and Assignee shall each have the right to offset any balance or amounts due from one such Party to the other under the terms of this Agreement.

## ARTICLE II
## SETTLEMENT AND MUTUAL RELEASE

Section 2.1        Mutual Release. In consideration of the covenants, agreements, and undertakings of the Parties under this Agreement, each Party, on behalf of itself and its respective present and former parents, subsidiaries, affiliates, officers, directors, shareholders, members, successors, and assigns (collectively, "**Releasors**") hereby releases, waives, and forever discharges the other Party and its respective present and former, direct and indirect, parents, subsidiaries, affiliates, employees, officers, directors, shareholders, members, agents, representatives, permitted successors, and permitted assigns (collectively, "**Releasees**") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, admiralty, or equity (collectively, "**Claims**"), which any of such Releasors ever had, now have, or hereafter can, shall, or may have against any of such Releasees for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the date of this Agreement directly in connection with the Original Agreement, except for any Claims relating to rights and obligations preserved by, created by, or otherwise arising out of this Agreement (including any surviving indemnification obligations under the Original Agreement). For purposes of clarity and avoidance of doubt, the foregoing release is limited to and shall only apply to Claims directly in connection with the Original Agreement, and shall not apply to any other Claims that the Parties currently have, may have, or may discover with respect to any and all matters not directly related to the terms, provisions and obligations of the Original Agreement.

Section 2.2        Intention to Release Unknown Claims; Waiver of Rights. Each Party, on behalf of itself and each of its respective Releasors, understands that it may later discover Claims or facts that may be different than, or in addition to, those that it or any other Releasor now knows or believes to exist regarding the subject matter of the release contained in Section 2.1, and which, if known at the time of signing this Agreement, may have materially affected this Agreement and such Party's decision to enter into it and grant the release contained in Section 2.1. Nevertheless, Releasors intend to fully, finally and forever settle and release all Claims that now exist, may exist or previously existed, as set forth in the

release contained in Section 2.1, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. Releasors hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts. Releasors have been made aware of, and understand, the provisions of California Civil Code Section 1542 ("**Section 1542**"), which provides: **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."** Releasors expressly, knowingly, and intentionally waive any and all rights, benefits, and protections of Section 1542 and of any other state or federal statute or common law principle limiting the scope of a general release.

Section 2.3    No Admission of Liability. The Parties acknowledge that the covenants, agreements, and undertakings set forth in this Agreement are being agreed upon as a compromise, final settlement, termination and resolution of the Original Agreement and may not be construed as an admission of liability by either Party, and is not to be construed as an admission that either Party engaged in any wrongful, tortious, or unlawful activity with respect to the Original Agreement.

### ARTICLE III
### MISCELLANEOUS

Section 3.1    Construction; Absence of Presumption.

(a)    For the purposes of this Agreement, (i) words (including capitalized terms defined herein) in the singular shall be held to include the plural and vice versa and words (including capitalized terms defined herein) of one gender shall be held to include the other gender as the context requires; (ii) the terms "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the Exhibits) and not to any particular provision of this Agreement, and Article, Section, paragraph and Exhibit references are to the Articles, Sections, paragraphs and Exhibits to this Agreement, unless otherwise provided; (iii) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation"; (iv) all references to any period of days shall be deemed to be to the relevant number of calendar days unless otherwise provided; and (v) all references herein to "$" or dollars shall refer to United States dollars, unless otherwise provided.

(b)    The Parties hereby acknowledge that each Party and its counsel have reviewed and revised this Agreement and that no rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall be employed in the interpretation of this Agreement (including all of the Exhibits and Addenda) or any amendments hereto or thereto.

Section 3.2    Headings. The Article and Section headings contained in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

Section 3.3    Notices. All notices, requests, claims, demands and other communications required or permitted to be given to any Party under this Agreement shall be in writing and any such notice, demand or other communication shall be deemed to have been duly given when delivered by email (provided confirmation of email receipt is obtained), hand, courier or overnight delivery service or, if mailed, two (2) Business Days after deposit in the mail and sent certified or registered mail, return

receipt requested and with first-class postage prepaid, or in the case of facsimile notice, when sent and transmission is confirmed, and, regardless of method, addressed to the Party at its address or facsimile number set forth below (or at such other address or facsimile number as the Party shall furnish the other Party in accordance with this Section 3.2):

(a)    If to Buyer:

QMax Acquisition Corp.
c/o Palladium Equity Partners
1270 Avenue of the Americas, Suite 31
New York, NY 10020
Attention: Caleb Clark and Scott Kirschner
Email: cclark@palladiumequity.com /
skirschner@palladiumequity.com

With a copy to:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attention: Matthew Hinker, Esq. / David
Schultz, Esq.
Email: nmitchell@omm.com / mhinker@omm.com /
dschultz@omm.com

(b)    If to Q'Max:

Christopher R. Murray, in his capacity as Chapter 7 Trustee for the Bankruptcy
Estate of Q'Max America Inc. and Anchor Drilling Fluids USA, LLC
Jones Murray & Beatty LLP
4119 Montrose Blvd, Suite 230
Houston, TX 77006
Email: christopher.murray@jmbllp.com

And to:

KPMG Inc., in its capacity as receiver of Q'Max Solutions Inc.
Bay Adelaide Centre
333 Bay Street, Suite 4600
Toronto, ON M5H 2S5
Attention: Anamika Gadia
Email: agadia@kpmg.ca

With a copy to:

Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C.
1200 Smith Street, Suite 1400
Houston, TX 77002-4310
Attention: Jarrod Martin
Email: jarrod.martin@chamberlainlaw.com

And with a copy to:

Osler, Hoskin & Harcourt LLP
225 6th Avenue, Suite 2700
Calgary, AB T2P 1N2
Attention: Justin Sherman
Email: jsherman@osler.com

Section 3.4    Governing Law. This Agreement and all claims arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without regard to the conflicts of law principles that would result in the application of any Law other than the Law of the State of Delaware.

Section 3.5    Entire Agreement. This Agreement, together with the APA and all Schedules, Exhibits and Addenda hereto and thereto and the Original Agreement and all Schedules, Exhibits and Addenda hereto and thereto, embody the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior written, oral or implied understandings among the Parties with respect to such matters.

Section 3.6    Amendment, Modification and Waiver. No amendment to this Agreement shall be effective unless it shall be in writing and signed by all Parties. Any failure of a Party to comply with any obligation, covenant, agreement or condition contained in this Agreement may be waived by the Party entitled to the benefits thereof only by a written instrument duly executed and delivered by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure of compliance.

Section 3.7    Severability. If any provision of this Agreement, or the application of any such provision, is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, or invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable Law, the Parties waive any provision of Law that renders any provision of this Agreement invalid, illegal or unenforceable in any respect. The Parties shall, to the extent lawful and practicable, use commercially reasonable efforts to enter into arrangements to reinstate the intended benefits, net of the intended burdens, of any such provision held invalid, illegal or unenforceable.

Section 3.8    Successors and Assigns; No Third Party Beneficiaries. Subject to the terms of this Section 3.7, this Agreement and all its provisions shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. Nothing in this Agreement, whether express or implied, will confer on any Person, other than the Parties or their respective permitted successors and assigns, any rights, remedies or liabilities; provided that the provisions of ARTICLE VII of the Original Agreement will continue to inure to the benefit of the indemnified parties.

Section 3.9    Assignment. No Party may assign this Agreement or its rights or obligations under this Agreement without the prior written consent of the other Party and any purported assignment without such consent shall be void.

Section 3.10    Expenses. Except as otherwise expressly stated in this Agreement, any costs, expenses, or charges incurred by any of the Parties shall be borne by the Party incurring such cost, expense or charge whether or not the transactions contemplated by this Agreement shall be consummated.

Section 3.11    Counterparts. This Agreement may be executed by the Parties in two or more counterparts which may be delivered by facsimile or other electronic transmission. Each counterpart when so executed and delivered shall be deemed an original, and all such counterparts taken together shall constitute one and the same instrument.

[*The remainder of this page has been intentionally left blank. Signature page follows.*]

**READ THE FOREGOING DOCUMENT CAREFULLY. IT INCLUDES A RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed the day and year first above written.

QMAX ACQUISITION CORP.

By: _____
   Name: Caleb Clark
   Title: Chief Executive Officer


PARAGON INTEGRATED SERVICES GROUP, LLC
F/K/A DRILLING SERVICES, LLC

By: _____
   Name: Caleb Clark
   Title: Chief Executive Officer


CHRISTOPHER R. MURRAY, SOLELY IN HIS
CAPACITY AS CHAPTER 7 TRUSTEE FOR THE
BANKRUPTCY ESTATE OF Q'MAX AMERICA INC.
AND ANCHOR DRILLING FLUIDS USA, LLC


By: _____
   Name: Christopher Murray
   Title: Trustee


KPMG INC., SOLELY IN ITS CAPACITY AS
RECEIVER FOR Q'MAX SOLUTIONS INC. AND
NOT IN ITS PERSONAL OR CORPORATE
CAPACITY


By: _____
   Name: Anamika Gadia
   Title: Senior Vice-President


*Signature Page to Termination and Release Agreement Regarding Q'Max Transition Services Agreement*

**READ THE FOREGOING DOCUMENT CAREFULLY. IT INCLUDES A RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed the day and year first above written.

QMAX ACQUISITION CORP.

By: _____
    Name: Caleb Clark
    Title: Chief Executive Officer

PARAGON INTEGRATED SERVICES GROUP, LLC
F/K/A DRILLING SERVICES, LLC

By: _____
    Name: Caleb Clark
    Title: Chief Executive Officer

CHRISTOPHER R. MURRAY, SOLELY IN HIS
CAPACITY AS CHAPTER 7 TRUSTEE FOR THE
BANKRUPTCY ESTATE OF Q'MAX AMERICA INC.
AND ANCHOR DRILLING FLUIDS USA, LLC

By: _____
    Name: Christopher Murray
    Title: Trustee

KPMG INC., SOLELY IN ITS CAPACITY AS
RECEIVER FOR Q'MAX SOLUTIONS INC. AND
NOT IN ITS PERSONAL OR CORPORATE
CAPACITY

By: _____
    Name: Anamika Gadia
    Title: Senior Vice-President

*Signature Page to Termination and Release Agreement Regarding Q'Max Transition Services Agreement*

## **EXHIBIT A**

### **Purchased Assets**

1. Exhibit A-1 is attached hereto and incorporated herein by this reference.

2. Exhibit A-2 is attached hereto and incorporated herein by this reference.

**EXHIBIT A-1**

SCHEDULE 1.1(b)

EXCLUDED INVENTORY

| Resource group | Resource | Product name | Size | Site | Warehouse | Warehouse name | Carrying Value (USD) |
|---|---|---|---|---|---|---|---|
| CHEMICAL | QM00537 | OIL BASE MUD | BBL | USNOR | PDF1007348 | CECELIA SE WEL JF #6 H_DF | (184,184.97) |
| CHEMICAL | QM00537 | OIL BASE MUD | BBL | USNOR | PDF1007968 | THREE DADS RCH BL#4H_DF | (16,451.70) |
| CHEMICAL | QM00537 | OIL BASE MUD | BBL | USNOR | PDF1007969 | MCMAHON #9H_DF | (14,133.41) |
| CHEMICAL | QM00537 | OIL BASE MUD | BBL | USNOR | TWUSNORDF | INTERNAL TRANSIT WAREHOUSE NOR DF | 311,945.28 |
| CHEMICAL | QM00537 | OIL BASE MUD | BBL | USNOR | WUSNOR01 | HORSEHEADS WAREHOUSE | 101,937.22 |
| CHEMICAL | QM00537 | OIL BASE MUD | BBL | USNOR | WUSNOR03 | WELLSVILLE MUD PLANT | 537,167.21 |
| CHEMICAL | QM00792 | SYNTHETIC BASE MUD | BBL | USNOR | TWUSNORDF | INTERNAL TRANSIT WAREHOUSE NOR DF | 193,482.95 |
| CHEMICAL | QM00792 | SYNTHETIC BASE MUD | BBL | USNOR | WUSNOR01 | HORSEHEADS WAREHOUSE | 94,114.20 |
| CHEMICAL | QM00792 | SYNTHETIC BASE MUD | BBL | USNOR | WUSNOR02 | LEETSDALE PLANT | 1,076,147.05 |
| CHEMICAL | QM00792 | SYNTHETIC BASE MUD | BBL | USNOR | WUSNOR03 | WELLSVILLE MUD PLANT | 553,027.30 |

OMM_US:78480126.2
3750939 8

**EXHIBIT A-2**

| Count | Fixed Asset # | Name | Transfer Category | Description | From: Location | To: Location | Quantity | Original Cost | Net Book Value | Date Moved | Source of Knowledge |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | F2500000028 | LABORATORY MIXER | Lab Equipment | SILVERSON INV#B0906 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $5,854.50 | – | 05/11/20 | Inspection of Equipment; Transfer Sheet |
| 2 | F2500000031 | RHEOMETER | Lab Equipment | FANN INSTRUMENT INV#95017385 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $243,462.11 | – | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 3 | F2500000034 | LAB VISCOMETER | Lab Equipment | INV# JDI1561 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $3,564.23 | $1,811.93 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 4 | F2500000035 | PARTICLE SIZE ANALYZER | Lab Equipment | INV#1095047786 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $94,612.93 | $48,094.97 | 05/11/20 | Inspection of Equipment; Transfer Sheet |
| 5 | F2500000036 | VISCOMETER | Lab Equipment | INV# IDG11580D1 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $4,471.00 | $2,272.66 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 6 | F2500000037 | FRONTIER KIT | Lab Equipment | INV #6638, 8353 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $10,483.65 | $5,504.13 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 7 | F2500000038 | FRONTIER KIT | Lab Equipment | INV #6638, 8353 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $10,483.65 | $5,504.13 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 8 | F2500000039 | FRONTIER KIT | Lab Equipment | INV #6638, 8353 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $10,483.65 | $5,504.13 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 9 | F2500000040 | FRONTIER KIT | Lab Equipment | INV #6638, 8353 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $13,532.11 | $7,104.22 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 10 | F2500000041 | CENTRIFUGE | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $2,400.00 | $1,260.00 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 11 | F2500000042 | SWELL METER | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $35,981.80 | $18,890.35 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 12 | F2500000044 | CAPILLARY SUCTION TIMER | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $3,546.96 | $1,862.04 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 13 | F2500000047 | VISCOMETER | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $4,471.33 | $2,347.51 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 14 | F2500000048 | VISCOMETER | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $4,471.33 | $2,347.51 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 15 | F2500000049 | VISCOMETER | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $4,471.33 | $2,347.51 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 16 | F2500000051 | RETORT KIT | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $2,046.33 | $1,074.48 | 05/11/20 | Inspection of Equipment; Transfer Sheet |
| 17 | F2500000052 | RETORT KIT | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $2,046.33 | $1,074.48 | 05/11/20 | Inspection of Equipment; Transfer Sheet |
| 18 | F2500000056 | PARTICLE PLUGGING APPARATUS | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $7,160.86 | $3,759.67 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 19 | F2500000060 | AGING CELLS | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $3,498.00 | $1,836.45 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 20 | F2500000061 | ROLLER OVEN | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $7,703.29 | $4,044.46 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 21 | F2500000062 | AGING CELLS | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $3,498.00 | $1,836.45 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 22 | F2500000064 | AGING CELLS | Lab Equipment | OFITE INV #6658 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $3,498.00 | $1,836.45 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 23 | F2500000068 | DYNAMIC FILTRATION | Lab Equipment | OFITE INV #7125 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $28,950.00 | $15,198.75 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 24 | F2500000071 | SPECTROPHOMETER | Lab Equipment | INV# 40288712 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $24,233.54 | $12,722.39 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 25 | F2500000075 | MINIFLASH FLP | Lab Equipment | PETROLAB INV#11182 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $18,868.00 | $9,905.89 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 26 | F2500000077 | VISCOMETER | Lab Equipment | OFITE INV #7733 | CTC Laboratory Houston | TBD NORTHEAST | 1 | $3,369.64 | $1,825.24 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 27 | F2500000078 | VISCOMETER | Lab Equipment | THERMO CUP, PRESSURING UNIT, ETC | CTC Laboratory Houston | TBD NORTHEAST | 1 | $24,788.65 | $11,361.60 | 05/19/20 | Inspection of Equipment; Transfer Sheet |
| 28 | F2520000834 | COMP_EQUIP.PANELVFD.480V-60HZ | Equipment Transfers | PCP-09-16 | LEOPARD UNIT 5A61 #61H_SC | CHARLES JAMISON MSH 8H_SC | 1 | $0.01 | $0.01 | 05/28/20 | A/X Equipment Transfer Log |
| 29 | F2520002323 | CENTRIFUGE.BIGBOWL. | Equipment Transfers | T-C-08 | MIDLAND SOLIDS CONTROL | BERNARD MCCULLEY WAS 1H_! | 1 | $125,000.00 | $52,083.45 | 07/03/20 | A/X Equipment Transfer Log |
| 30 | F2520002325 | COMP_EQUIP.PANELVFD.480V-60HZ | Equipment Transfers | TERRA/V | MIDLAND SOLIDS CONTROL | BERNARD MCCULLEY WAS 1H_! | 1 | $0.01 | $0.01 | 07/03/20 | A/X Equipment Transfer Log |
| 31 | F2520002340 | CENTRIFUGE.BIGBOWL. | Equipment Transfers | T-C-10 | MIDLAND SOLIDS CONTROL | CHARLES JAMISON MSH 8H_SC | 1 | $105,000.00 | $43,750.00 | 05/28/20 | A/X Equipment Transfer Log |
| 32 | F2520001204 | CENTRIFUGE.BIGBOWL. | Equipment Transfers | SOS CF 31 | MIDLAND SOLIDS CONTROL | FRY GAMBLE 10BH_SC | 1 | $195,000.00 | $134,062.50 | 06/01/20 | A/X Equipment Transfer Log |
| 33 | F2520004960 | COMP_EQUIP.ELECTRIC.PANEL | Equipment Transfers | (blank) | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $0.01 | $0.01 | 06/01/20 | A/X Equipment Transfer Log |
| 34 | F2520000762 | COMP_EQUIP.PRESSURE.WASHER | Equipment Transfers | TERRA/EPW-18 | CHICKASHA WAREHOUSE | NEWCOMERSTOWN | 1 | $3,800.00 | $2,929.24 | 05/05/20 | A/X Equipment Transfer Log |
| 35 | F2520000077 | COMP_EQUIP.CENTRIFUGE STAND.ADJUSTABLE | Equipment Transfers | (blank) | MIDLAND SOLIDS CONTROL | NEWCOMERSTOWN | 1 | $20,709.46 | $13,806.42 | 05/06/20 | A/X Equipment Transfer Log |
| 36 | F2520001097 | PUMP.CENTRIFUGAL. | Equipment Transfers | (blank) | MIDLAND SOLIDS CONTROL | NEWCOMERSTOWN | 1 | $5,000.00 | $3,125.12 | 05/06/20 | A/X Equipment Transfer Log |
| 37 | F2520001479 | CENTRIFUGE.BIGBOWL. | Equipment Transfers | TERRA/BBC-05 | MIDLAND SOLIDS CONTROL | NEWCOMERSTOWN | 1 | $46,000.00 | $35,458.26 | 05/06/20 | A/X Equipment Transfer Log |
| 38 | F2520001481 | COMP_EQUIP.PANELVFD.480V-60HZ | Equipment Transfers | TERRA/BBCVFD-05 | MIDLAND SOLIDS CONTROL | NEWCOMERSTOWN | 1 | $40,000.00 | $30,833.26 | 05/06/20 | A/X Equipment Transfer Log |
| 39 | F2520000512 | COMP_EQUIP.PRESSURE.WASHER | Equipment Transfers | TERRA/EPW-39 | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $3,800.00 | $2,929.24 | 05/05/20 | A/X Equipment Transfer Log |
| 40 | F2520000801 | CENTRIFUGE.BIGBOWL. | Equipment Transfers | PC-18-16 | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $1,440.00 | $456.00 | 05/05/20 | A/X Equipment Transfer Log |
| 41 | F2520000805 | COMP_EQUIP.PANELVFD.480V-60HZ | Equipment Transfers | PCP-06-16 | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $40,000.00 | $22,916.53 | 05/05/20 | A/X Equipment Transfer Log |
| 42 | F2520002522 | CENTRIFUGE.BIGBOWL. | Equipment Transfers | PC-25-16 | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $199,000.00 | $126,447.80 | 05/05/20 | A/X Equipment Transfer Log |
| 43 | F2520002544 | COMP_EQUIP.PANELVFD.480V-60HZ | Equipment Transfers | (blank) | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $0.01 | $0.01 | 05/05/20 | A/X Equipment Transfer Log |
| 44 | F2520000519 | PUMP.CENTRIFUGAL. | Equipment Transfers | SOSCFP119 | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $3,026.78 | $2,080.88 | 05/07/20 | A/X Equipment Transfer Log |
| 45 | F2520002540 | PUMP.CENTRIFUGAL. | Equipment Transfers | (blank) | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $5,126.78 | $3,524.78 | 05/07/20 | A/X Equipment Transfer Log |
| 46 | F2520002578 | COMP_EQUIP.PANELVFD.480V-60HZ | Equipment Transfers | (blank) | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $0.01 | $0.01 | 05/07/20 | A/X Equipment Transfer Log |
| 47 | F2520002579 | PUMP.CENTRIFUGAL. | Equipment Transfers | (blank) | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $5,126.78 | $3,524.78 | 05/07/20 | A/X Equipment Transfer Log |
| 48 | F2520002592 | COMP_EQUIP.PANELVFD.480V-60HZ | Equipment Transfers | PCP-16-16 | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $24,000.00 | $16,750.00 | 05/07/20 | A/X Equipment Transfer Log |
| 49 | F2520003905 | CENTRIFUGE.BIGBOWL. | Equipment Transfers | PC-16-16 | THREE RIVERS WAREHOUSE | NEWCOMERSTOWN | 1 | $213,394.00 | $85,333.48 | 05/07/20 | A/X Equipment Transfer Log |
| 50 | F2520005968 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $2,800.00 | $1,924.90 | 06/28/20 | A/X Invoice Investigation |
| 51 | F2520005980 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $6,250.00 | $4,297.00 | 06/28/20 | A/X Invoice Investigation |
| 52 | F2520005981 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $6,250.00 | $4,297.00 | 06/28/20 | A/X Invoice Investigation |
| 53 | F2520005983 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $6,250.00 | $4,297.00 | 06/28/20 | A/X Invoice Investigation |
| 54 | F2520005984 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $6,250.00 | $4,297.00 | 06/28/20 | A/X Invoice Investigation |
| 55 | F2520005989 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $6,500.00 | $4,468.70 | 06/28/20 | A/X Invoice Investigation |
| 56 | F2520005990 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $6,500.00 | $4,468.70 | 06/28/20 | A/X Invoice Investigation |
| 57 | F2520006070 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $8,500.00 | $5,843.80 | 06/28/20 | A/X Invoice Investigation |
| 58 | F2520006071 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $8,500.00 | $5,843.80 | 06/28/20 | A/X Invoice Investigation |
| 59 | F2520006347 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $16,000.00 | $10,999.90 | 06/28/20 | A/X Invoice Investigation |
| 60 | F2520006088 | TANK.STORAGE.400 BBLS | Equipment Transfers | /400 BBLS | NORGE WAREHOUSE | HORSEHEADS WAREHOUSE | 1 | $8,750.00 | $6,015.50 | 06/28/20 | A/X Invoice Investigation |

Total Value   $1,699,865.07   $808,092.49

## EXHIBIT B

## BILL OF SALE

THIS BILL OF SALE (this "**Bill of Sale**") is made and entered into as of _____, 2022 (the "**Effective Date**"), by and among Christopher R. Murray, Chapter 7 Trustee for the bankruptcy estate of Q'Max America Inc., a company incorporated under the laws of Delaware ("**Q'Max**"), Christopher R. Murray, Chapter 7 Trustee for the bankruptcy estate of Anchor Drilling Fluids USA, LLC, a Delaware limited liability company ("**Anchor Drilling**" and, together with Q'Max (or, as applicable, Christopher R. Murray, Chapter 7 Trustee (the "**Trustee**") acting on behalf of Anchor Drilling and/or Q'Max), collectively, "**Sellers**"), and Paragon Integrated Services Group, LLC f/k/a Drilling Services, LLC, a Delaware corporation ("**Buyer**"). Sellers and Buyer are each a "**party**" and together are "**parties**" to this Bill of Sale.

WHEREAS, Sellers have agreed to sell, transfer, convey, assign and deliver to Buyer all right, title and interest in and to the assets listed on **Appendix A** attached hereto and made a part hereof (collectively, the "**Assets**"); and

WHEREAS, this Bill of Sale is being executed and delivered in order to effect the sale of the Assets to Buyer as approved by Order No._____ entered in Case No. 20-60030-CML in *Re: Q'Max America, Inc., et al, Debtors, in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division* pursuant to title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "**Bankruptcy Code**").

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     **Sale of Assets.** Sellers do hereby sell, transfer, convey, assign and deliver to Buyer, and Buyer hereby purchases, all of Sellers' right, title and interests in and to the Assets, free and clear of all liens, claims, interests and encumbrances, in exchange for an aggregate purchase price of $100,000 in cash. Buyer agrees to pay Sellers such purchase price simultaneously with the execution of this Bill of Sale in cash by wire transfer of immediately available funds to an account designated by Sellers or by delivery of a cashier's check. Notwithstanding the foregoing, upon the mutual agreement of the parties, Sellers and Buyer shall each have the right to offset any balance or amounts due from one party to the other under the terms of this Agreement and that certain Termination and Release Agreement Regarding Q'Max Transition Services Agreement, dated _____, 2022, by and among the parties hereto. **Buyer purchases the Assets from Sellers AS-IS, WHERE-IS and WITH ALL FAULTS. Buyer will be solely responsible for any and all taxes, transfer fees, or any other charges or expenses of any nature to transfer title of the Assets to Buyer, including but not limited to sales and use taxes. Should Buyer believe the transaction is not subject to sales and use tax, it is Buyer's responsibility to provide Sellers with the requisite exemption certificate.**

2.     **Disclaimer of Warranties.   SELLERS AND THE TRUSTEE MAKE NO REPRESENTATION OR WARRANTY WHATSOEVER WITH RESPECT TO THE ASSETS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE. BY ACCEPTING THIS BILL OF SALE, BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR**

WARRANTY MADE BY ANY SELLER OR THE TRUSTEE, OR ANY OTHER PERSON ON SELLERS' OR THE TRUSTEE'S BEHALF.

**3.**    **Choice of Law.**  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Bill of Sale shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the laws of the State of Texas, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.  The United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") shall retain exclusive jurisdiction to enforce the terms of this Bill of Sale and to decide any claims or disputes which may arise or result from, or be connected with, this Bill of Sale, any breach or default hereunder, or the transactions contemplated hereunder, and any and all litigation, claims or proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby irrevocably and unconditionally consent to, attorn to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court.

**4.**    **Third Party Beneficiaries.**  This Bill of Sale shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and assigns and nothing herein, express or implied, is intended to or shall confer upon any other party hereto any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Bill of Sale.

**5.**    **Counterparts.**  This Bill of Sale may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument. A signed copy of this Bill of Sale delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

**6.**    **Entire Agreement; Amendments and Waivers.**  This Bill of Sale may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only in writing by Buyer and Sellers (which may be by way of e-mail), or in the case of a waiver, by the party waiving compliance.  No waiver of any of the provisions of this Bill of Sale shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be duly executed as of the day and year first written above.

**BUYER:**

PARAGON INTEGRATED SERVICES GROUP, LLC F/K/A DRILLING SERVICES, LLC

By: _____

Name: Caleb Clark
Title:  Chief Executive Officer

**SELLERS:**

CHRISTOPHER R. MURRAY, SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF Q'MAX AMERICA INC. AND ANCHOR DRILLING FLUIDS USA, LLC

By:_____
        Christopher R. Murray
        Trustee

*Signature Page to Bill of Sale*

# APPENDIX A

## __Assets__

**EXHIBIT C**

**Dell Laptops**

| Tag# | Equipment Description | LastSAM | LastUPN | Buyout Amt |
|------|----------------------|---------|---------|-----------|
| 94VWDP2 | Dell Latitude 3590 BTX | jgodeaux | josh.godeaux@qmaxsolutions.com | $223.80 |
| 97NTXR2 | Dell Latitude 3590 BTX | cpeterson | cpeterson@anchorusa.com | $223.80 |
| H98WDP2 | Dell Latitude 3590 BTX | dowen | dowen@anchorusa.com | $223.80 |
| 3FSHHM2 | Dell Latitude 5480, BTX | bgreenway | bgreenway@qmaxsolutions.com | $240.70 |
| 6YFQHM2 | Dell Latitude 5480, BTX | MAGonzalez | maria.gonzalez2@qmaxsolutions.com | $240.70 |
| G9ZHHM2 | Dell Latitude 5480, BTX | sandra.reid | sandra.reid@qmaxsolutions.com | $240.70 |
| 521VLQ2 | Dell Latitude 5490 CTO | DDenney | dustin.denney@qmaxsolutions.com | $329.60 |
| 6CRWQQ2 | Dell Latitude 5490 CTO | jrivera | jocelyn.rivera@qmaxsolutions.com | $329.60 |
| 9R3RQQ2 | Dell Latitude 5490 CTO | DDenney | dustin.denney@qmaxsolutions.com | $223.80 |
| 74MZTT2 | Dell Latitude 5490 XCTO | atorres | atorres@anchorusa.com | $329.60 |
| CN10VT2 | Dell Latitude 5490 XCTO | ALapham | adria.lapham@qmaxsolutions.com | $329.60 |
| 18Y8ZM2 | Dell Latitude 5580 XCTO | rmurray | rmurray@qmaxsolutions.com | $318.40 |
| 1XG01N2 | Dell Latitude 5580 XCTO | derrick.williams | derrick.williams@qmaxsolutions.com | $318.40 |
| 51GY0N2 | Dell Latitude 5580 XCTO | dharriso | david.harrison@qmaxsolutions.com | $318.40 |
| 5YHG7S2 | Dell Latitude 5590 CTO | TMcCormick | tmccormick@anchorusa.com | $195.00 |
| CBYPQQ2 | Dell Latitude 5590 CTO | jcato | jcato@qmaxsolutions.com | $195.00 |
| 1LVRST2 | Dell Latitude 5590 XCTO | MKaronka | mkaronka@anchorusa.com | $195.00 |
| D9HY7H2 | Dell Latitude 7280 | crivers | chris.rivers@qmaxsolutions.com | $306.80 |
| 13HTSQ2 | Dell Latitude 7290 | achurch | alex.church@qmaxsolutions.com | $280.50 |
| 91HTSQ2 | Dell Latitude 7290 | GRivas | guido.rivas@qmaxsolutions.com | $280.50 |
| 8VMVLH2 | Dell Latitude E5470 XCTO | mtrebilcock | mauricio.trebilcock@qmaxsolutions.com | $231.80 |
| CRFXNH2 | Dell Latitude E5470 XCTO | JRedmon | jeff.redmon@qmaxsolutions.com | $231.80 |
| 38XRWF2 | Dell Latitude E5470, BTX | ksethura | kesavan.sethuraman@qmaxsolutions.com | $231.80 |
| 53BQLH2 | Dell Latitude E5570 XCTO | kkeltner | kkeltner@anchorusa.com | $318.40 |
| 7VFVNH2 | Dell Latitude E5570 XCTO | sbrown | shawn.brown@qmaxsolutions.com | $318.40 |
| 2GPW2G2 | Dell Latitude E5570, BTX | RCook | ryan.cook@qmaxsolutions.com | $318.40 |
| 5D7X2G2 | Dell Latitude E5570, BTX | fsjodin | fredrik.sjodin@qmaxsolutions.com | $318.40 |
| BFNS2G2 | Dell Latitude E5570, BTX | CRoman | chris.roman@qmaxsolutions.com | $318.40 |
| FJ8SVF2 | Dell Latitude E5570, BTX | tony.faulkenberry | tony.faulkenberry2@qmaxsolutions.com | $318.40 |
| 9S3XNV2 | Mobile Precision 3530 XCTO BASE | bhilliard | brad.hilliard@qmaxsolutions.com | $356.10 |
| 6PF77P2 | OptiPlex 3050 Small Form Factor BTX | KErickson | kenneth.erickson@qmaxsolutions.com | $181.90 |
| 701B7P2 | OptiPlex 3050 Small Form Factor BTX | tmccormick | tmccormick@anchorusa.com | $181.90 |
| 8QKGMN2 | OptiPlex 3050 Small Form Factor BTX | DDenney | dustin.denney@qmaxsolutions.com | $181.90 |
| 3QK6BT2 | OptiPlex 3060 SFF XCTO | agreene | agreene@anchorusa.com | $197.00 |

| 3QL3BT2 | OptiPlex 3060 SFF XCTO | atorres | atorres@anchorusa.com | $197.00 |
| 3QM5BT2 | OptiPlex 3060 SFF XCTO | lluna | lluna@anchorusa.com | $197.00 |
| 3YWQHQ2 | OptiPlex 3060 SFF XCTO | CRoman | chris.roman@qmaxsolutions.com | $197.00 |
| C4QKRQ2 | Dell Latitude 5591 XCTO | brian.coe | brian.coe@qmaxsolutions.com | $197.00 |
|  |  |  |  | $9,836.30 |

**EXHIBIT D**

**Prior License**

**Exclusive License Agreement**

This Exclusive License Agreement is between Q'Max Solutions Inc. (**"QSI"**) and Q'Max America Inc. (**"Licensee"**).

1.     **LICENSE AND PAYMENT**

1.1     **License**. QSI hereby grants Licensee a worldwide, perpetual (unless terminated under section 1.6), and non-transferable (except to a permitted assignee of this agreement under section 2.5) license under all Intellectual Property Rights owned by QSI to exploit such Intellectual Property Rights in the Territory in any manner, including to: (1) use, make, have made, sell, offer for sale, and import any invention or article, (2) practice any method or process, and (3) use, reproduce, create derivative works of, distribute, publicly perform, and publicly display any work of authorship. Licensee may sublicense to third parties the licenses granted in this section 1.1. This license is exclusive (even as to QSI) in the Territory. Licensee shall not exercise the license granted in this section 1.1 outside the Territory or permit or authorize any sublicensee to do so. QSI shall use commercially reasonable efforts to prosecute and maintain any Intellectual Property Rights included in this license that are subject to any registration or application with a governmental entity.

1.2     **Delivery**. Within a reasonable time following the date of this agreement, QSI shall deliver to Licensee a copy of the tangible embodiments of the copyrights, trade secrets, and know-how included in the licensed Intellectual Property Rights, including any works of authorship and the Licensed Software in source and object code forms, but excluding any non-technology-related records. During the first six months of this agreement, QSI shall make available to Licensee its Rackspace-hosted server and Licensee may make a copy of the Licensed Software made available on that server.

1.3     **Trademarks**. Licensee shall use the Trademarks included in the licensed Intellectual Property Rights in a manner consistent with the quality standards and trademark usage practices followed by QSI prior to the grant of the license in this agreement.

1.4     **Maintenance Services**. During the first six months of this agreement, QSI shall deliver to Licensee all updates, upgrades, new versions, error corrections, or bug fixes for the Licensed Software created by QSI.

1.5     **Payment and Expenses**. No later than 30 days following the end of each month during the first five years of this agreement, Licensee shall pay QSI $2500 in U.S. dollars.

1.6     **Term and Termination**. This agreement begins on the Effective Date and continues until terminated under this section 1.6. QSI may only terminate this agreement if Licensee does not pay QSI the amounts in section 1.5 when they are due and such failure to pay continues for more than 60 days after QSI has provided Licensee with notice of nonpayment. Termination of this agreement shall also terminate any sublicenses.

1.7 **Disclaimer. The licensed Intellectual Property Rights and any tangible embodiments provided to Licensee are provided "AS IS" and QSI does not make any representations or warranties to Licensee with respect to such Intellectual Property Rights or tangible embodiments, whether express or implied, by statute, usage, trade custom, or otherwise. QSI does not guarantee or warrant that the Licensed Software will be secure or free of defects or meet Licensee's requirements.**

1.8 **Definitions**. As used in this agreement, the following definitions apply:

    (a) **"Intellectual Property Rights"** means common law and statutory rights recognized in any jurisdiction in the world, in, to, or associated with: (1) patents, patent applications, and invention disclosures; (2) copyrights, copyright registrations and applications, and mask work rights; (3) the protection of trade or industrial secrets or confidential information; (4) trademarks, service marks, and other designations of source or origin (collectively, **"Trademarks"**); (5) industrial designs; (6) databases and data collections; (7) all other intellectual property rights and proprietary rights; (8) for any items described in (1) through (7) above, any divisions, continuations, continuations-in-part, counterparts, re-examinations, post-grant reviews, inter parties reviews, supplemental examinations, provisionals, renewals, reissuances, extensions, and rights to apply for, file for, certify, register, record, or perfect; or (9) rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," or "droit moral."

    (b) **"Licensed Software"** means the MAXSITE suite of software of engineering applications, including any updates, upgrades, new versions, error corrections, or bug fixes and any data associated or used with such software.

    (c) **"Territory"** means the United States, including any of its territories.

## 2. MISCELLANEOUS

2.1 **Governing Law**. New York law governs all adversarial proceedings arising out of this agreement.

2.2 **Exclusive Jurisdiction**. Any adversarial proceeding arising out of this agreement shall be brought exclusively in the state and federal courts located in New York.

2.3 **Severability**. The parties acknowledge that if a dispute between the parties arises out of this agreement or the subject matter of this agreement, they would want the court to interpret this agreement as follows: (1) with respect to any provision that it holds to be unenforceable, by modifying that provision to the minimum extent necessary to make it enforceable or, if that modification is not permitted by law, by disregarding that provision; (2) if an unenforceable provision is modified or disregarded in accordance with this section 2.3, by holding that the rest of the agreement will remain in effect as

written; (3) by holding that any unenforceable provision will remain as written in any circumstances other than those in which the provision is held to be unenforceable; and (4) if modifying or disregarding the unenforceable provision would result in failure of an essential purpose of this agreement, by holding the entire agreement unenforceable.

2.4     **Waiver**. No waiver of satisfaction of a condition or nonperformance of an obligation under this agreement will be effective unless it is in writing and signed by the party granting the waiver.

2.5     **Assignment**. Upon notice to QSI, Licensee may assign this agreement in its entirety to a third party.

2.6     **Amendment**. No modification of this agreement will be effective unless it is in writing and signed by the parties.

2.7     **Notices**. For a notice of other communication under this agreement to be valid, it must be in writing and delivered (1) by hand, (2) by a national transportation company (with all fees prepaid), (3) by fax, (4) by registered or certified mail, return receipt requested and postage prepaid, or (5) by email, when directed to the email address below. A valid notice or other communication under this agreement via the methods (1) through (4) above will be effective when received by the party to which it is addressed and if via email, when receipt is confirmed by a non-automated response. If the party to which it is addressed rejects or otherwise refuses to accept it, or if it cannot be delivered because of a change in address for which no notice was given, the notice or communication will be deemed received upon that rejection, refusal, or inability to deliver. Notices or other communications to a party must be addressed using the information specified below for that party or any other information specified by that party in a notice under this section 2.7.

| QSI Notice: | Licensee Notice: |
|---|---|
| Rafael Diaz-Granados | Chris Pennington |
| President & CEO | US Vice President |
| 11700 Katy Freeway, Suite 200 | 11700 Katy Freeway, Suite 200 |
| Houston, Texas 77079 | Houston, Texas 77079 |
| Email: RADG@qmax.com | Email: CPennington@AnchorUSA.com |

2.8     **Entire Agreement**. This agreement constitutes the entire agreement between the parties relating to its subject matter, and supersedes all prior or contemporaneous discussions, or presentations and proposals, written or oral relating to such subject matter.

2.9     **Effectiveness and Date**. This agreement will become effective when all parties have signed it. Each party is signing this agreement on the date stated opposite that party's signature. The date of this agreement will be the date this agreement is signed by the last party to sign it (as indicated by the date associated with that party's signature) (the "**Effective Date**"). If a party signs this agreement but fails to date their signature, the

3

date the other party receives the signing party's signature will be deemed to be the date the signing party signed this agreement.

**Q'MAX SOLUTIONS INC.**

Date: May 22, 2020

By: _____

Name: Rafael Diaz-Granados

Title: President & CEO

**Q'MAX AMERICA INC.**

Date: May 22, 2020

By: _____

Name: Rafael Diaz-Granados

Title: President

4